# EXHIBIT-B

# TEXACO — GULF

# NAPO AGREEMENTS

# AND

# NAPO
# JOINT OPERATING
# AGREEMENT

## (ECUADOR)

## TABLE OF CONTENTS (Cont'd)

Page

III. NAPO JOINT OPERATING AGREEMENT Between Texaco Petroleum Company and Ecuadorian Gulf Oil Company, dated January 1, 1965 ........................ 29

Article 1   Definitions ........................ 31
Article 2   Term of Agreement ........................ 32
Article 3   Joint Area ........................ 32
Article 4   Participation ........................ 33
Article 5   Representatives of the Parties ........................ 34
Article 6   Operator ........................ 37
Article 7   Powers and Duties of Operator ........................ 39
Article 8   Programs and Budgets ........................ 42
Article 9   Defaults with Respect to Financing of Operation ........................ 44
Article 10   Sole Risk Programs ........................ 45
Article 11   Costs and Expenses ........................ 48
Article 12   Ownership of Property and Production ........................ 48
Article 13   Disposal of Production ........................ 48
Article 14   Delivery and Transportation ........................ 52
Article 15   Production Handling Facilities ........................ 53
Article 16   Assignment of Interests ........................ 55
Article 17   Release of Rights ........................ 56
Article 18   Relation of Parties ........................ 57
Article 19   Arbitration ........................ 58
Article 20   Division of Assets, Dissolution and Termination ........................ 58
Article 21   Laws and Regulations ........................ 59
Article 22   Force Majeure ........................ 60
Article 23   Interpretation ........................ 61
Article 24   Waivers ........................ 61
Article 25   Notices ........................ 61
Article 26   Succession ........................ 63

TEXACO-GULF

NAPO JOINT OPERATING AGREEMENT

(ECUADOR)

THIS AGREEMENT, made and entered into as of the 1st day of January, 1965, by and between TEXACO PETROLEUM COMPANY, a Delaware corporation, sometimes herein called "TEXACO", and ECUADORIAN GULF OIL COMPANY, a Delaware corporation, sometimes herein called "GULF" (a party individually and without distinction is referred to herein as "Party", and the parties collectively sometimes are referred to herein as "Parties");

WITNESSETH:

WHEREAS, Compañía Texaco de Petróleos del Ecuador, C. A., and Gulf Ecuatoriana de Petróleo, S.A. (hereinafter referred to collectively as "Concessionaires" and separately, without distinction, as "Concessionaire"), each own a 50% undivided interest in the hydrocarbons concession (hereinafter sometimes referred to as the "Napo Concession") by virtue of a contract with the Republic of Ecuador (hereinafter sometimes referred to as the "Concession Contract"), dated March 5, 1964, registered in the Office of the Minister - Judge of Mines on March 14, 1964, as authorized by Supreme Decree No. 205-A, issued in Quito, Ecuador, on February 5, 1964, and published in the Registro Oficial of Ecuador No. 186, dated February 21, 1964;

WHEREAS, by an agreement (hereinafter sometimes referred to as the "Texaco Napo Agreement") dated as of January 1, 1965, between TEXACO and Compañía Texaco de Petróleos del Ecuador, C. A., TEXACO agreed to make certain payments, incur certain expenditures and perform certain work relating to the operation of the Napo Concession and in return

29

was granted by said Concessionaire the right to take at the well-head 95% of said Concessionaire's share of the oil, gas and related hydrocarbons produced (after deduction of Government royalty taken in kind and production used in operations) from the area covered by the Napo Concession;

WHEREAS, by an agreement (hereinafter sometimes referred to as the "Gulf Napo Agreement") dated as of January 1, 1965, between GULF and Gulf Ecuatoriana de Petróleo, S. A., GULF agreed to make certain payments, incur certain expenditures and perform certain work relating to the operation of the Napo Concession, and in return was granted by said Concessionaire the right to take at the wellhead 95% of said Concessionaire's share of oil, gas and related hydrocarbons produced (after deduction of Government royalty taken in kind and production used in operations) from the area covered by the Napo Concession (the Texaco and Gulf Napo Agreements are hereinafter sometimes referred to collectively as "Napo Agreements" and separately, without distinction, as the "Napo Agreement"); and,

WHEREAS, the Parties desire (i) to carry out jointly their respective work obligations under the Napo Agreements in the Joint Area, as hereinafter defined, in an orderly and economic manner and to secure the mutual benefits to be afforded to the Parties, the Republic of Ecuador and the Concessionaires by reason of greater ultimate recovery, avoidance of waste, reduction of costs and greater efficiency through such a joint arrangement, and (ii) to provide for the separate disposition of the Parties' shares of production of oil, gas and other substances which may be obtained from the Joint Area on the basis of continuing competition between the Parties in the disposition thereof;

NOW, THEREFORE, in consideration of the premises and of the respective undertakings and obligations of the Parties, IT IS AGREED:

30

## Article 1

## DEFINITIONS

1.1 (a) "Gas" when used herein means hydrocarbons in the gaseous phase and all other gases as may be legally utilized.

(b) "Oil" when used herein means hydrocarbons in a liquid phase.

(c) A "barrel of oil" as herein used means 42 U.S. gallons net, after deduction of all basic sediment, water and other impurities, corrected for temperature to 60° F.

(d) An "affiliate" of a Party means, for the purpose of this Agreement, any corporation of which such Party is a direct or indirect subsidiary or a corporation which is a direct or indirect subsidiary of such Party, or a corporation which is a direct or indirect subsidiary of any corporation of which such Party is a direct or indirect subsidiary. One corporation is the subsidiary of another, for the purpose of this Agreement, when the latter directly or indirectly controls 51% or more of the voting stock of the former.

(e) An "agreed program" as herein used means any program adopted by the Representatives for the operation of the Joint Area or any other projected activity or desistance related to the operation mutually agreed upon by the Parties.

(f) The term "wellhead market value" when used herein (i) with relation to oil shall mean the weighted average price of sales to third parties during each calendar quarter at the deep water port served by pipeline from the Joint Area, less inland transportation and handling costs from the wellhead and (ii) with relation to gas shall mean the weighted average price of sales to third parties during each calendar quarter less transportation and handling costs from the wellhead and (iii) if the factors provided in (i) and (ii) for determining value of oil or

31

(¶ 1.1 (f) Cont.)

gas do not exist at any particular time, shall mean the value agreed by the Representatives, or failing such agreement, the matter will be referred to two reputable disinterested oil brokers, selected by the Representatives, and such brokers' agreed opinion or the average of their individual opinions shall be conclusive. In the event that more than one deep water port is served by pipeline from the Joint Area, the Parties shall agree upon a new method for determining wellhead market value under (i) above.

## Article 2
### TERM OF AGREEMENT

2.1 This Agreement shall be effective as of the 1st day of January, 1965, and, unless terminated by mutual agreement of the Parties or by dividing assets as provided in Article 20, shall endure so long as and to the extent that TEXACO and GULF have work obligations and rights to production within the Joint Area, and thereafter until all jointly-owned property and facilities shall have been disposed of and a final settlement made between the Parties.

## Article 3
### JOINT AREA

3.1 The term "Joint Area", as used herein, shall mean the aggregate of all areas within the Napo Concession, identified and outlined on "Attachment No. 1" hereof (including conversions, extensions, renewals, substitutions, revisions and reissuances thereof), in or with respect to which each of the Parties has or shall have work obligations and rights to production under the Napo Agreements and any extensions, renewals, substitutions or replacements thereof. Actions and work done and being carried out by the Parties jointly or for and on their joint behalf under the provisions of this Agreement are sometimes herein referred to as "Joint Operations".

## Article 4

## PARTICIPATIONS

4.1 The work obligations of the Parties under the Napo Agreements affecting the Joint Area, including exploration, development, maintenance and exploitation thereof, shall be carried out by the Parties jointly. All assets acquired for, in connection with or by reason of such joint operation, including well installations, shall be owned jointly by the Parties regardless of in whose name acquired and/or held. The production from the Joint Area to which the Parties shall be entitled under the Napo Agreements (hereinafter sometimes referred to as "Parties' shares of Production") and the costs of carrying out the aforesaid work obligations shall be shared equally by the Parties, or shared in such other proportions as may be hereafter established. A Party's share of participation, as it may exist at any particular time, is hereinafter referred to as its "percentage interest".

4.2 All work obligations and related expenditures for the Joint Area to which either of the Parties is subject under the Napo Agreements shall be for the joint account of the Parties according to their respective percentage interests, except that the cost of Government royalties and other obligations, the effects of which are determined by volume of production, shall be borne by the Parties according to their respective receipts of production delivered under the provisions of this Agreement.

4.3 A Party shall not use or allow others to use its respective share of production from the Joint Area in any manner which shall not be in conformity with the provisions of the Concession from the Republic of Ecuador covering the Joint Area nor with any Ecuadorian law or regulation nor with the Napo Agreements. Should an unauthorized use be made of a Party's share of production and such Party shall not promptly take all proper and necessary action to atone therefore, the other or the Operator, at the cost of and in the name and on behalf of such

33

(¶ 4.3 Cont.)

Party, may take such remedial action as it may deem proper and necessary.

## Article 5

### REPRESENTATIVES OF THE PARTIES

5.1  Each Party shall appoint a Representative and a First and Second Alternate. The First Alternate shall have full power to act in the absence of the Representative, and the Second Alternate shall have full power to act in the absence of both the Representative and First Alternate. Each Party shall notify the other of the names and addresses of its Representative and Alternates. The Representative and Alternate of a Party may be changed by such Party at any time and from time to time by notice in writing to the other Party. The Chairman of the Representatives shall be the Representative of the Party acting as the Operator. The initial Representatives and Alternates of the Parties shall be as follows:

|  | Representative | First Alternate | Second Alternate |
|---|---|---|---|
| TEXACO | R.B. Wheeler | E.E. Massimine | R.H. Martin |
| GULF | T.A. Kibby | R.W. Baldwin | L.C. Sass |

5.2  The powers and duties of the Representatives shall be to:

(a)  Receive from the Operator work programs and budgets and consider, reject, modify or approve the same;

(b)  Review agreed programs and budgets semi-annually and as requested by a Party as hereinafter provided, and modify, reject, or approve the same;

(c)  Establish policies and procedures;

34

(d)   Prescribe the manner, frequency and form in which customary operating records shall be kept and reports shall be made by the Operator, including any reports and statements provided under Article 7;

(e)   Appoint and maintain an Accounting Committee and a Reservoir Engineering Committee, and, if desired, appoint other committees for any other technical assistance they deem advisable (each Representative shall appoint one member to each such committee); and

(f)   In addition to the foregoing and within the provisions of this Agreement, decide all other matters pertaining to the operation of the Joint Area.

5.3   A Representative may submit in writing to the other any proposal concerning operations and expenditures not included in an agreed program of operation or budget. If approved, the Chairman shall give notice to the Operator in writing that such proposal or modified proposal is approved and the Operator shall proceed to carry on to completion the operation or make the expenditure so approved at the expense of the Parties, as elsewhere herein provided.

5.4   (a)   The Representatives shall meet for the purpose of deciding upon and reconsidering programs of operations and budgets, as provided in Article 8 hereof. The Chairman shall give at least seven days' prior notice of all meetings. An agenda shall accompany all notices of meetings.

(b)   When requested by a Representative the Chairman shall call a meeting of the Representatives to act upon any submitted proposal. Notice of the time, place and purpose of the meeting shall be given in writing to the Representatives at least seven days prior to the date of the meeting, unless such notice is waived.

35

(c)   The presence of Representative(s) or Alternate(s) representing a Party or Parties holding percentage interests aggregating at least 51% of total participation hereunder shall constitute a quorum.

(d)   The meetings of the Representatives shall be held in Quito, Ecuador, or at such other places as the Representative(s) of a Party or Parties holding a majority percentage interest shall determine.

(e)   The Representatives may be assisted at all meetings by any advisers they require.

· (f)   At any meeting of the Representatives, a vote of a majority of the percentage interest determined by the Parties' participations at the time of voting, shall be binding on the Parties as to any matter included in the agenda of which the Representatives have been notified, as hereinafter provided, as well as all other matters which the Representatives have unanimously agreed to consider at such meeting and, subject to the other terms and provisions of this Agreement, operations which have been so approved shall be conducted to completion at the expense of the Parties, as elsewhere herein provided. The vote of a Representative or Alternate shall be binding on his principal.

(g)   Written minutes of all regular and special meetings of the Representatives shall be kept. Such minutes of all meetings shall be approved before final adjournment and copies thereof shall be furnished to each Party by the Chairman.

5.5  In the absence of a meeting any act agreed to in writing by Representatives or Alternates of all the Parties shall be deemed to be approved by the Parties.

5.6  An assignment of a Party's interest in the Joint Area to third persons, as hereinafter provided, shall neither increase

36

(¶ 5.6 Cont.)

nor decrease the number of Representatives provided for in this Article 5. In the event one of the Parties hereto shall assign all of its interest in the Joint Area to a third person or persons, then the Assignee(s) in such transaction shall succeed to the Assignor's right to appoint a Representative and Alternates pursuant to paragraph 5.1 hereof. Prior to such appointment the Assignor's Representative shall be deemed the Representative of the Assignee(s). In the event of assignment of less than a Party's entire interest in the Joint Area, then the Assignor and Assignee(s) shall agree upon the method of appointment of a Representative and Alternates; and until the said Assignor and Assignee(s) shall reach such agreement, the Assignor's Representative shall act for both the Assignor and Assignee(s) and both shall be bound by his actions.

## Article 6
## OPERATOR

6.1 The Parties hereby designate TEXACO and TEXACO agrees to be the first Operator in accordance with the provisions of this Agreement.

6.2 The Operator shall be the Parties' exclusive agent and contractor to be in direct charge of carrying out the Parties' work obligations and performing other duties in and related to the Joint Area, either directly or through contracts with others made by the Operator as the agent of the Parties all in accordance with the provisions of this Agreement.

6.3 The Operator shall render its services and comply with its duties and obligations under this Agreement at cost and without profit to the Operator. All necessary funds, materials, equipment and supplies shall be furnished Operator by the Parties as the same may be required for carrying out the provisions of this Agreement and agreed programs and budgets. Such funds, materials, equipment and supplies shall be owned by the Parties

37

(¶ 6.3 Cont.)

in their respective percentage interests, and when delivered to Operator shall be held in custody by the latter for its use and consumption in carrying out its obligations and duties hereunder. Rights in land, waters and land covered by waters shall be made available to the Operator by the Parties as they may be required for carrying out the provisions of this Agreement.

6.4 If the Operator shall exercise its best judgment and care to select competent personnel and competent contractors to carry out and discharge its duties and obligations under this Agreement, the Operator shall not be liable to the Parties in damages or otherwise for its acts or omissions in carrying out and discharging or failing to carry out and discharge its duties and obligations under this Agreement. The Parties shall indemnify and save the Operator harmless from all claims and demands which may be made against Operator by third parties due to, arising out of, or related to the performance by the Operator of its duties under this Agreement.

6.5 Each term for which a Party is named the Operator shall be 10 years, the first term expiring December 31, 1974. A Party not acting as the Operator during any term shall be entitled to be appointed as the Operator for the next succeeding term by giving the Representatives written notice not less than two years before the end of the then current term of its desire to act as such. A Party acting as the Operator may resign as such effective only at the end of the then current term and only by giving the Representatives at least two years' written notice of intention to do so. If at the end of any term the Party acting as the Operator shall not have resigned and the other shall not have requested appointment, as above provided, the one so acting shall be deemed appointed as the Operator for the next ensuing term. Should neither Party be available for appointment as the Operator for any particular term, the Representatives shall arrange for the operation of the Joint Area on a mutually agreeable basis.

38

## Article 7

### POWERS AND DUTIES OF OPERATOR

7.1  The Operator, subject to the restrictions of this Agreement and the determinations by the Representatives, shall have exclusive control and management of the operations conducted under this Agreement.

7.2  The Operator (in addition to submitting proposed programs of operations and related proposed budgets, serving notices on the Parties and performing other functions as elsewhere herein provided) shall, directly or through the services of reputable contractors, perform all work in accordance with the agreed programs and budgets, and, to the extent to which funds are received by Operator, as provided in the budget and in respect of which there has been no default, shall do any and all things necessary or appropriate in that connection. In furtherance of the foregoing authority (but not in limitation thereof, except where a provision hereof expressly limits the Operator's authority) the Operator shall be empowered, and, when it has been furnished the necessary funds by the Parties or either or them, it shall be obligated:

(a)  To pay or cause to be paid for and in the names of the Parties, or either of them, as the case may be, all taxes and payments which may become payable under the Napo Agreements with respect to the Joint Area or production therefrom, either by direct payment or by reimbursement to the Party paying them; provided, however, that the Operator shall not pay taxes the amount of which are measured by income, which shall be settled by each Party for its own account.

(b)  To procure or cause to be procured in the names and on behalf of the Parties by expropriation, purchase, lease or contract temporary or permanent surface rights or surface ownership where necessary to the development of the Joint Area.

39

(c)   To prosecute, defend and settle or cause the prosecution, defense and settlement in the names and on behalf of the Parties any litigation or claims by non-parties involving the Parties' rights in or to the Joint Area or in any manner arising out of this Agreement, with the right to employ counsel for the purpose if the Operator deems it advisable. The settlement of claims without prior approval shall, however, be limited to claims involving in the aggregate the expenditure of not more than the equivalent of $25,000 (U.S. currency) or such other amount as may be determined by the Representatives. All expenditures incurred and paid in settlement or satisfaction of such claims, or judgments in any such litigation, against the Operator and/or the Parties or either of them, and related expenses, including those for legal services, to the extent that said items have not been recovered from insurance, shall be at the cost of the Parties. Nothing herein shall in any manner restrict or affect a Party's right individually to prosecute or defend any action involving its interest in the Joint Area.

(d)   To take all steps necessary for the maintenance and protection of and production from the Joint Area, and wells and other assets in the Joint Area and to carry on the normal business of the joint operation, including payment of taxes (except taxes the amount of which is determined by income), whether or not such items are covered by an agreed program and budget.

(e)   To give each Party access, at its own risk, to wells and other installations and to permit inspection of records pertaining thereto at all reasonable times and to permit it to examine logs, cores and samples from wells. Each Party shall receive two copies of all logs, seismograph and other geological surveys, including interpretative data, the cost of preparation of which is charged to the joint account. If a Party wishes to receive cores and samples or additional copies of logs and seismograph and other geological surveys, same will be furnished at its expense. Such information, maps and data shall be held confidential by the Parties and the Operator.

40

(f)   To furnish to the Parties, in the manner and form and at the time prescribed from time to time by the Representatives, statements and reports regarding production, operations, losses or damage to assets, and other matters pertaining to the Joint Area.

(g)   To procure and maintain such public liability, property damage and other insurance against liabilities of the Operator to employees and/or outsiders as shall be required by the laws, rules and regulations of the Republic of Ecuador and such other and additional insurance as the Representatives may require from time to time. The Parties shall be named as insureds under all policies, whenever appropriate. When inappropriate, the Operator shall obtain waivers of subrogation in favor of the Party or Parties who may not be acting as the Operator. The Operator shall duly file claims with respect to insurance arranged and maintained by it and take all necessary and proper steps to collect the insurance and properly credit the proceeds thereof. If requested by a Party, Operator shall furnish copies of all insurance policies purchased by it.

7.3  Without prior approval of the Representatives, during any budget period, the Operator, when necessary to carry out agreed programs, may (i) transfer funds from one project to another within the same budget category and/or (ii) overexpend any budgeted project by not more than 10% of the amount budgeted therefor; provided, however, that the foregoing shall not authorize the Operator to overexpend the total amount of all budget funds.

7.4  Without prior approval of the Representatives, during any budget period the Operator may make expenditures or incur liabilities on behalf of the Parties for non-budgeted items which in the aggregate do not exceed the equivalent of $25,000 (U.S. currency), or such other amount agreed upon by the Representatives. Whenever such expenditures made and obligations incurred without prior approval shall exceed the equivalent of

41

(¶ 7.4 Cont.)

said $25,000 or other amount, the same shall be reported to the Representatives before further unauthorized non-budgeted expenditures or obligations are made or incurred. After such reporting to the Representatives and obtaining their approval of such reported expenditures, the Operator may again make non-budgeted expenditures or incur non-budgeted liabilities, aggregating not in excess of the equivalent of said $25,000 or other amount, before reporting the same in the same manner, and so on, successively. This limitation shall not apply, and the Operator is expressly authorized to make expenditures and incur liabilities without prior authorization or approval as may be necessary or advisable in the Operator's judgment to deal with unforeseen emergencies, such as, but not limited to, well blowouts and fires, but not including fishing for tools and equipment.

7.5  (a)  The Operator, when purchasing materials and supplies on behalf of the Parties, shall cause bills of sale and other title documents, including import/export and shipping documents, to be issued in such names as the Parties may direct.

(b)  Whenever the Operator considers that any jointly-owned materials, equipment or supplies are no longer needed or suitable for the conduct of operations hereunder, the Operator shall notify the non-Operator and such materials, equipment and supplies shall be disposed of in a manner to be agreed upon. Upon the termination of this Agreement all salvable items shall be salvaged by the Operator and the net proceeds shall be credited to the joint account.

7.6  The Parties shall furnish to the Operator necessary powers of attorney to enable it to carry out its duties.

## Article 8

## PROGRAMS AND BUDGETS

8.1  Work in and related to the Joint Area shall be carried

42

(¶ 8.1 Cont.)

out with due diligence and in accordance with good oil field practices and sound business principles.

8.2 The budget periods shall be 12 months each, expiring December 31 of each year. A detailed proposed program of operations and proposed budget shall be submitted by the Operator to the Representatives not later than September 1 of each year for their consideration. At least 20 days in advance of the beginning of each budget period, the Representatives shall adopt a program of operations and budget for such period; provided, however, that a Representative may require reconsideration of the program and budget for the second six months of the budget period by so notifying the other Representative on or before the first day of June of the corresponding budget period, whereupon the Representatives shall, within 30 days thereafter, adopt a new program and budget for said second six months' operations. The amount of estimated expenditures required under a budget is hereinafter referred to as the "budget funds".

8.3 Each program of operations adopted by the Representatives shall designate the portion or portions of the Joint Area in which the program of operations is to be conducted and shall specify the kind and extent of such operations in such detail as the Representatives may deem suitable.

8.4 Each budget adopted by the Representatives shall contain a detailed estimate of budget funds to be required during each quarter of the budget period and shall segregate and properly identify separate categories of projects.

8.5 The program of operations and budget adopted by the Representatives for a budget period shall be subject to review and revisions by the Representatives from time to time during the budget period. Each revision of a previously approved budget shall include a statement of budget funds for the then current quarter and the remaining quarters of the budget period.

43

8.6 The Operator shall promptly mail to each Party a copy of the approved program of operations and its related budget and any approved revision of a previously adopted program and budget. The amount of each Party's share of budget funds shall be clearly indicated on the budget or revision of same, and shall be in the same proportion as the Party's percentage interest in the Joint Area.

8.7 The Parties shall advance their respective share of budget funds, as and when such funds will be required to carry out agreed programs, on a monthly basis or for a period not to exceed the current quarter of the budget period in the event the Representatives so determine.

8.8 The Operator shall make written requests at least 30 days in advance of due date upon each of the Parties to advance its respective share of the necessary budget funds, specifying in such request the amount of such funds required in U.S. dollars and the amount of such funds required in Sucres. The due date for payment to Operator of the budget funds for a given period shall be 10 days prior to the first day of the period for which such funds are to be provided.

## Article 9

## DEFAULTS WITH RESPECT TO
## FINANCING OF OPERATION

9.1 If a Party shall fail to pay its share of the budget funds within 30 days after the due date and if the other has duly paid its share of the budget funds to the Operator, the non-paying Party shall be in default.

9.2 If a default occurs, the non-defaulting Party shall have the option, exercisable within 30 days thereafter, of paying the defaulting Party's share of budget funds. If this option is not exercised, the Operator shall, to the extent of funds previously provided, carry on under Article 7 of this Agreement until the end

44

(¶ 9.2 Cont.)

of the budget period as to which the default occurred. Any funds furnished by the non-defaulting Party for the account of the defaulting Party shall establish a credit for the former's account.

9.3 If a default occurs and the non-defaulting Party furnishes the defaulting Party's share of budget funds, the percentage interest of each Party shall be adjusted. The adjustment shall be accomplished by deducting from the defaulting Party's percentage interest a proportion determined by the ratio that the defaulted amount bears to the total investment of the Parties made prior to the call for funds in respect of which the default occurs. The proportion deducted from the defaulting Party's percentage interest shall be added to the non-defaulting Party's percentage interest. Total investment shall be the total cash contributions made under this Agreement by the Parties prior to the call for funds in respect of which the default occurs, plus their respective total book costs of acquiring their participations in the Joint Area and expenditures made which were directly related to the Joint Area to the extent that such book costs and expenditures have not constituted any part of said cash contributions.

9.4 Within 30 days from date of default, the defaulting Party may restore its position by paying to the other the amount of the default. In the event a defaulting Party does not so cure its default within said 30 days, such Party may restore its position by giving notice to the other within the succeeding 60 days of intention to do so and by paying to the other the amount of the default, plus a penalty equal to 50% thereof, within one year from the date of default.

## Article 10

### SOLE RISK PROGRAMS

10.1 In the event a Party refuses to agree to the drilling, deepening or testing of an exploratory well proposed by the

45

(¶ 10.1 Cont.)

other, separate and apart from exploratory drilling, deepening
or testing pursuant to an agreed program and budget, such other
Party (hereinafter called the "Drilling Party") may at any time
cause the Operator to drill, deepen or test such a well (herein
called "sole risk well") during any budget period anywhere with-
in the Joint Area for the Drilling Party's sole account and risk
upon advancing funds from time to time to the Operator for
Operator's estimated cost thereof. If the Operator is unable to
undertake all or part of such work for the Drilling Party due
to lack of equipment or personnel or inability to secure a reputa-
ble contractor's services, the Drilling Party may, directly or
through the services of a reputable contractor, carry out such
of the work which the Operator is unable to perform. An ex-
ploratory well shall be one which is five kilometers or more from
a drilling well or a well capable of producing 200 barrels of oil
or 5,000,000 cubic feet of gas per day for thirty (30) consecutive
days.

10.2 The Parties' interest in such well shall be and remain
equal to their percentage interests.

10.3 The Drilling Party shall, within 6 months after ter-
mination of drilling, deepening and testing any such well, notify
the Representatives whether or not it elects to treat such well
as commercially productive. If it elects to treat said well as not
commercially productive, the Drilling Party shall not have any
further separate right to the production of said well. There-
after said Drilling Party shall be obligated promptly to plug
and abandon said well at its own cost and risk in accordance
with the applicable laws and regulations.

10.4 In the event a well is treated as commercially pro-
ductive by the Drilling Party, said Party shall receive the total
of the Parties' shares of the production from such well until
the wellhead market value thereof shall equal its cost expend-

46

(¶ 10.4 Cont.)

ed in connection therewith plus a premium of 400% of such
cost, after deducting royalty and the cost of operating the well
to produce such amount. Cost as used in this paragraph 10.4
shall mean the cost of locating, drilling, deepening, testing and
completing the well and of connecting the production therefrom
with the Joint Area's facilities, to the extent undertaken by the
Driling Party.

10.5  If the Joint Operation completes any productive well or
wells within 600 meters of any sole risk well, the Drilling Party re-
ferred to in paragraph 10.4 shall receive the total of the Parties'
shares of the oil and/or gas produced and sold from such pro-
ductive wells, in addition to the Parties' shares of production
from the sole risk well drilled by it as above provided, until the
wellhead market value of such shares of production from such
wells shall equal the costs incurred by the Drilling Party in drill-
ing the sole risk well, as defined in paragraph 10.4, plus the
payment to it of the corresponding premium; provided, how-
ever, that such application of the Parties' shares of production
of said Joint Area productive wells shall not commence until
the Joint Operation has completely recovered its cost, as defined
in paragraph 10.4, of said productive wells, including the cost
of placing the same on production.

10.6  In the event a sole risk well drilled, deepened or tested
by a Drilling Party is treated as commercially productive by
the Drilling Party, the Representatives shall have the sole right
to decide if and when such well shall be exploited at the expense
of the Parties jointly. In the event the Representatives are un-
willing to connect the well to the joint facilities prior to the
expiration of the ensuing budget period, the Drilling Party shall
have the right, up to the end of the budget period following such
ensuing period, to connect such well to the joint facilities and
place it on stream by paying the producing and operating costs
of the well and cost of the connecting facilities. Thereafter the

47

(¶ 10.6 Cont.)

producing and operation of such well shall be under the control of the Operator in accordance with the provisions of this Agreement.

## Article 11
## COSTS AND EXPENSES

11.1  All costs and expenses incurred by the Operator on behalf of the Parties in carrying out operations under this Agreement (whether or not specifically mentioned herein) shall be borne in such proportions as may for the time being represent the Parties' respective percentage interests.

## Article 12
## OWNERSHIP OF PROPERTY AND PRODUCTION

12.1  All property, whether real or personal, including expendable material and supplies, acquired at the cost of the Parties for use in connection with operations conducted pursuant to this Agreement, shall be owned by the Parties according to their respective percentage interests, unless specifically provided otherwise by the Parties at the time of the acquisition thereof.

12.2  The Parties' shares of production shall, subject to the provisions of this Agreement, be owned by the Parties in their respective percentage interests as of the time they are recovered.

## Article 13
## DISPOSAL OF PRODUCTION

13.1  Once commercial production of hydrocarbons has been established within the Joint Area, each Party shall have the right and be obligated in the manner and to the extent below provided to take in kind its percentage interest of all production available to and owned by the Parties.

48

13.2 The determination of oil production rates and disposal of oil production shall be as follows:

(a)  Operator's Estimated Rates: Not later than 60 days before the commencement of each calendar quarter, the Operator, with the advice of the Reservoir Engineering Committee, shall give the Parties a written estimate of the total quantity of oil (stated in terms of barrels per day) which can be produced from the Joint Area in accordance with good oil field practices and sound engineering principles during such period, together with an estimate of total quantities of such production (i) to be used in operations, (ii) deliverable to the Concessionaires under the Napo Agreements, and (iii) Government royalty to be taken in kind. The difference between the two foregoing estimates shall be "available oil".

(b)  Nominations: Within 15 days after receipt of the Operator's estimates, each Party separately shall advise the Operator in writing the quantity of oil desired by such Party during such calendar quarter (hereinafter called "Nomination"). A Party may not nominate a quantity greater than its percentage interest of available oil. If a Party fails to make a nomination within the time allowed therefor, such Party shall be deemed to have nominated zero quantity.

(c)  Increased Nominations: Within 5 days after expiration of the time allowed for making nominations, the Operator shall advise each Party the respective quantities nominated by the Parties. A Party which nominates a quantity less than would be its percentage interest of available oil may, within 72 hours after receiving notice of quantities nominated, increase its nomination up to its percentage interest of available oil by so notifying the Operator. Within 48 hours after the expiration of the time for increasing nominations, the Operator shall give notice to each Party of the final respective nominations of the Parties.

49

(d)  Adjustment of Nominations: A Party which has nominated its percentage interest of available oil for a calendar quarter may purchase all or some of the quantity which the other Party fails to nominate within its percentage interest entitlement by so notifying such other Party and the Operator in writing within 48 hours following receipt of the Operator's notice of the final respective nominations of the Parties as provided in paragraph (c) above. Quantities so elected and purchased shall be purchased at (i) wellhead market value, less 15%, or (ii) cost of production plus royalty attributable to the quantities so purchased, whichever is greater, and payment therefor shall be made to such other Party in U.S. currency by the receiving Party within 10 days following the end of each month, for quantities so received during such month; provided, that if the failure to take and dispose of crude production is attributable to either Party's inability to obtain a valid export permit for all or part of its share of the agreed production, which fact shall be notified to the other Party at the time of making nomination under paragraph (b) above, said discount shall not apply to the portion which may not be exportable for that reason. A Party which has nominated zero or any other quantity less than its percentage interest of available oil shall have the right to increase its nomination up to its percentage interest of available oil (less any quantities which the other Party may have elected to purchase as above provided in this paragraph) one time during each calendar semester (in addition to the normal quarterly revision of nominations), and the Operator, promptly upon receipt of such notice, shall use its best efforts to comply with same.

(e)  Subsequent Quarters: Such failure to nominate shall not entitle such Party to take in excess of its percentage interest of available oil during any subsequent calendar quarter. Oil held in storage in the field tanks at the close of a calendar quarter shall be applied to the satisfaction of the next calendar quarter's nominations of the Parties.

50

(f)  Ratable Taking: The Operator shall attempt to produce at approximately uniform rates the aggregate amount of oil desired by the Parties, Government royalty to be taken in kind and the amount necessary to satisfy the Concessionaires' retained interests in accordance with good oil field practices. Each Party shall be obligated to take currently delivery of such percentage of the actual production (whether more or less than the desired aggregate amount) as its desired amount (nomination and purchases plus its pro rata share of Government purchases, if any) of estimated available oil bears to the desired aggregate amount; provided, if the amount actually produced is less than the total amount desired by the Parties, the actual production (after satisfying Government royalty taken in kind and retained interest requirements) shall be delivered to the Parties in accordance with their respective percentage interests up to a total quantity necessary to deliver the lower nominator's desired amount. Any quantities of actual production in excess shall be applied, firstly, towards completing delivery of the quantity nominated by the higher nominator, and, secondly, towards delivering oil purchases, if any. In the event that either Compañía Texaco de Petróleos del Ecuador, C.A., or Gulf Ecuatoriana de Petróleo, S. A., should fail to currently lift its retained interest share of oil produced, such underlifted amount shall be subtracted from the amount that would otherwise have been delivered to TEXACO, in the first case, and GULF in the second, and TEXACO and GULF shall, individually, have full and sole responsibility for accounting therefor to their respective affiliated companies.

13.3 If either Party obtains a market for gas that is produced or producible from the Joint Area, such Party shall notify the other Party thereof, giving full particulars concerning the price and terms applicable to the sale of such gas. If the proposal is considered favorable by the other Party, such Party shall be entitled to share in said market for gas in proportion to its then percentage interest by giving the Party who obtained such market written notice of election so to do within thir-

51

(¶ 13.3 Cont.)

ty (30) days after receipt of said notification; provided, how-
ever, that the Party which elects to share in such market shall
be obligated to join with the Party who obtained the market
in a contract for the sale and delivery of its share of gas to be
sold in such market. If a Party fails to take in kind or other-
wise dispose of its share of any gas produced and saved in opera-
tions hereunder, currently as and when such gas is produced,
the Operator shall have the temporary right (subject to revo-
cation at will by such Party) but not the obligation to sell the
same to others at the best price obtainable for the account of
such Party. It is understood that in so marketing the other Par-
ty's gas, the Operator shall enter into contracts of sale only
for such reasonable periods of time as are consistent with the
minimum needs of the industry, but in no event shall any such
contract be for a period in excess of one year. Each Party shall
have sole responsibility for arranging for the participation in
such gas sales by its respective affiliated company, if such com-
pany should so desire.

## Article 14

## DELIVERY AND TRANSPORTATION

14.1 Oil produced from the Joint Area shall be delivered
to the Parties in the amounts determined in accordance with
the provisions of Article 13. Measurements of each Party's oil
shall be made in the field production tanks, or such other tanks
or metering equipment as the Parties may be required to install
for Ecuadorian fiscalization purposes. Delivery of oil to each
Party shall occur as the oil leaves such tanks or metering equip-
ment. All oil losses and costs prior to such taking of delivery
shall be shared by the Parties in accordance with their percent-
age interests, and thereafter losses and costs shall be borne in-
dividually by each Party regarding the oil delivered to it.

14.2  The Parties shall each have the right to storage space in the jointly-owned storage facilities in the proportion that its percentage interest at the time bears to the total capacity of such storage. Government royalty oil taken in kind and stored in such facilities shall be attributed to each Party's capacity rights in proportion to such Party's receipts of oil. Unless otherwise agreed by the Parties, each Party shall remove all liquid and gaseous hydrocarbons and related substances stored for its account in the jointly-owned storage facilities at such time and in such quantities that there shall not remain in such storage for its account any quantity in excess of its percentage ownership interest in such storage facilities.

14.3  Measurements of quantities of gas produced shall be in accordance with the quantities registered on gas meters installed by the Operator. Delivery of each Party's percentage interest of gas shall be at the downstream flanges of said meters. All gas treating and/or transportation facilities, regardless of ownership, available to any gas produced from the Joint Area shall be available to the Parties in accordance with their percentage interests. If a Party should transport its gas through gas transportation facilities belonging to the other, such Party shall pay to the owner of such facilities the tariff, if any, approved by the Ecuadorian Government for use of such facility; otherwise charges for the use of such facilities shall be at rates commensurate with charges made by other owners of similar facilities in Ecuador for similar use.

## Article 15

## PRODUCTION HANDLING FACILITIES

15.1  Oil and/or gas producing, treating, transporting, storing and other handling facilities which shall be jointly owned and subject to this Agreement shall be only those reasonably necessary for the proper operation of producing wells in accordance with good oil field practices and sound engineering principles

(¶ 15.1 Cont.)

and, in addition to actual well site facilities, shall include field production tanks and such other tanks or meters as are required for fiscalization purposes, and gathering lines and/or other means for transporting production from the wells to such tanks.

15.2 Should either Party propose to construct or otherwise acquire, operate and maintain pipelines and/or other terminal facilities, including facilities for the extraction of liquids from gas and for the export of crude oil (herein called "additional facility") entirely within the Republic of Ecuador for transporting, storing and other handling (not including refining or manufacturing facilities) of production from the Joint Area, it shall give written notice of such intention to the other, setting out (i) a general description and location of the intended additional facility, (ii) capacity desired by such Party, and (iii) approximate date construction is intended to commence which shall not be sooner than 90 days from the date of such notice.

Within 60 days after the date of such notice, the other may elect to participate in the intended additional facility by giving written advice to the Party who gave the original notice, which advice shall (i) state the capacity it desires in the intended additional facility, and (ii) indicate the replying Party's agreement to bear a share of the total cost of construction, maintenance and operation equal to the proportion which its desired capacity bears to the total capacity of the additional facility. Total capacity shall be the sum of the capacities desired by the Parties.

15.3 If the other Party does not elect to participate in an additional facility, the Party giving notice of intention with respect thereto shall be free to construct, operate and maintain such facility individually, and shall be allowed free use, including ingress and egress, of such concession areas, lands, water and/or lands covered by waters subject to this Agreement as may be reasonably required for the proper construction, operation, maintenance and use of such facility; provided, however, such use shall

54

(¶ 15.3 Cont.)

not interfere with the use or operation of any then existing installation or the carrying out of an agreed program.

## Article 16

### ASSIGNMENT OF INTERESTS

16.1 A Party may assign all or a part of its share of production and its rights under this Agreement, but not as to production and rights affecting only a portion of the Joint Area, and the provisions of this Agreement shall extend to and be binding upon the respective successors and assigns of the Parties hereto, but an assignment by a Party shall not relieve the assignor of any responsibility or liability hereunder accruing up to the time of such assignment becoming effective, unless consented to in writing by the other.

16.2 A Party desiring to make an assignment as provided in paragraph 16.1 shall have a bona fide offer from a responsible prospective purchaser in terms of cash or other consideration the value of which shall be readily determinable in cash and shall give notice thereof in writing to the other Party, such notice to set forth the terms and conditions of such offer. The Party receiving such notice shall have the right and option, for a period of 60 days from and after the date of receipt of such notice within which to agree to purchase said interest at the price and upon the same terms and conditions as set forth in the bona fide offer. If the other Party does not elect to purchase and an agreement of sale is not made under this paragraph within 90 days after the date of receipt of said notice, such notice shall be ineffective.

16.3 The preferential right to purchase set out in paragraph 16.2 shall not apply to mergers or consolidations or to assignments between a Party and an affiliate of such Party.

16.4 Should a Party hereto sell its entire interest in the Joint Area, then the Party so disposing of its interest shall be relieved of all obligations hereunder which may accrue subsequent to the date such assignment or conveyance becomes effective.

16.5 Any assignment made in violation of any of the provisions of this Article 16 or Article 17 shall be absolutely void.

## Article 17
## RELEASE OF RIGHTS

17.1 Each Party shall comply with all its obligations under the Napo Agreement to which it is a party, and take all such other action as may be proper and necessary to maintain such agreement in full force and effect during the life of this Agreement. Neither Party shall permit any amendment (through agreement, acquiescence, course of dealing or otherwise) of the Napo Agreement to which it is a party without the prior written consent of the other Party.

17.2 In the event a Party shall desire, as to any area or areas within the Joint Area, to release to a Concessionaire the rights it has under the Napo Agreement to which it is a party, as provided in Article 7 of the Napo Agreements, it shall give notice to that effect to the other Party. The Party giving such notice is referred to in this Article as the "Desiring Party". If the Party receiving such notice does not wish that such rights be released it shall, within 30 days after receiving said notice, advise the other Party in writing to that effect. The Party so opposing such release of rights is referred to in this Article as the "Opposing Party". In the absence of opposition to a so proposed release of rights such rights shall be forthwith released as provided in Article 7 of the Napo Agreements and the area or areas concerning which said rights have been released shall cease to be a part of the Joint Area and shall be free of this Agreement.

56

17.3 In the event of opposition to a proposed release of rights, such rights shall not be surrendered to the Concessionaire but the area or areas affected shall cease to be a part of the Joint Area, and shall be free of this Agreement, except as follows:

(a)   The Desiring Party shall maintain such area or areas subject to the Napo Agreement to which it is a party and hold its rights therein (including but not limited to rights to production) under said Agreement for the benefit of the Opposing Party;

(b)   The Opposing Party shall in the name and on behalf of the Desiring Party comply with all the Desiring Party's obligations applicable to such area or areas under the provisions of said Napo Agreement; and

(c)   The Opposing Party shall pay to the Desiring Party the latter's percentage interest of the appraised salvage value of all wells and permanently installed equipment within such area or areas desired to be surrendered.

## Article 18
## RELATION OF PARTIES

18.1   The intent of the Parties in making this Agreement is to establish the Operator as their agent to act for each of the Parties in its separate capacity for the sole purpose of carrying out their work obligations under the provisions of the Napo Agreements in the Joint Area as a joint operation under the terms and conditions herein stated. Nothing herein contained is intended to create, or shall be construed as creating, an association between the Parties in any sense of that term.

18.2   It is intended that this Agreement shall not create the relationship of a partnership between the Parties; and that no act done by either Party pursuant to the provisions hereof shall

57

(¶ 18.2 Cont.)

operate to create such relationship, nor shall the provisions of this Agreement be construed as creating such relationship. The Parties' liabilities shall be several, not joint or collective, and each Party shall be liable only for its percentage interest of the costs, expenses and liabilities incurred hereunder. The Parties shall separately dispose of their respective shares of production from the Joint Area on the basis of continuing competition between themselves.

18.3 Each of the Parties agrees and elects for the duration of this Agreement to be excluded from the application of all of the provisions of Sub-chapter K of Chapter 1 of Subtitle A of the Internal Revenue Code of 1954, as authorized by regulations promulgated by the Secretary or his delegate under Section 761 (a) thereof. The Operator shall make this election in a statement attached to a partnership return filed with the Internal Revenue Service of the United States of America in accordance with such regulations.

## Article 19
## ARBITRATION

19.1 Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration in accordance with the rules then obtaining of the American Arbitration Association. The arbitration shall be held in New York, N.Y., and judgment upon any award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction.

## Article 20
## DIVISION OF ASSETS, DISSOLUTION AND TERMINATION

20.1 In the event that a division of assets is required by one Party as a matter of right, or is mutually agreed upon, or is to be

58

(¶ 20.1 Cont.)

made for any reason, division of the jointly-owned assets shall be made, failing agreement on another method of distribution, in accordance with the respective percentage interests of the Parties pursuant to the following procedure:

(a)   All physical assets shall be valued by mutual agreement of the Parties or by a disinterested appraiser appointed by them, and the Parties shall thereupon divide said physical assets in the following manner:

They shall determine by lot which has the first choice, and the Party obtaining such first choice shall select physical assets equal in value to 1/3 of its percentage interest; the other Party shall thereupon select physical assets equal in value to 1/3 of its percentage interest; and so on, alternately, until all such physical assets have been distributed.

(b)   Any other assets embraced in the operations shall be divided between the Parties according to their respective percentage interest.

20.2 Neither Party shall be entitled to receive its distributive share of any assets until it shall have discharged all of its liabilities under this Agreement.

20.3 After the assets have been distributed to the Parties this Agreement shall terminate.

### Article 21

### LAWS AND REGULATIONS

21.1 This Agreement and the operations contemplated hereby shall be subject to all valid laws, and all valid rules, regulations and orders of any regulatory body or official having jurisdiction, and in the event any provision of this Agreement shall be found to be contrary to, or inconsistent with, any such law, rule,

(¶ 21.1 Cont.)

regulation or order, the latter shall be deemed to control and this Agreement shall be deemed modified accordingly, but in all other respects shall continue in full force and effect.

21.2  Nothing contained in this Agreement shall be deemed to constitute the waiver by a Party of any right it would otherwise have to contest the validity of any law or any order or regulation of governmental authority relating to, or affecting the conduct of, operations within the Joint Area or to appeal from any such order.

### Article 22

### FORCE MAJEURE

22.1  Neither Party shall be liable for failure to perform other than to make payments due hereunder, when performance of its covenants and agreements herein is hindered or prevented by strikes, stoppage of labor, accident, fire, flood, invasions, war, revolutions, uprisings, insurrections, usurped power, order of any civil power, act of God or of the public enemy, or any cause beyond its control, whether or not similar to the causes herein specifically mentioned. In case a Party shall be unable, wholly or in part, because of any such cause of force majeure, to carry out its obligations under this Agreement, it shall promptly give written notice to that effect to the Operator and the other Party stating the particulars of such force majeure. The performance of any obligation or obligations suspended while force majeure is operative shall be resumed as soon as reasonably possible after the termination thereof.

22.2  Each Party solely and individually, shall have the exclusive control of the settlement and negotiation of labor disputes experienced by it.

60

## Article 23

## INTERPRETATION

23.1    This Agreement and the relationship of the Parties here-
under shall be governed by and interpreted in accordance with
the laws of the State of New York in the United States of Amer-
ica, except for those matters which are necessarily governed by
the laws of the Republic of Ecuador such as, but not limited to,
matters pertaining to the titles to and obligations under the Con-
cession Contract covering the Joint Area.

## Article 24

## WAIVERS

24.1    The failure of a Party in any one or more instances to
insist upon strict performance of any of the covenants or condi-
tions of this Agreement, or to exercise any privileges herein con-
ferred, shall not be construed as a waiver or relinquishment for
the future of any such covenant, condition or privilege, but the
same shall be and remain in full force and effect.

## Article 25

## NOTICES

25.1    Each notice herein provided or permitted to be given
by a Party to the other or the Operator and by the Operator to
the Parties shall be in writing, and shall be deemed given only
if and when received by the Party to whom given. Each Party
and the Operator shall furnish all Parties with copies of notices
given under the provisions of this Agreement. Notices may be
delivered in person to the Representative or Alternate of the Par-
ty to whom the notice is given, or may be given by depositing the
same in the mails of Ecuador, Trinidad, W.I., or the United States
of America, or by filing the same with a generally recognized tele-

61

(¶ 25.1 Cont.)

graph company for transmission by telegram, cablegram, or radio-
gram. For the purpose of such notices, the proper addresses of
the Parties shall be as follows:

| | |
|---|---|
| Ecuadorian Gulf Oil Company | Texaco Petroleum Company |
| P. O. Box 910 | Apartado No. 1006 |
| Coral Gables, Florida 33134 | Calle Río de Janeiro No. 130 |
| Cables: GULFPRO - Miami | Quito, Ecuador |
| | Cables: TEXPET - Quito |

However, a Party may change its address at any time by giving
to the other at least 15 days' advance notice thereof. Reports and
other communications herein provided for shall be sent by mail
properly addressed to the Parties as above provided.

## Article 26

## SUCCESSION

26.1  Subject to the provisions hereof, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto and each of them respectively.

Executed at Coral Gables, Florida, on the 22nd day of October 1965, in two counterparts.

TEXACO PETROLEUM COMPANY
By R. M. Bischoff                                    McNW
Vice President and Manager

ATTEST:
W. J. Clayton
Secretary

ECUADORIAN GULF OIL COMPANY
By T. A. Kibby
Vice President

ATTEST:
R. W. Dorius
Assistant Secretary

63

REPUBLIC OF ECUADOR
MINISTRY OF ENERGY AND MINES

### MEMORANDUM OF UNDERSTANDING
### BETWEEN THE GOVERNMENT OF ECUADOR,
### PETROECUADOR AND TEXACO PETROLEUM COMPANY

*This Memorandum of Understanding is made and entered into by the Government of Ecuador, through the Ministry of Energy and Mines, legally represented by the Minister, Eng. Gustavo Galindo Velasco, hereinafter the "Ministry," and the state company Petróleos de Ecuador, PETROECUADOR, legally represented by its Executive President, Dr. Federico Vintimilla Salcedo, hereinafter "PETROECUADOR," as party of the first part; and by Texaco Petroleum Company, a Delaware corporation with offices at Av. 6 de Diciembre 2816 and J. Orton, Quito, legally represented by its Legal Representative in Ecuador, Mr. Rodrigo Pérez Pallares, and by Dr. Ricardo Reis Veiga, in his capacity of Vice President thereof, hereinafter "Texpet," as party of the second part.*

I. *OBJECTIVES*

    *The objectives of this Memorandum of Understanding are the following:*

a)   *To set out the scope of the environmental remedial work to be conducted in the area of the former PETROECUADOR-TEXACO Consortium, concerning the biotic, abiotic, and socioeconomic aspects, which scope shall constitute the basis on which Texpet shall issue the corresponding request for bids;*

b)   *To formalize the authorization by the Ministry and PETROECUADOR to Texpet to select a Contractor for the performance of said environmental remedial work, from a list previously approved by the Ministry and PETROECUADOR;*

c)   *To create procedures for the Ministry and PETROECUADOR to review and approve the environmental remedial work to be performed; and*

d)   *To establish the mechanisms by which Texpet is to be released from any claims that the Ministry and PETROECUADOR may have against Texpet concerning the environmental impact caused as a consequence of the operations of the former PETROECUADOR-TEXACO Consortium.*

II., *SCOPE OF WORK*

    *The scope of the environmental remedial work for the*

1

ATTACHMENT A

*negative effects caused by the operations of the
PETROECUADOR-TEXACO Consortium, once approved by the
parties, based on the "Final Draft Proposal for
Environmental Remediation" signed by the technical
representatives of the parties on August 24, 1994, and
issued under their own terms, shall constitute the basis
on which Texpet shall issue a request for bids for
contracting the environmental remedial work in the area
of the former Consortium, and shall constitute an
integral part of this Memorandum of Understanding.*

### III. SELECTION OF THE CONTRACTOR AND DETAILED REVISION OF THE SCOPE OF WORK BY THE MINISTRY AND PETROECUADOR

*Texpet shall request bids before selecting the Contractor
which shall carry out environmental remedial work,
according to the scope of work indicated in Clauses I and
II of this Memorandum. Texpet shall review and control
the implementation of the contract, to assure that it
complies with that set forth in the Scope of Work
approved by the Ministry and PETROECUADOR. The contracted
work must be carried out using technology compatible with
the Amazonian Region. Although the Ministry and
PETROECUADOR shall review and approve the detailed scope
of work to be submitted by the selected contractor, the
terms and conditions of the contract between Texpet and
the Contractor shall not be shared with the Ministry and
PETROECUADOR. Texpet shall submit to the Ministry and
PETROECUADOR complete details of any remedial,
alleviation or compensation action which may affect the
operations currently carried out by PETROECUADOR, before
beginning such action, and the parties shall negotiate in
good faith in order to minimize the impact thereof,
within the main objective and goal of completing the
remedial work.*

### IV. RELEASE OF TEXPET FROM OBLIGATIONS

*The parties shall negotiate the full and complete release
of Texpet's obligations for environmental impact arising
from the operations of the Consortium, based on the full
completion of the remedial work agreed upon. Such
release shall be implemented as follows:*

2

a) TEXPET shall not be responsible for the environmental impact or effects not included in the Scope of Work, and shall be released from any liability concerning such impact upon execution of the Contract for Implementing Environmental Remedial Work and Release of Obligations.

b) The release for the work to be performed in accordance with said Scope of Work shall discharge Texpet from any liability for environmental impact arising from the operations of the Consortium, and shall be effective upon the notification from the Contractor that it has performed the work, and by acceptance and certification issued by the Ministry and PETROECUADOR to the effect that the work has been performed. The acceptance and certification of the environmental remedial work shall be made on a site by site basis. The Ministry and PETROECUADOR shall accept the environmental remedial work at each site, and shall certify within the contractual terms, that the work was completed, after being notified of such completion. If no objections are raised within said terms, it shall be deemed that the Ministry and PETROECUADOR have accepted the completion of the work and have certified such fact. Any disagreement between the parties that cannot be resolved within 15 days after the date on which such disagreement has originated, shall be resolved with the intervention of a domestic or foreign independent consulting company previously selected by the parties from a list proposed by Texpet and approved by the Ministry and PETROECUADOR.

V. PROJECTS FOR SOCIO-ECONOMIC COMPENSATIONS

Texpet shall pledge to perform or carry out Projects for Socio-economic Compensation, designed to resolve the problems of this nature caused by the oil operations of the Consortium, identified in the Scope of Work set forth in Clauses I and II of this Memorandum, which projects shall be discussed, agreed upon and approved by the Ministry, PETROECUADOR and TEXPET. Such projects shall be part of the total proposal for environmental remedial work, and shall be carried out taking into consideration the inhabitants of the Oriente Region.

VI. The implementation of the environmental remedial work shall be subject to the execution by the parties of the Contract for Implementing Environmental Remedial Work and Release of Obligations reflecting the provisions of the Scope of Work, and the principles and procedures set forth in this Memorandum of Understanding, which shall constitute a reference framework for the parties until the final execution of the Contract for Implementing Environmental Remedial Work and Release of Obligations.

3

VII. *APPLICATION OF ECUADORAN ENVIRONMENTAL LAWS*

> *The environmental remedial work referred to in this Memorandum of Understanding must be performed subject to the provisions of the Political Constitution of the Republic, the Hydrocarbon Law, the Special Law for state company Petróleos del Ecuador (PETROECUADOR) and its Affiliates, the Law for Prevention and Control of Environmental Contamination, published in Registro Oficial No. 97 of May 31, 1976, the Law for Forestry and Preservation of Natural Areas and Forest Life, published in Registro Oficial No. 436 of February 22, 1983, the Law for the Creation of INEFAN, published in Registro Oficial No. 278 of September 27, 1992, the Regulation for Hydrocarbon Operations, issued by Decision No. 1311, published in Registro Oficial No. 681 of May 8, 1987, and the Environmental Regulation for Hydrocarbon Activities in Ecuador, issued by Decision No. 621, published in Registro Oficial No. 898 of March 6, 1992, as well as other legal and administrative regulations valid on the execution date of this Memorandum.*

VIII. *The provisions of this Memorandum of Understanding shall apply without prejudice to the rights possibly held by third parties for the impact caused as a consequence of the operations of the former PETROECUADOR-TEXACO Consortium.*

*In witness whereof the Parties accept the provisions set forth above, and sign this Memorandum of Understanding in Quito, on Dec. 14, 1994.*


*Eng. Gustavo Galindo Velasco*
*MINISTER OF ENERGY AND*
*MINES*

*Dr. Federico Vintimilla Salcedo*
*EXECUTIVE PRESIDENT OF*
*PETROECUADOR*


*Dr. Rodrigo Pérez Pallares*
*LEGAL REPRESENTATIVE OF*
*TEXACO PETROLEUM COMPANY*

*Dr. Ricardo Reis Veiga*
*VICE PRESIDENT OF TEXACO*
*PETROLEUM COMPANY*

*DIR.LEG.CONS. DR. MPE*
*JSM/*
*CFS/NCG*
*December 14, 94*

4

City of New York, State of New York, County of New York

I, Jaime Wengroff, am a competent translator of Spanish into English,

and hereby certify that the following is, to the best of my knowledge and belief, a

true and accurate translation from Spanish (5 pages) into English (4 pages) of

the Memorandum of Understanding Between the Government of Ecuador,

Petroecuador and Texaco Petroleum Company.

Signature

Sworn to before me this

16th day of December, 1994.

Signature, Notary Public

JOSEPH BOTTILE
Notary Public, State of New York
No. 31-4627205
Qualified in New York County
Commission Expires October 21, 1995

Stamp, Notary Public