UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                          :
THE REPUBLIC OF ECUADOR and PETROECUADOR, :
                                                          :        04 CV 8378 (LBS)
            Plaintiffs,                                   :
                                                          :        ECF CASE
     - v. -                                               :
                                                          :
CHEVRONTEXACO CORPORATION and           :
TEXACO PETROLEUM COMPANY,                :
                                                          :
            Defendants.                                   :
-----------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF THE REPUBLIC OF ECUADOR AND PETROECUADOR'S MOTION FOR SUMMARY JUDGMENT SEEKING A PERMANENT STAY OF ARBITRATION PROCEEDINGS**


**INTERNATIONAL LABOR RIGHTS
FUND**
733 15th Street, N.W. Suite 920
Washington, D.C. 20005
T: (202) 347-4100
F: (202) 347-4885

**Attorneys for the Republic of Ecuador
and Petroecuador**

**MEREDITH COHEN GREENFOGEL
& SKIRNICK, P.C.**
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 240-0020
F: (212) 240-0021

**Attorneys for the Republic of Ecuador
and Petroecuador**

## TABLE OF CONTENTS

Page

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    The operative contracts between the Republic and Petroecuador and Texaco in this case
       were executed in 1973, 1974, and 1977. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   Under the Federal Arbitration Act, the Republic and Petroecuador are entitled to a
       permanent stay of the arbitration proceedings that Texaco has commenced against
       Petroecuador before the AAA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.     Nothing in the express terms of the 1973, 1974, and 1977 Contracts indicates
              that either the Republic or Petroecuador ever agreed to arbitration in this
              matter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.     Even if the Plaintiffs had agreed to arbitrate, under the doctrine of waiver
              Texaco should be barred from pursuing arbitration proceedings against
              Petroecuador for indemnification on claims first filed against Texaco in 1993. . 10

       C.     Because the 1973 Contract was an official act of the Ecuadorian State
              implementing its oil policy, the act of state doctrine provides an independent
              ground at law for this Court to stay arbitration proceedings under the FAA. . . . 14

IV.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I.    Introduction

This case has its origins in a previously litigated action. *Aguinda v. Texaco*, 142 F.Supp.2d 534 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002), in which Texaco successfully maintained that the Republic of Ecuador and Petroecuador enjoyed sovereign immunity in the United States in this matter. Plaintiffs, the Republic of Ecuador and Petroecuador (collectively "the Republic"), originally filed this case in the New York Supreme Court as a summary proceeding for a stay of arbitration proceedings commenced by Defendants ChevronTexaco Corporation and Texaco Petroleum Company (collectively "Texaco") in June 2004 against Petroecuador before the American Arbitration Association ("AAA"). Texaco's arbitration demand sought indemnification from the Republic on claims filed against it in Lago Agrio, Ecuador in May 2003 and currently being litigated against it in Ecuador. (Ex. A, I.)[1]

After Texaco removed the case to this Court, the Republic filed an amended complaint on December 8, 2004. The Republic's amended complaint re-styled its claims for summary stay of arbitration proceedings under New York procedural law into a federal action and added claims, *inter alia*, for injunctive relief on the grounds that the doctrine of waiver barred Texaco from seeking an arbitration against Petroecuador in this matter.

On January 10, 2005, Texaco filed an Answer to the Republic's Amended Complaint. Texaco's Answer asserted counterclaims against the Republic seeking indemnification on the same claims on which Texaco also seeks indemnification through arbitration. On January 31,

---

[1] All Exhibit references refer to the Plaintiffs' Exhibits in Support of Motions for a Permanent Stay of Arbitration Proceedings, Summary Judgment, and to Dismiss Counterclaims under Rule 12(b) that Plaintiffs filed with this Court on January 31, 2005. Additional facts are contained in the Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Facts on Motion for Summary Judgment.

2005, the Republic filed a Motion to Dismiss Counterclaims under Rule 12(b), supported by Exhibits A – S.

The Republic now moves this Court for summary judgment and a permanent stay of the arbitration proceedings currently pending against Petroecuador before the AAA on the ground that there is no valid agreement to arbitrate these claims. *See infra* Parts II, III.A. Moreover, even if the Plaintiffs had agreed to arbitrate, under the doctrine of waiver Texaco should be barred from pursuing arbitration proceedings against Petroecuador for indemnification on claims that were first filed against Texaco in 1993. *See infra* Part III.B. Alternatively, the Republic moves for a permanent stay of the arbitration proceedings on the ground that because the 1973 Contract is a public act of the Ecuadorian State that requires Texaco to bring its claims before the courts of Ecuador, the act of state doctrine provides this Court with an independent ground at law to stay the arbitration proceedings under the FAA. *See infra* Part III.C. In support of this motion, the Republic relies on all prior pleadings and proceedings herein; Plaintiffs' Exhibits A – S, filed with this Court on January 31, 2005; and the Local Civil Rule 56.1 Statement of Undisputed Facts on Motion for Summary Judgment attached hereto.

## II.    The operative contracts between the Republic and Petroecuador and Texaco in this case were executed in 1973, 1974, and 1977.

Texaco was involved in petroleum exploration and extraction operations in Ecuador from 1964 to 1992.[2] Its involvement began through a series of contracts executed in 1964 and 1965 between the Republic, Texaco, and Ecuadorian Gulf Oil Company ("Gulf").[3] The contracts granted the two oil companies an oil concession in the Oriente region of Ecuador near the Napo

---

[2] Texaco Answer para. 20, 35.
[3] Texaco Answer para. 20 – 26.

River ("the Napo Concession").[4]  Texaco and Gulf's joint venture in Ecuador became known as the "Napo Consortium."[5]

In Texaco's arbitration demand, Texaco claims that Petroecuador had become a party to a 1965 Joint Operating Agreement ("JOA") between Texaco and the Ecuadorian Gulf Oil Company ("Gulf") that contains an arbitration clause. (Ex. A, B.)  The JOA established that Texaco would be the initial primary actor, or "Operator," of the Consortium and obligated Gulf to indemnify Texaco for "damages or otherwise for its acts and omissions" in operating the Consortium whenever Texaco was found to have "exercise[d] its best judgment and care to select competent personnel and competent contractors to carry out and discharge its duties and obligations . . . ."  (Ex. B art. 6.4.)  The JOA contained an arbitration clause requiring that all disputes between Texaco and Gulf be resolved before the AAA in New York.  (Ex. B. art. 19.1.) Texaco has based its arbitration demand against Petroecuador on the arbitration clause within the 1965 JOA between Texaco and Gulf.  (Ex. A para. 28.)

Tellingly, however, Texaco's arbitration demand does not even mention the three contracts of 1973, 1974, and 1977 through which Petroecuador ultimately became a majority owner of the Napo Concession.  Texaco's omission is critical because these agreements do not contain arbitration clauses.

On the contrary, the 1973 agreement requires disputes to be resolved by the courts of Ecuador.  (Ex. C cl. 50.1.)  On August 4, 1973, the Republic published Supreme Decree No. 925, which required that Texaco and Gulf agree to the terms of a new contract ("the 1973 Contract") for the Napo Concession.  (Ex. C.)  One of the Republic's terms was that CEPE, the state oil company that was later re-organized and renamed Petroecuador, receive an option to purchase a

---

[4] Texaco Answer Countercl. para. 7.
[5] Texaco Answer Countercl. para. 7.

25% share of the Napo Consortium by June 6, 1977. (Ex. C cl. 52.) And, importantly, the 1973

Contract provides for the termination of all previous contracts relating to the Napo Consortium

between and among the parties. (Ex. C. cl. 53.1, 53.3.)[6]

In January 1974, the Republic elected to accelerate CEPE's participation in the

Consortium and issued Supreme Decree No. 9, which ordered that CEPE's 25% purchase under

the 1973 Contract take place that year. (Ex. P.) Following that decree, the Republic and CEPE

(acting jointly as one party) entered into a purchase agreement ("the 1974 Contract") with

Texaco and Gulf on June 14, 1974. (Ex. Q.)

On May 27, 1977, the Republic and CEPE (again, acting jointly as one party) became

majority owners of the Napo Consortium by entering a purchase agreement with Gulf ("the 1977

Contract") for Gulf's remaining 37.5% share of Consortium assets. (Ex. O.)

The 1973 Contract, the 1974 Contract, and the 1977 Contract control the relationship

between the Republic and Texaco. None of these contracts provide any basis for arbitration.

**III.    Under the Federal Arbitration Act, the Republic and Petroecuador are entitled to a permanent stay of the arbitration proceedings that Texaco has commenced against Petroecuador before the AAA.**

A moving party is entitled to summary judgment on its claims if it can show that "there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c).

Because it is undeniable that the relationship between the Republic and Texaco "involves

commerce" under the meaning of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 (2000), the

---

[6] The 1973 Contract incorporates one provision of a previous contract between the Republic, Texaco, and Gulf. This provision, Clause 11 of a 1969 contract between the three entities, relates to the construction and operation of a pipeline in Ecuador. (Ex. D.) This provision is not material to this case. The 1973 Contract incorporates no other provision of any previous contract. (Ex. C.)

federal substantive law of arbitration applies to this dispute. *See Coenen v. R.W. Pressprich & Co., Inc.*, 453 F.2d 1209, 1211 (2d Cir. 1972) ("Once a dispute is covered by the Act, federal law applies to all questions of interpretation, construction, validity, revocability, and enforceability."). When one party claims the existence of an arbitration agreement and the other party denies it, federal law employs "generally accepted principles of contract law" to determine whether there is a valid agreement to arbitrate. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987).

As the United States Supreme Court has explained, "the fact that arbitration is simply a matter of contract between the parties" means that "it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). *See also Monisoff v. Am. Eagle Invs.*, 927 F. Supp. 137, 138 (S.D.N.Y. 1996), *aff'd*, 104 F.3d 356 (2d Cir. 1996) ("While federal arbitration policy may help to define the scope of what the parties are agreeing to when they agree to arbitrate a contractual dispute, it cannot create a contract between non-contracting parties."). Under the FAA, private written agreements to arbitrate shall be enforced according to their terms "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2000). Arbitration may never be compelled in the absence of a written agreement. *See, e.g., Garnac Grain Co. v. Nimpex Int'l*, 249 F. Supp. 986, 986 (S.D.N.Y. 1964) ("A written agreement for arbitration is the sine qua non of an enforceable arbitration agreement."). Whether the parties have agreed to submit a dispute to arbitration is a question for the court, not the arbitrator, "[u]nless the parties have clearly and unmistakably provided otherwise." *AT&T Techs., Inc. v. Communication Workers of Am.*, 475 U.S. 643, 649 (1986). In making this determination, the court is not to consider the underlying merits of the dispute. *Id.*

Under Section Four of the FAA, "if the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4 (2000). *See also Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 84 (2002) (describing a question of arbitrability as "a gateway dispute about whether the parties are bound by a given arbitration clause"). This Court has the power to order a permanent stay of the arbitration proceedings pursuant either to the FAA and the All Writs Act or by using the New York procedural rule found in N.Y. C.P.L.R. § 7503. *See, e.g., Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt. & Sys. Co.*, 643 F.2d 863 (1st Cir. 1981) (staying arbitration pursuant to FAA); *Sec. Ins. Co. of Hartford v. Trustmark Ins. Co.*, 283 F. Supp. 2d 602 (D. Conn. 2003) (staying arbitration pursuant to state law). Under the circumstances of this case, summary judgment is appropriate. *See Canada Life Assurance Co. v. Guardian Life Ins. Co. of Am.*, 242 F. Supp. 2d 344, 354 n.7 (S.D.N.Y. 2003) ("'Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.'" (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980))).

The Republic's motion for summary judgment seeking a permanent stay of the arbitration proceedings that Texaco commenced against Petroecuador before the AAA should be granted, because there are no genuine issues of material fact as to whether the Republic or Petroecuador ever agreed to arbitration in this matter. Although Texaco claims that Petroecuador became a party to the 1965 JOA between Texaco and Gulf that contains an arbitration clause, nothing in that agreement between Texaco and Gulf and nothing in the express terms of the 1973, 1974, and 1977 Contracts indicates that either the Republic or Petroecuador ever agreed to arbitration. *See infra* Part III.A. Moreover, even if the Plaintiffs had agreed to arbitrate, under the doctrine of waiver Texaco should be barred from pursuing arbitration proceedings against Petroecuador for

indemnification on claims that were first filed against Texaco in 1993. *See infra* Part III.B.
Alternatively, the Republic's motion for summary judgment seeking a permanent stay of the
arbitration proceedings should be granted because the act of state doctrine provides this Court
with an independent ground at law to stay the arbitration proceedings under the FAA. *See infra*
Part III.C. For these reasons, the Republic is entitled to judgment as a matter of law on its
request for a permanent stay of the arbitration proceedings in this matter.

A.    **Nothing in the express terms of the 1973, 1974, and 1977 Contracts indicates that
either the Republic or Petroecuador ever agreed to arbitration in this matter.**

The 1973, 1974, and 1977 Contracts were the contractual mechanisms through which the
Republic and CEPE/Petroecuador (acting jointly as one party) bought into the Napo Consortium.
Whether one views these Contracts as conventional contracts or as official acts of the Ecuadorian
State, these Contracts control the relationship between the Republic and Texaco in this case.
Nothing in the express terms of these Contracts indicates that the Republic ever agreed to
become a party to the 1965 JOA or otherwise agreed to arbitration in this matter.

By rescinding the original Napo Concession and regranting the Concession on terms that
gave an option to the Republic and CEPE to buy into the Concession, the 1973 Contract was a
novation between and among the Republic, Texaco, and Gulf that substituted for all previous
contracts between the parties. *See, e.g., Restatement (Second) of Contracts* § 280 (1981) ("A
novation is a substituted contract that includes as a party one who was neither an obligor nor an
obligee of the original duty."); *id.* cmt. b ("A novation discharges the original duty, just as any
other substituted contract does . . . .").

Furthermore, the 1973 Contract expressly provides for the termination of all previous
contracts relating to the Napo Consortium between and among the Republic, Texaco, and Gulf.
Clause 53.1 states that "the parties shall hereinafter be governed only by the stipulations set forth

in this public instrument." (Ex. C cl. 53.1.) Clause 53.3 requires Texaco and Gulf to establish a new operating agreement for the Concession. (Ex. C cl. 53.3.) The clause further requires that "[s]aid [operating] agreement shall not contain the transfer of [Concession] rights, and shall not limit at all [Texaco and Gulf's] obligations." (Ex. C. cl. 53.3.) Through these provisions, the 1973 Contract establishes a new contractual framework to govern the operation of the Napo Consortium.

The 1973 Contract contains no arbitration clause. On the contrary, the Contract contains a clearly-expressed requirement that disputes be resolved in an Ecuadorian forum. Clause 50.1 states that Texaco and Gulf "shall submit to the laws, courts, and judges of Ecuador . . . and expressly waive any claim through diplomatic channels." (Ex. C cl. 50.1.) Clause 43.2 creates a unique method of alternative dispute resolution for certain disputes that might arise under the Contract:

> Indemnities to be paid by the contractors for the damages caused on lands, crops, buildings or other properties due to the exploration, exploitation or any other phase of the oil industry, shall be determined by experts designated by the parties. In case of disagreement the Ministry concerned shall appoint a third expert, whose verdict shall be unappealable.

(Ex. C cl. 43.2.) These two provisions confirm that the underlying intent behind the 1973 Contract was that all disputes involving the Napo Consortium be resolved in Ecuador.

Under the 1974 Contract, CEPE acquired a 25% share of Napo Concession operations, "in proportional parts of all investments, operational costs, obligations, royalties, [and] sales of crude for internal consumption . . . ." (Ex. Q cl. 10.) Clause 8 states that "[t]he totality of the activities that will develop in the Joint Operation will be regulated by an operating agreement entered into by the parties." (Ex. Q cl. 8.) However, neither the Republic nor CEPE/Petroecuador ever entered into such a formal operating agreement with Texaco and/or Gulf. The 1974 Contract does not contain an arbitration clause, nor does it contain any terms

8

that modify the legal backdrop for CEPE's participation in the Napo Concession that was created

by the 1973 Contract. (Ex. Q.)

The 1977 Contract transferred all of Gulf's Napo Consortium assets to CEPE and

extinguished Gulf's obligations under the 1973 Contract. (Ex. O cl. 2.1.)  Clause 2.13 states that.

> With respect to any obligations Gulf may have toward third parties and which do
> not appear in its accounts, neither the Ecuadorian government nor CEPE shall
> assume any responsibility whatsoever, and these must be taken care of by Gulf.
> Therefore CEPE shall assume only those obligations that are in accordance with
> this agreement.

(Ex. O cl. 2.13.)  The 1977 Contract further includes a "quitclaim" between the Republic/CEPE

and Gulf, stating that "neither of the parties has any claim against the other on any account

whatsoever, with the exception of any claim that might arise from a breach or non-performance

of this agreement." (Ex. O cl. 2.16.)  The 1977 Contract does not contain an arbitration clause,

nor does it contain any terms that modify the legal backdrop for CEPE's participation in the

Napo Concession that was created by the 1973 Contract. (Ex. O.)

The 1973, 1974, and 1977 Contracts contain no express terms indicating that either the

Republic or Petroecuador ever agreed to become a party to the 1965 JOA or otherwise agreed to

arbitration in this matter.  Not only do none of the Contracts contain an arbitration clause, but the

1973 Contract specifically requires Texaco and Gulf to enter into a new operating agreement

following the execution of the Contract.  Although the 1974 Contract left open the possibility

that CEPE/Petroecuador might enter into a formal operating agreement with Texaco and Gulf, no

such operating agreement was ever executed.  Moreover, a clearly-expressed intent underlying

the 1973 Contract was that all disputes relating to the Ecuadorian oil industry be resolved in

Ecuador.

**B.**   **Even if the Plaintiffs had agreed to arbitrate, under the doctrine of waiver Texaco should be barred from pursuing arbitration proceedings against Petroecuador for indemnification on claims first filed against Texaco in 1993.**

The Republic's claims for injunctive relief through application of the doctrine of waiver stem from Texaco's conduct with respect to the underlying claims on which Texaco seeks indemnification (originally through arbitration, and now also through counterclaims) in this case. Texaco's arbitration demand states that Texaco seeks indemnification in this case on claims filed against it in Lago Agrio, Ecuador in May 2003. (Ex. A para. 5.)  Texaco does not mention, however, that these claims bear a direct relationship to claims filed by many of the same plaintiffs ("the Aguinda Plaintiffs") in 1993 in this District. (Ex. E, I.)

The Aguinda Plaintiffs sought to represent a putative class of over 30,000 residents of the Oriente region of Ecuador. (Ex. E.)  The Aguinda Plaintiffs claim that during the twenty-three year period in which Texaco operated the Napo Consortium, Texaco employed a series of allegedly reckless and negligent practices that resulted in widespread environmental devastation of their lands and environment and caused the Aguinda Plaintiffs severe personal injuries. (Ex. E, I.)  The Aguinda Plaintiffs seek remediation of their lands and other relief. (Ex. E, I.)  The Aguinda Plaintiffs litigated their claims against Texaco for nine years before New York federal courts. *See Aguinda v. Texaco*, 303 F.3d 470 (2d Cir. 2002) (recounting the history of the case).[7]

While *Aguinda* was being litigated in New York, Texaco never commenced arbitration proceedings against Petroecuador or the Republic, nor did it otherwise seek indemnification from Petroecuador or the Republic on the Aguinda Plaintiffs' claims. *See id.* On the contrary, Texaco argued that the case be transferred to Ecuador, in part because Texaco was unable to implead the Republic and Petroecuador as third-party plaintiffs because they enjoy sovereign immunity in the

---

[7] The Second Circuit's 2002 *Aguinda* decision is Exhibit H of the Exhibits filed by Plaintiffs on January 31, 2005.

United States in this matter under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1603 – 11. (Ex. F.)  For example, in a 1998 brief that Texaco filed with the Second Circuit, Texaco stated that "[n]o one disputes the District Court's holding that [sovereign] immunity applies both to Petroecuador and the Republic under [the FSIA]." (Ex. F at 27.)  For this reason among others, Texaco argued in *Aguinda* that the Aguinda Plaintiffs' claims should have been dismissed under the doctrines of *forum non conveniens*, international comity, and inability to join necessary parties, the Republic and Petroecuador, under Fed. R. Civ. P. 19. (Ex. F.)

The *Aguinda* District Court accepted Texaco's argument that the Republic and Petroecuador enjoy sovereign immunity in the United States in this matter, and so held in its 1996 decision dismissing the case under the doctrine of *forum non conveniens*. *Aguinda v. Texaco*, 945 F. Supp. 625, 627 (S.D.N.Y. 1996) ("[W]hile the Republic of Ecuador and Petroecuador are subject to service of process, neither can feasibly be joined in this action because, under the provisions of the Foreign Sovereign Immunities Act . . . neither is subject to suit in the United States.").

The 1996 *Aguinda* decision was appealed to the Second Circuit and reversed on other grounds, specifically that the District Court had erred in not conditioning its dismissal on Texaco consenting to jurisdiction in Ecuadorian courts on the Aguinda Plaintiffs' claims. *See Jota v. Texaco*, 157 F.3d 153, 155 (2d Cir. 1998) ("We hold that dismissal on the ground of forum non conveniens was erroneous in the absence of a condition requiring Texaco to submit to jurisdiction in Ecuador . . . .").  However, both the District Court and the Second Circuit continued to rely on the District Court's 1996 holding that the Republic and Petroecuador enjoy sovereign immunity in the United States in this matter. *See, e.g.*, *Aguinda v. Texaco*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001) ("Not only is the Government of Ecuador not named as a

party but also it cannot be sued as a third-party defendant, since it has now formally affirmed that it will not waive sovereign immunity with respect to these cases . . . .").[8]

Ultimately, the case was dismissed under the doctrine of *forum non conveniens* after Texaco consented to the jurisdiction of Ecuadorian courts on the Aguinda Plaintiffs' claims. *See Aguinda v. Texaco*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002) ("[T]he record establishes overwhelmingly that these cases have everything to do with Ecuador and nothing to do with the United States . . . .); *id.* ("Following remand, Texaco provided the missing commitment to submit to the jurisdiction of the courts of Ecuador . . . ."). Following this dismissal, a substantial number of the Aguinda Plaintiffs – now joined by other members of the putative class in *Aguinda* – re-filed their claims against Texaco in Lago Agrio, Ecuador in May 2003. (Ex. E, 1.)

Although the federal substantive law of arbitration, as embodied in the FAA, evinces a clear policy in favor of enforcing valid written arbitration agreements, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), waiver of the right to arbitrate under the FAA may be found when prejudice to the opposing party is demonstrated. *Rush v. Oppenheimer*, 779 F.2d 885, 887 (2d Cir. 1985). In fact, a waiver of the right to arbitrate under the FAA "need not always be express; rather, courts can infer a waiver from the circumstances." *Jones Motor Co. v. Chauffeurs, Teamsters, & Helpers Local Union No. 633*, 671 F.2d 38, 42 (1st Cir. 1982). Although no one factor determines whether a party has waived its right to arbitrate, two relevant factors (among others) that a Court may consider are the length of the delay between when the party could have first sought arbitration and when arbitration ultimately was sought, and "whether the defendants have invoked the jurisdiction of the court by filing a counterclaim

---

[8] The 2001 *Aguinda* District Court decision is Exhibit G of the Exhibits filed by Plaintiffs on January 31, 2005.

without asking for a stay of the proceedings." *In re Citigroup, Inc., Capital Accumulation Plan Litigation*, 376 F.3d 23, 26 (1st Cir. 2004).

Even if Petroecuador had agreed to arbitrate. Texaco has waived its right to arbitrate in this matter under the FAA through its failure to make its arbitration demand against Petroecuador during the nine years in which *Aguinda* was litigated before federal courts in New York. No procedural bar prevented Texaco from moving the *Aguinda* Court to compel arbitration against Petroecuador under the FAA and the FSIA. *See* 9 U.S.C. § 4 (2000); 28 U.S.C. §§ 1330, 1605(a)(6)(A) (2000). That Texaco did not move the *Aguinda* Court to compel arbitration against Petroecuador was consistent with its then-strategy of arguing that the Aguinda Plaintiffs' claims should be transferred to Ecuador, in part because of Texaco's alleged inability to implead the Republic and Petroecuador in that action. Failure to move to compel arbitration was also consistent with Texaco's recognition that there was no operative agreement under which either the Republic or Petroecuador had agreed to arbitrate. Texaco did not make its arbitration demand until June 2004 – almost eleven years after the Aguinda Plaintiffs first filed their claims in New York. (Ex. E.)

The Republic and Petroecuador would be unfairly prejudiced by Texaco's eleven-year delay. *See Citigroup*, 376 F.3d at 27 (holding that defendant waived its right to arbitrate by waiting three years before seeking arbitration). For the eleven years prior to Texaco's arbitration demand, the Republic has based its litigation strategy with respect to the Aguinda Plaintiffs' claims on the premise that the Republic and Petroecuador enjoy sovereign immunity in the United States in this matter. Texaco argued for the sovereign immunity of the Republic and Petroecuador in *Aguinda* – when it was in Texaco's interest to do so – and should now be barred

13

from contradicting eleven years of settled expectations by the Republic through its present
arbitration demand.

Texaco also has waived its right to arbitrate under the FAA through its conduct in this
case. Rather than moving this Court to compel Petroecuador to participate in the arbitration
before the AAA, Texaco has chosen to assert counterclaims that seek indemnification on the
same claims on which Texaco is also seeking indemnification through the arbitration. (Texaco
Answer Countercl. para. 65 – 84.) If Texaco's real interest in this case was to see Petroecuador
participate in the arbitration proceedings that Texaco has commenced before the AAA, Texaco
would have moved this Court to compel arbitration immediately upon removing this case from
the New York Supreme Court.

As there is no genuine issue of material fact with respect to these issues, the Republic is
therefore entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c) on its claims for
injunctive relief through application of the doctrine of waiver.

C.    **Because the 1973 Contract was an official act of the Ecuadorian State
      implementing its oil policy, the act of state doctrine provides an independent
      ground at law for this Court to stay arbitration proceedings under the FAA.**

Pursuant to the act of state doctrine, "a United States court 'will refrain from examining
the validity of an act of a foreign state by which that state has exercised its jurisdiction to give
effect to its public interests.'" *Sharon v. Time, Inc.*, 599 F. Supp. 538, 544 (S.D.N.Y. 1984)
(quoting *Restatement (Second) of Foreign Relations Law* § 41 (1962)), *cited in W.S. Kirkpatrick
& Co. v. Enviro. Tectonics Corp.*, 493 U.S. 400, 406 (1990). Courts apply the act of state
doctrine "for the limited purpose of avoiding determinations of the validity of official acts of
foreign states and preventing invalidation of those acts." *Id.* at 545. The doctrine affects a
court's determination of what law to apply in a particular case by requiring that the public act of
a sovereign state within its own territory become "a principle of decision binding on federal and

state courts alike." *W.S. Kirkpatrick*, 493 U.S. at 406 (emphasis and internal quotation marks omitted).

Even if the Republic and/or Petroecuador had agreed to arbitrate this matter with Texaco, the act of state doctrine provides an independent ground at law for this Court to stay the arbitration commenced against Petroecuador by Texaco before the AAA. On the one hand, the FAA provides that valid agreements to arbitrate shall not be enforced if there exist "grounds . . . at law or in equity [as would support] the revocation of any contract." 9 U.S.C. § 2 (2000). On the other hand, the act of state doctrine requires courts to treat the public acts of foreign sovereigns with their own territories as controlling rules of law wherever they apply. *W.S. Kirkpatrick*, 493 U.S. at 406. Application of the act of state doctrine thus prevents courts from engaging in any inquiry that could result in a judgment that the foreign sovereign's public act is without validity or that refuses to give it legal effect. *See Sharon*, 599 F. Supp. at 545 (stating that act of state doctrine prevents "judicial redress of grievances predicated on [making] a finding of invalidity" regarding the public acts of a foreign sovereign). The combined effect of these two doctrines is clear: where the act of state doctrine provides a court with the controlling rules of law in the case before it, and those rules of law preclude the establishment of a valid agreement to arbitrate, then the operation of the act of state doctrine supplies grounds at law that require the court to refuse enforcement of the invalid arbitration agreement.

In this case, the 1973 Contract was an official act of the Ecuadorian State implementing its oil policy, and the act of state doctrine requires this Court to treat the provisions of the 1973 Contract as controlling rules of law wherever they apply. The circumstances surrounding the formation of the 1973 Contract through which the Republic decreed that CEPE/Petroecuador receive an option to purchase a 25% share of the Napo Consortium indicates that the 1973

15

Contract was an official act of the Republic implementing its oil policy that Texaco and Gulf were compelled to accept. The factual backdrop against which the 1973 Contract was established has already been the subject of factfinding by United States District Courts in two separate litigations to which Texaco was a party, and Plaintiffs here rely on those findings of fact for the circumstances surrounding the formation of that agreement. *See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 658 F. Supp. 1061 (D. Del. 1987). *aff'd in part, rev'd on other grounds*, 842 F.2d 1466 (3d Cir. 1988); *Norsul Oil & Mining Co. Ltd. v. Texaco, Inc.*, 703 F. Supp. 1520 (S.D. Fla. 1988).[9]

In February 1972, a military Government seized power in Ecuador. *Phoenix Canada*, 658 F. Supp. at 1066 – 67; *Norsul Oil*, 703 F. Supp. at 1529. The new Government sought to increase substantially the Republic's control over, and participation in, the development of its oil reserves. On June 6, 1972, the Republic issued Supreme Decree No. 430, which, *inter alia*, required Texaco and Gulf to agree to new oil concession contracts with the Republic and to relinquish a substantial percentage of Napo Concession lands. *Phoenix Canada*, 658 F. Supp. at 1067; *Norsul Oil*, 703 F. Supp. at 1529. If Texaco and Gulf had refused to comply with the Decree, they would have forfeited the Napo Concession. *Phoenix Canada*, 658 F. Supp. at 1067; *Norsul Oil*, 703 F. Supp. at 1529. When Texaco and Gulf relinquished a percentage of Napo Concession lands, CEPE immediately began to exploit those areas where oil production was already underway. *Phoenix Canada*, 658 F. Supp. at 1067; *Norsul Oil*, 703 F. Supp. at 1530. The Republic rejected the requests of Texaco and Gulf for compensation for the Concession

---

[9] *Phoenix Canada* and *Norsul Oil* are Exhibits M and N, respectively, of the Exhibits filed by Plaintiffs on January 31, 2005. The 1974 and 1977 Contracts also were official acts of the Ecuadorian State implementing its oil policy. *See* Pls.' Mot. to Dismiss Countercl. under Rule 12(b) Part III.B.1.

lands that they relinquished. *Phoenix Canada*, 658 F. Supp. at 1067; *Norsul Oil*, 703 F. Supp. at 1530.

On March 27, 1973, the Republic issued Decree No. 317, which laid out the terms of a Model Contract that Texaco and Gulf would be required to sign pursuant to Supreme Decree No. 430 of 1972. *Norsul Oil*, 703 F. Supp. at 1530. *See also Phoenix Canada*, 658 F. Supp. at 1069 – 70. Following slight modifications to the terms of the contract, the 1973 contract was re-promulgated by the Republic in Decree No. 925 on August 4, 1973, and Texaco and Gulf ultimately signed the 1973 Contract on August 6, 1973. *Phoenix Canada*, 658 F. Supp. at 1070; *Norsul Oil*, 703 F. Supp. at 1530.

The 1973 Contract provides for the termination of all previous contracts relating to the Napo Consortium between and among the parties. (Ex. C. cl. 53.1. 53.3.) As mandated by Supreme Decree No. 430 of 1972, the 1973 Contract incorporated the terms of a 1971 Hydrocarbons Law that gave the Republic greater control over oil pricing and a larger percentage of royalties. *Phoenix Canada*, 658 F. Supp. at 1066 – 67, 1070 – 71; *Norsul Oil*, 703 F. Supp. at 1529 – 30. The 1973 Contract also included the option for CEPE to purchase into the Napo Consortium by June 6, 1977. (Ex. C cl. 52.)

In short, the 1973 Contract was an act of state. The terms of the 1973 Contract were established through a series of executive decrees issued by the Republic. Texaco and Gulf reluctantly accepted the terms of the 1973 Contract, because they had little choice. A Texaco representative described the situation with which Texaco was confronted as follows: "[T]his is now in the form of a law and cannot be avoided without a direct confrontation. We reluctantly conclude it must be accepted . . . ." *Phoenix Canada*, 658 F. Supp. at 1070. *See also Norsul Oil*, 703 F. Supp. at 1529 ("After Decree 430 was enacted the companies had the option of refusing

to sign new contracts, and probably losing all or part of their investments, or signing the new agreement with the new limitations included."). Through the 1973 Contract, Texaco and Gulf were forced to relinquish, *without compensation*, concessionary rights to lands that were granted to them under the original Napo Concession. They were also forced to agree to less favorable oil pricing and royalty terms with the Republic and to allow CEPE to buy into their Consortium. Clearly. the 1973 Contract was not a freely bargained contract between equal parties, but rather its formation was an act of the Ecuadorian state implementing its oil policy.[10]

The 1973 Contract was an expropriation by the Republic of certain valuable rights or assets of the Napo Consortium. A foreign sovereign's expropriation of property within its own territory is a classic example of a public act covered by the act of state doctrine. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 – 437 (1964). The Republic's various decrees compelling Texaco and Gulf to enter into new contractual terms with the Republic and CEPE "were issued to carry out the public interest of the Ecuadorian State . . . ." *Norsul Oil*, 703 F. Supp. at 1540 – 41. As such, the act of state doctrine applies to the 1973 Contract, requiring this Court to treat its provisions as controlling rules of law in this case wherever they apply.

The 1973 Contract provides for the termination of all previous contracts relating to the Napo Concession between and among the parties and requires Texaco to resolve disputes before the courts of Ecuador.

The 1973 Contract expressly provides for the termination of all previous contracts relating to the Napo Consortium between and among the Republic. Texaco, and Gulf. Clause 53.1 states that "the parties shall hereinafter be governed only by the stipulations set forth in this

---

[10] *Cf. Phoenix Canada*, 658 F. Supp. at 1072 (referring to the 1974 Contract, Minister of Natural Resources and Energy Gustavo Jarrin Ampudia testified in a deposition that "I was responsible and I implemented oil policy and I established it").

public instrument." (Ex. C cl. 53.1.) Clause 53.3 requires Texaco and Gulf to establish a new

operating agreement for the Concession. (Ex. C cl. 53.3.) The clause further requires that

"[s]aid [operating] agreement shall not contain the transfer of [Concession] rights, and shall not

limit at all [Texaco and Gulf's] obligations." (Ex. C. cl. 53.3.) Through these provisions, the

1973 Contract establishes a new contractual framework to govern the operation of the Napo

Consortium.

The 1973 Contract also contains a clearly-expressed requirement that all disputes relating

to the Napo Consortium be resolved in an Ecuadorian forum. Clause 50.1 of the 1973 Contract

states that Texaco and Gulf "shall submit to the laws, courts, and judges of Ecuador . . . and

expressly waive any claim through diplomatic channels." (Ex. C cl. 50.1.) Clause 43.2 creates a

unique method of alternative dispute resolution for certain disputes that might arise under the

Contract:

> Indemnities to be paid by the contractors for the damages caused on lands, crops,
> buildings or other properties due to the exploration, exploitation or any other
> phase of the oil industry, shall be determined by experts designated by the parties.
> In case of disagreement the Ministry concerned shall appoint a third expert,
> whose verdict shall be unappealable.

(Ex. C cl. 43.2.) These two provisions confirm that the underlying intent behind the 1973

Contract was that all disputes involving the Napo Consortium be resolved in Ecuador.

Texaco is required by the 1973 Contract to make all claims relating to the Napo

Consortium in an Ecuadorian forum. By making its demand for arbitration before the AAA,

Texaco has violated Clause 50.1 of the 1973 Contract.

Under the act of state doctrine, this Court is required to treat the 1973 Contract as "a

principle of decision binding on federal and state courts alike." *W.S. Kirkpatrick*, 493 U.S. at

406 (emphasis and internal quotation marks omitted). In other words, because the 1973 Contract

originated as an executive decree of the Republic, the act of state doctrine requires this Court to

apply the provisions of the 1973 Contract as valid rules of law binding on the parties in this case.
The act of state doctrine operates to prevent this Court from holding that Texaco might have an
available forum for its claims other than the courts of Ecuador, because so doing would
undermine the validity of the 1973 Contract as a lawful decree of the Republic. *See Sharon*, 599
F. Supp. at 545 (stating that act of state doctrine prevents "judicial redress of grievances
predicated on [making] a finding of invalidity" regarding the public acts of a foreign sovereign).
Thus, the act of state doctrine provides grounds at law for this Court to issue a permanent stay of
arbitration proceedings under the FAA.

Therefore, the arbitration proceedings commenced by Texaco against Petroecuador
before the AAA should be stayed under the FAA, because under the act of state doctrine the
1973 Contract is a public act of the Ecuadorian State that requires Texaco to bring its claims
before the courts of Ecuador.

**IV.    Conclusion**

Plaintiffs, the Republic of Ecuador and Petroecuador, respectfully request that their
motion for summary judgment seeking a permanent stay of the arbitration proceedings
commenced by Texaco against Petroecuador before the American Arbitration Association be
granted.

Dated:  February 7, 2005

Respectfully submitted,


/s/ Terry Collingsworth
Terry Collingsworth, Esq.
Thomas Cmar, Esq.
Natacha Thys, Esq.
Derek Baxter, Esq.
INTERNATIONAL LABOR RIGHTS FUND

733 15th Street, N.W. Suite 920
Washington, D.C. 20005
T: (202) 347-4100
F: (202) 347-4885


/s/ Robert A. Skirnick
Robert A. Skirnick (RS-2636)
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
One Liberty Plaza
35th Floor
New York, NY 10006
T: (212) 240-0020
F: (212) 240-0021

Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
117 S. 17th Street
22nd Floor
Philadelphia, PA 19103
T: (215) 564-5182
F:(215) 569-0958

Dr. José María Borja Gallegos
Procurador General del Estado Ecuatoriano
Calle Robles 731 y Avenida Amazonas
Quito, Ecuador
Tel. 011-593-22-562-059/011-593-22-562-029
Fax. 011-593-22-562-080

Dra. Martha Escobar Koziel
Subdirectora de Contencio Administrativo
Dirección General de Patrocinio
Procuradoría Nacional del Estado
Calle Robles 731 y Avenida Amazonas
Quito, Ecuador
Tel. 011-593-22-580-357/011-593-22-562-058
Fax. 011-593-22-559-305

Dr. Fernando Castro Barrios
Asesor del Presidente Ejecutivo
Ing. Luis Camacho Barrios
PETROECUADOR
Avenida 6 de Diciembre y Alpallana
Quito, Ecuador

Tel. 011-593-22-505-550
Fax. 011-593-22-669-738

Attorneys for the Republic of Ecuador and Petroecuador