UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
:
THE REPUBLIC OF ECUADOR and                                        :
PETROECUADOR,                                                      :
:
Plaintiffs,                                           :
:
— against —                                             :          04 CV 8378 (LBS)
:
CHEVRONTEXACO CORPORATION and                                      :          ECF CASE
TEXACO PETROLEUM COMPANY,                                          :
:
Defendants.                                           :
-------------------------------------------------------------------x
:
CHEVRONTEXACO CORPORATION and                                      :
TEXACO PETROLEUM COMPANY,                                          :
:
Counterclaim-Plaintiffs,                              :
:
— against —                                             :
:
THE REPUBLIC OF ECUADOR and                                        :
PETROECUADOR,                                                      :
:
Counterclaim-Defendants.                              :
-------------------------------------------------------------------x

**CHEVRONTEXACO CORPORATION'S AND TEXACO PETROLEUM COMPANY'S
MEMORANDUM IN OPPOSITION TO THE REPUBLIC OF ECUADOR'S AND
PETROECUADOR'S MOTION FOR SUMMARY JUDGMENT SEEKING A
PERMANENT STAY OF ARBITRATION PROCEEDINGS**

**JONES DAY**
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939

**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939

**Counsel for ChevronTexaco Corporation and Texaco Petroleum Company**

## TABLE OF CONTENTS

**Page**

I.    The 1973 Concession Did Not Extinguish The Napo JOA, And Petroecuador
Assumed The Napo JOA And Its Arbitration Clause By Joining The Consortium .......... 3

    A.    The Absence Of Novation Is Evident On The Face Of The Napo JOA And
The 1973 Concession ............................................................................................ 4

    B.    The Absence Of Novation Is Confirmed By The Evidence That
Petroecuador Assumed The Napo JOA In 1974 By Stepping Into The
Shoes Of The Consortium Members.................................................................. 11

        1.    Petroecuador Admitted That The Napo JOA Governs ........................... 12

        2.    Petroecuador Directly Benefited From The Napo JOA ......................... 15

        3.    Petroecuador Adhered To The Precise Obligations Of The Napo
JOA ....................................................................................................... 17

        4.    Petroecuador Asserted Rights Under The Napo JOA............................. 18

    C.    The Republic's And Petroecuador's Act Of State Argument Is Merely A
Recharacterization Of Their Meritless Claim About The 1973 Concession ....... 20

II.    The Right To Arbitrate Has Not Been Waived............................................................. 20

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001),
  *aff'd*, 303 F.3d 470 (2d. Cir. 2002) .................................................................22

*Aquinda [sic] v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996),
  *mot. for recons. denied*, 175 F.R.D. 50 (S.D.N.Y. 1997) ................................21

*Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
  775 F.2d 476 (2d Cir. 1985) ..............................................................................11

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
  170 F.3d 349 (2d Cir. 1999) .........................................................................11, 16

*In re Arbitration of A/S Ganger Rolf & Zeeland Transp., Ltd.*,
  191 F. Supp. 359 (S.D.N.Y. 1961)......................................................................25

*In re Arbitration of Waterspring, S.A. & Trans Marktg. Houston Inc.*,
  717 F. Supp. 181 (S.D.N.Y. 1989)......................................................................25

*In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68 (2d Cir. 1996) ........................................4

*Bell v. Cendant Corp.*, 293 F.3d 563 (2d Cir. 2002) ...................................................20

*Deloitte Noraudit A/S v. Deloitte, Haskins & Sells, U.S.*,
  9 F.3d 1060 (2d Cir. 1993) ................................................................................16

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin
  Intermediates, S.A.S.*, 269 F.3d 187 (3d Cir. 2001) ........................................16

*Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*,
  No. 99 C 4704, 2003 WL 164220 (N.D. Ill. Jan. 23, 2003) .............................19

*Hardie v. United States*, 367 F.3d 1288 (Fed. Cir. 2004) ............................................11

*Hardie v. United States*, No. 01-5005,
  2001 WL 1154557 (Fed. Cir. Oct. 1, 2001)................................................14, 19

*Holland v. Fahnestock & Co.*, 210 F.R.D. 487 (S.D.N.Y. 2002) ...................................4

*John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001)...............................24

# TABLE OF AUTHORITIES (CONT.)

**Page**

*Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) ............................................................21, 23, 24

*Kolson v. Vembu*, 869 F. Supp. 1315 (N.D. Ill. 1994).....................................................................14

*Lloyds Bank PLC v. Republic of Ecuador*, No. 96 Civ. 1789(DC)(L),
    1998 WL 118170 (S.D.N.Y. Mar. 16, 1998) .........................................................................4

*McCabe v. Queensboro Farm Prods.*, 239 N.E.2d 340 (N.Y. 1968) ...........................................23

*Plumbers & Steamfitters Local No. 150 Pension Fund v.*
    *Vertex Constr. Co.*, 932 F.2d 1443 (11th Cir. 1991) ...........................................................8

*Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210 (S.D.N.Y. 2003).............................................11

*S&R Co. v. Latona Trucking, Inc.*, 159 F.3d 80 (2d Cir. 1998).....................................................21

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith*
    *Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999) .......................................................16

*Sutera v. Schering Corp.*, 73 F.3d 13 (2d Cir. 1995).....................................................................20

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ........................................................................................11, 19

## STATUTES AND RULES

Fed. R. Civ. P. 56(f) ......................................................................................................................20

For several decades, Petroecuador acknowledged, benefited from, complied with, and asserted rights under the 1965 Napo Joint Operating Agreement ("Napo JOA"). Indeed, Petroecuador has admitted that it assumed the obligations of the Napo JOA when it stepped into the shoes of the original signatories to the agreement, first as a third party with a minority interest and then, after acquiring a co-party's interest, as the majority shareholder. But now, despite these past acts and admissions, Plaintiffs Petroecuador and the Republic of Ecuador raise, *for the first time*, the argument that Petroecuador was never bound by the Napo JOA. Plaintiffs wrongfully seek to deprive Defendants ChevronTexaco Corporation and Texaco Petroleum Company ("TexPet") of their contractual right under the Napo JOA to proceed with an arbitration pending before the American Arbitration Association ("AAA").

The arbitration demand (Ex. 1)[1] was brought to enforce Petroecuador's contractual obligation to indemnify ChevronTexaco and TexPet for past, present, and future losses arising out of a third-party lawsuit pending in Lago Agrio, Ecuador (*see* Affidavit of Ricardo Reis Veiga ("Veiga Aff.") Ex. H (Lago Agrio Compl., 5/7/03)). That lawsuit, in turn, arises out of TexPet's prior work as "Operator" of the Petroecuador-TexPet "Consortium," which explored for and extracted oil under a concession granted by the Republic of Ecuador. The concession was granted to, and the Consortium was formed by, TexPet and Ecuadorian Gulf Oil Company ("Gulf") in the mid-1960s. A decade later, after oil extraction began, Petroecuador acquired a 62.5% stake in the Consortium by first acquiring a 25% interest (12.5% each from TexPet and Gulf) and then acquiring Gulf's remaining 37.5% interest.[2] The concession term expired in

---

[1] Numbered exhibits are attached to the Declaration of Michael Kolis submitted herewith. Affidavits are also attached, accompanied by lettered exhibits.

[2] All references herein to the Petroecuador-TexPet Consortium include the period, from 1974 to 1977, when Gulf was a third member of the Consortium.

1992, and all Consortium equipment and other hard assets were transferred to Petroecuador, which has continued oil operations in the concession area ever since. Both before and after Petroecuador's entry, the Consortium's internal operations were governed by the Napo JOA, which unambiguously requires Petroecuador's indemnification of the Operator against third-party claims and, just as clearly, requires arbitration before the AAA of all disputes.[3]

The Republic's and Petroecuador's three arguments for avoiding its obligation to arbitrate are an attempt to avoid these facts by stretching separate obligations and irrelevant documents to cover over the whole history of Petroecuador's participation in the Napo JOA. *First*, a 1973 agreement amending the terms of the concession (the "1973 Concession") did not amount to a novation that extinguished the Napo JOA. To the contrary, the Napo JOA expressly provided that it would remain in effect notwithstanding any amendment or substitution of the original concession. Thus, the Napo JOA continued to govern the Consortium's internal operations and became binding on Petroecuador when it entered the Consortium in 1974—as is confirmed by the parties' conduct and express admissions throughout the Consortium's existence and beyond. *Second*, because the 1973 Concession did not extinguish or alter the parties' obligations under the Napo JOA, ChevronTexaco and TexPet need not and do not suggest that the 1973 Concession is invalid. Accordingly, Plaintiffs' invocation of the act of state doctrine is a mere diversion that should be ignored. *Third*, the Republic's and Petroecuador's waiver argument (which in all events is not properly before the Court) does not withstand scrutiny because ChevronTexaco and TexPet timely filed their arbitration demand after Petroecuador repudiated its indemnification obligation with regard to the underlying litigation in Lago Agrio.

---

[3] Attached hereto are schematic timelines presenting the history of the Napo Concession and the relationship between Petroecuador and TexPet.

**I.    The 1973 Concession Did Not Extinguish The Napo JOA, And Petroecuador Assumed The Napo JOA And Its Arbitration Clause By Joining The Consortium**

In opposition to the Republic's and Petroecuador's earlier motion for preliminary injunction, ChevronTexaco and TexPet presented overwhelming evidence—reviewed in Section I.B below—establishing that Petroecuador repeatedly admitted the Napo JOA's binding effect, accepted its benefits, assumed its obligations, and asserted rights under it.  In response, the Republic and Petroecuador withdrew the motion for preliminary injunction and sought postponement of these proceedings, ostensibly so that they would have time to prepare, authenticate, and translate affidavits and documents to dispute ChevronTexaco's and TexPet's evidence.  Now, however, the Republic and Petroecuador seek to avoid this evidence—as well as pending discovery demands—by moving for summary judgment based on *only* the 1973 Concession and the 1974 and 1977 agreements through which Petroecuador acquired its stake in the Consortium.  According to the Republic and Petroecuador, the 1973 Concession extinguished the Napo JOA, and neither the 1973 Concession nor the 1974 or 1977 agreement included an arbitration clause to replace the one in the Napo JOA.  The Republic and Petroecuador are quite clear that if this thin and formal novation argument is not sufficient, they have no further facts or law to offer to avoid the binding effect of the Napo JOA.  But the *absence* of a novation is evident on the face of the Napo JOA and the 1973 Concession.  And, significantly, the absence of a novation is confirmed by the very evidence that the Republic and Petroecuador seek to avoid:  Both Petroecuador and TexPet adhered to the Napo JOA and expressly recognized its binding effect, in direct contravention of the notion that the Napo JOA had been extinguished in 1973.  Because the Napo JOA thus remained in effect and was assumed by Petroecuador when it entered the Consortium in 1974, the absence of arbitration clauses in the 1973, 1974, and 1977 agreements is immaterial.

### A.    The Absence Of Novation Is Evident On The Face Of The Napo JOA And The 1973 Concession

A novation exists only if there is "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract." *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82-83 (2d Cir. 1996) (internal quotation marks omitted). "The parties must have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement." *Lloyds Bank PLC v. Republic of Ecuador*, No. 96 Civ. 1789(DC)(L), 1998 WL 118170, at *10 (S.D.N.Y. Mar. 16, 1998) (internal quotation marks omitted); *accord Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 490 (S.D.N.Y. 2002); Affidavit of Dr. Gustavo Romero-Ponce ("Romero Aff.") ¶¶ 44-50 (analogous standard under Ecuador law). As in another case where the Republic asked this Court to find a novation, "Ecuador cannot establish . . . [a] novation[] because it fails to offer any evidence of a 'clear and definite' intent to extinguish the parties' prior obligations." *Republic of Ecuador*, 1998 WL 118170, at *10. In fact, the relevant agreements clearly demonstrate that the Napo JOA was *not* extinguished.

On its face, the 1973 Concession states that it supersedes prior *concession* agreements, thereby showing that the parties did *not* intend to extinguish the Napo JOA. (Affidavit of Rodrigo Pérez Pallares ("Pérez Aff.") Ex. E (1973 Concession § 53.3).) And the Napo JOA, anticipating the 1973 Concession, expressly provided that the operating agreement would remain in effect for as long as the Consortium members had rights and obligations under the 1964 "Napo Concession," "*including conversions, extensions, renewals, substitutions, revisions and reissuances thereof.*" (*Id.* Ex. C (Napo JOA ¶ 3.1 (emphasis added)).)

The Republic's and Petroecuador's novation argument not only ignores the clear evidence on the face of the 1973 Concession and the Napo JOA, but also ignores the

fundamental distinction between concession and joint operating agreements generally. Through *concession* agreements, a host government grants oil exploration and extraction rights to "concessionaire" companies; through *joint operating* agreements, the concessionaires establish their rights and obligations *to each other*.

A concession agreement is a type of host government contract used to contract with private companies to carry out the exploration and development of government-owned mineral and hydrocarbon resources, such as crude oil. (*See* Affidavit of Professor Owen L. Anderson ("Prof. O. Anderson Aff.") ¶¶ 11-12.) Because, in most countries other than the United States, governments, rather than private parties, own the mineral and hydrocarbon resources, host government contracts are common, and they govern the rights and obligations of the host government and the company with respect to each other. (*Id.* ¶¶ 11-14.) Matters typically addressed in host government contracts include: the minimum work obligations that the companies agree to carry out; fiscal terms regarding payments to the host government; authorization of the companies to export hydrocarbons, subject to possible domestic supply commitments; and the hiring and training of nationals. (*Id.* ¶ 15.) Often two or more companies spread the risks of failure and the benefits of success by entering into a single contract with the host government. In these situations, the host government contract still governs the rights and obligations of the host government vis-à-vis the companies. (*Id.* ¶¶ 14, 16; Affidavit of Norman N. Anderson ("N. Anderson Aff.") ¶ 12.)

In contrast to host government contracts, joint operating agreements govern the rights and obligations between (or among) the contracting companies. Joint operating agreements govern how the companies acting jointly will meet their obligations and efficiently realize any benefits from their investment. (Prof. O. Anderson Aff. ¶¶ 17-19; N. Anderson Aff. ¶ 13.)

It is standard custom and practice that joint operating agreements have certain key features, including recognition that each company will share in production, expenses, and potential liability in proportion to its percentage interest of concession rights; designation of an operator; confirmation that the operator (if one of the companies) will make no profit and suffer no loss solely by reason of serving as operator; indemnification provisions; confirmation that the operator acts on behalf of all parties to the agreement; and dispute resolution provisions, such as arbitration clauses.  (Prof. O. Anderson Aff. ¶¶ 20-25, 30; N. Anderson Aff. ¶¶ 14-18.)  Once entered into, the joint operating agreement is ordinarily effective for the entire duration of the parties' underlying concession rights, and remains effective for any necessary winding up of the parties' joint operations or liabilities.  (Prof. O. Anderson Aff. ¶¶ 28-29.)

In short, concession and operating agreements are inherently different agreements entered into by different groups of parties for different purposes.  These distinctions give rise to a strong presumption that a new or amended concession agreement is *not* intended to extinguish a joint operating agreement.  The Republic's and Petroecuador's contrary presumption—that a new concession contract automatically extirpates a corresponding joint operating agreement—is as illogical as a presumption that a new joint operating agreement automatically extinguishes the corresponding concession.

Nor does it make a difference when a new or amended concession agreement adds or substitutes a new concessionaire.  A joint operating agreement typically provides that it is binding on any assignees or successors, so that, absent an express release, an assigning party remains liable for all costs and liabilities that have accrued up to the date of assignment, but may be relieved of all obligations arising thereafter.  Assignees are bound by the existing agreement because existing parties do not want to renegotiate their agreement every time an assignment

-6-

occurs, especially because renegotiation in the middle of joint operations would be highly inefficient and could prove difficult to achieve. Unless and until a new agreement is executed, therefore, the pre-existing operating agreement remains in force, allowing changes in consortium ownership to efficiently occur without imposing chaos on, or otherwise impeding, the joint operations. (*Id.* ¶ 29; N. Anderson Aff. ¶¶ 18-19.)

The same custom and practice exists in situations where a national oil company acquires a joint interest in a contract area, as became increasingly common after the widespread formation of such companies in the 1960s and 1970s. (Prof. O. Anderson Aff. ¶ 32.) No matter when and under what circumstances a national oil company becomes a participating joint owner, it will typically and automatically become a party to the existing joint operating agreement in the absence of a separately negotiated joint operating agreement. (*Id.* ¶ 33.)

The Napo Concession and the Napo JOA conform to this industry custom and practice precisely. (*Id.* ¶ 34; N. Anderson ¶¶ 10, 14.) A 1964 host government contract—the "1964 Concession"—established and governed the relationship between the Republic of Ecuador and the concessionaires, TexPet and Gulf, with respect to exploration and production rights in the "Oriente" region of Ecuador near the Napo River. In 1965, TexPet and Gulf entered into the Napo JOA, which contained the standard joint operating terms discussed above, including: duration provisions (Articles 2 and 3); provisions on the relationship of the operator and non-operators, including the powers and duties of the operator, the limited liability of the operator, and indemnity for third-party claims (Articles 5-8); a dispute resolution provision (Article 19); and provisions for assignment and for binding successors in interest (Articles 16 and 26). (*See* Pérez Aff. Ex. C (Napo JOA).)

In 1971, the Republic of Ecuador changed its regulations to take greater royalties from oil concessions, to impose greater restrictions on concessionaires, and to include an option for its state-owned oil company, Corporación Estatal Petrolera Ecuatoriana ("CEPE"), later renamed "Petroecuador,"[4] to take a 25% share of all concessions.  (Romero Aff. ¶¶ 9-10; Pérez Aff. ¶¶ 30-31.)  TexPet and Gulf thereafter entered into a new concession contract with the Republic, the "1973 Concession," which included the option for participation by Petroecuador.  (Pérez Aff. ¶¶ 32-34.)  The 1973 Concession, like the original 1964 Napo Concession, governed the relationship between the Republic and the concessionaires jointly.  (*See, e.g.*, *id.* Ex. E (1973 Concession § 1.1 ("The rights and obligations of the two contracting companies are indivisible and in equal parts, and, consequently, the companies are severally responsible towards the Government of all the obligations deriving from this contract.")).)

Neither the Republic nor the concessionaires suggested that the 1973 Concession would have any effect on the Napo JOA.  (Bucaram Aff. ¶ 33.)  To the contrary, the 1973 Concession, as already  mentioned, identified precisely which contracts it affected and replaced—namely, the 1961 Coca Concession,[5] the 1964 Concession, and a 1969 modification—and the Napo JOA was not included in this list.  (Pérez Aff. Ex. E (1973 Concession § 53.1).)  It is a settled rule of contract construction that, "when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."  *Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991).  Thus, the exclusion of the Napo JOA from the list of superseded contracts demonstrates that the 1973 Concession did

---

[4] For ease of reference, the remainder of this memorandum generally refers to CEPE and Petroecuador as "Petroecuador," irrespective of timeframe.

[5] The 1961 Coca Concession, which TexPet and Gulf acquired from another company in 1966, granted concession rights for the Coca area of the Oriente region, located adjacent to the Napo Concession.  (Ex. 2 (1961

not extinguish the Napo JOA.  Moreover, the Napo JOA itself provided that it would remain in effect for as long as the Consortium members had concession rights in the Napo Concession. (Pérez Aff. Ex. C (Napo JOA ¶ 2.1 ("This Agreement . . . shall endure so long as and to the extent that [the parties] have work obligations and rights to production within the Joint Area, and thereafter until all jointly-owned property and facilities shall have been disposed of and a final settlement made between the Parties."); *id.* ¶ 3.1 (defining "Joint Area" as all areas within Napo Concession, including all substitutions and revisions)).)  These clear provisions—demonstrating that the 1973 Concession was *not* a novation of the 1965 Napo JOA—are fully consistent with the oil industry's use of corresponding but distinct concession agreements and joint operating agreements.

Nevertheless, in an attempt to argue that a novation was intended, the Republic and Petroecuador invoke certain provisions of the 1973 Concession.  Thus, Plaintiffs invoke the final sentence of Clause 53.1, which states that "the parties shall hereinafter be governed only by the stipulations set forth in this public instrument."[6]  But, in context, it is clear that the final sentence refers only to the rights and obligations of the Consortium *with respect to the Republic*.  The full provision states:

CLAUSE 53.  Substitution of Contracts

53.1    By virtue of the mandates contained in the fifth and sixth transitory provisions of Art. 1 of Supreme Decree No. 430 dated June 6, 1972 and Supreme Decree 516 published in Official Registry No. 307 dated May 16, 1973, "*the contract executed on August 26, 1961, in its applicable portion, and the contracts executed on March 5,*

---

Concession); Ex. 3 (Contract between Minas, TexPet, and Gulf, 2/23/66).)  The 1973 Concession consolidated the Napo and Coca Concessions.

[6] Further confusing matters, the Republic and Petroecuador assert that Petroecuador lacked independent legal identity and contracting capacity, and that they therefore entered into contracts as one entity.  On the contrary, under Ecuador law, Petroecuador had the authority to enter into contracts in its own right.  (Romero Aff. ¶¶ 7-34.)

>*1964, and June 27, 1969* are completely substituted by the present contract as of the date of registration in the Hydrocarbons Registry.  Consequently, the parties shall hereinafter be governed only by the stipulations set forth in this public instrument.

(Pérez Aff. Ex. E (1973 Concession § 53.1 (emphasis added)).).  The word "consequently" confirms the sentence's limited scope:  Because the 1973 Concession superseded all three prior concession agreements between the Consortium members and the Republic, the 1973 Concession became the sole agreement governing the rights and obligations of the concessionaires vis-à-vis the Republic.[7]

The Republic and Petroecuador similarly err in invoking Clause 53.3, arguing (pp. 8-9) that the provision "require[d]" the concessionaires to enter into a *new* operating agreement, thereby supposedly extinguishing the existing operating agreement.  This grossly mischaracterizes Clause 53.3, which provides that "the contractors are hereby *authorized* to enter agreements with a company constituted by them in order to exercise the rights conferred by this contract."  (Pérez Aff. Ex. E (1973 Concession § 53.3 (emphasis added)).)  Thus, the contractors were allowed (but not required) to cancel the Napo JOA and create a new company to operate the Consortium.  If, as it turned out, the contractors chose *not* to create a new company, they needed no authorization for the Consortium's operations because the Napo JOA remained in effect.

Finally, the Republic and Petroecuador also err in invoking particular provisions that address the resolution of disputes and liability allocation, arguing (p. 8) that the provisions evince an intent for "all disputes involving the Napo Consortium [to] be resolved in Ecuador." On the contrary, as explained in Section II.A of ChevronTexaco's and TexPet's Memorandum in

---

[7] Indeed, the 1973 Concession expressly identifies its limited scope by defining the "contracting parties" as "'the Government' and 'the contractors', respectively."  (Pérez Aff. Ex. E (1973 Concession § 1.1).)

Opposition to Plaintiffs' Motion to Dismiss Counterclaims, the provisions do not provide for
*exclusive* jurisdiction in Ecuador, and they have no force beyond disputes over the 1973
Concession itself.  In any event, the provisions certainly do not express an intent to override the
Napo JOA's express arbitration clause.  Without clear intent, Plaintiffs' novation argument fails.[8]

### B.    The Absence Of Novation Is Confirmed By The Evidence That Petroecuador Assumed The Napo JOA In 1974 By Stepping Into The Shoes Of The Consortium Members

The Republic and Petroecuador appropriately do not dispute that, when Petroecuador
entered into the Consortium, it necessarily acquired—on a going-forward basis—the rights and
obligations of all Consortium members in proportion to its ownership interest.[9]  What they claim

---

[8] Clear intent is required not only under the standard for establishing novation but also under the rule that any ambiguities must be construed against the party that offered the language.  *See, e.g., Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482-83 (2d Cir. 1985).  As the Republic and Petroecuador go to great lengths to establish, the Republic "egregious[ly]" insisted upon the terms of the 1973 Concession.  (Pls.' Mot. Dismiss Countercls. at 18.)

[9] When a party acquires an interest in an ongoing enterprise, it steps into the shoes of the party from which it acquired an interest, and, as a consequence, becomes bound by pre-existing agreements governing the enterprise's operations—including being bound by any arbitration provisions in the agreements.  *See, e.g., Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 778-79 (2d Cir. 1995); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999).  The Federal Circuit recently applied this rule in *Hardie v. United States*, 367 F.3d 1288, 1291 (Fed. Cir. 2004), holding that the federal government "unequivocally" had become "bound by the terms of [a] joint venture agreement," including its arbitration clause, when the government acquired a party's interest in the venture.  The court explained that the government was bound because it had "elected to step into the shoes" of a party to the venture.  *Id.*  Accordingly, "[e]ven though the United States was not an original party to the joint venture agreement, it assumed the obligations of the original party . . . when it received that party's interest."  *Id.* at 1289; *see also Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 219-20 (S.D.N.Y. 2003) (holding that, because an acquiring broker-dealer had stepped into the shoes of the first broker-dealer, it was bound to client agreements executed by the first broker-dealer, including the agreements' arbitration provisions).

As in *Hardie*, Petroecuador necessarily stepped into the shoes of TexPet and Gulf and assumed the obligations of the Napo JOA—the agreement that governed the commercial enterprise into which it had entered— including the arbitration obligation.  Petroecuador's assumption is reinforced by the text of the Napo JOA itself, which provides that it "shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto and each of them respectively." (Pérez Aff. Ex. C (Napo JOA ¶ 26.1).) *See Ryan, Beck*, 268 F. Supp. 2d at 214, 219-20 (non-signatory that stepped into the shoes of party to agreement was bound to arbitration because "[e]ach such Client Agreement . . . provided that the Client Agreement would 'inure to the benefit of and be binding upon' the parties to the Client Agreement and, among others, their respective successors and assigns").  Petroecuador's assumption of the Napo JOA is especially clear because its initial 25% stake, authorized by the 1973 Concession, was mandated by the Republic.  (*See* Bucaram Aff. ¶¶ 23-24.)  Like the government's co-venturer in *Hardie*, therefore, TexPet "had no choice but to accept its new 'partner,'" 367 F.3d at 1291, and Petroecuador, as the uninvited partner, became bound by the agreement that had governed the operations of the Consortium ever since its inception.  Petroecuador's assumption of the Napo JOA also is reinforced by the fact that, after it entered the

instead is that the Napo JOA was not part of those rights and obligations because it supposedly

had been extinguished by the 1973 Concession.  This contention is contradicted not only by the

two agreements themselves but also by the undisputed facts showing that Petroecuador, for

several decades:  (1) expressly admitted that the Napo JOA governs; (2) directly and

substantially benefited from the Napo JOA; (3) consistently complied with the Napo JOA; and

(4) even affirmatively asserted rights under the Napo JOA.

### 1.    Petroecuador Admitted That The Napo JOA Governs

Starting with the most striking evidence first, Petroecuador's express admissions show

that it is bound by the Napo JOA.  Jorge Pareja Cucalón, General Manager of CEPE

(Petroecuador's predecessor) in the early 1980s, has observed:  "There was no question that,

when CEPE became an interest holder in the Napo Concession, *CEPE also became a party to the*

*Napo JOA, as that contract controlled the relationship and operations of the parties to the*

*concession*."  (Affidavit of Jorge Pareja Cucalón ("Pareja Aff.") ¶ 8 (emphasis added).)  Mr.

Pareja "*always understood, as did CEPE,* that the Napo JOA was the agreement that governed

the relationship between TexPet and CEPE regarding oil exploration and production in the Napo

Concession."  (*Id.* (emphasis added).)[10]  This testimony is fully confirmed and amplified by that

of René Bucaram, the Consortium's Manager of Operations from 1978 to 1987, Donald Sawyer,

the General Manager of TexPet's separate "proprietary" office[11] from 1984 through 1989, and

---

Consortium, both TexPet and Gulf remained Consortium owners.  The Napo JOA continued to apply as to TexPet and Gulf and, thus, as to Petroecuador as well.

[10] Significantly, Mr. Pareja's affidavit was first submitted to the Court last October, in conjunction with ChevronTexaco's and TexPet's opposition to the motion for preliminary injunction.  The Republic and Petroecuador have failed to introduce a single affidavit, or any other evidence, to dispute this testimony.

[11] To carry out its duties as Operator of the Consortium, TexPet established a "Consortium" office, which was distinct from a separate "proprietary" office that handled TexPet's obligations as a Consortium member. (Bucaram Aff. ¶¶ 31, 33.)

Rodrigo Pérez Pallares, who was TexPet's Chief Counsel from 1975 to 1977 and an Assistant Manager in the proprietary office from 1987 to 1982.  (Bucaram Aff. ¶¶ 29, 33; Affidavit of Donald G. Sawyer ("Sawyer Aff.") ¶ 6; Pérez Aff. ¶ 37.)

Petroecuador also has admitted repeatedly in writing that it is bound by the Napo JOA. For example, the parties acknowledged the continuing force of the Napo JOA in discussions leading up to the assumption of the role of Operator by a subsidiary of Petroecuador (Petroamazonas) in 1990.  In an appendix to the Agreement for the Change of Operator of the Consortium Petroecuador-Texaco, the parties agreed:  "For any other [cash call] procedure not expressly covered in the present Appendix, the co-owners [Petroecuador and TexPet] and Petroamazonas *shall be bound by the Napo Agreement*."  (Pérez Aff. Ex. N (Agreement Establishing Procedures to Request Funds in the Petroecuador-Texaco Consortium ¶ 15 (emphasis added)).)[12]  Likewise, Petroamazonas's 1990 annual report, prepared and certified by Price Waterhouse, explicitly acknowledged that "[t]he activities of the PETROECUADOR-

---

[12]  The entire course of dealing surrounding Petroecuador's assumption of the role of Operator, and the concomitant amendment or replacement of the Napo JOA, was consistent with the admission in the 1990 agreement that the Napo JOA governed unless and until it was superseded.  In 1985, for example, the parties agreed that TexPet would be replaced as Operator, that a new joint operating agreement would be signed, and that the Napo JOA would remain effective in the interim:  "Until the [new] Joint Operations Agreement becomes effective, the Consortium's operations shall be carried out according to the standards and procedures that have been in force up to now."  (*See* Sawyer Aff. Ex. A (1985 Agreement ¶ 3.3.2) & ¶ 12 (reference to "standards and procedures that have been in force up to now" was reference to Napo JOA); Pérez Aff. ¶ 44 (same).)  During the subsequent negotiations, moreover, Petroecuador's General Manager sent TexPet a partial draft agreement providing that the Napo JOA "would be *amended* as follows."  (Pérez Aff. Ex. M (facsimile from Petroecuador to TexPet, 6/20/90 (emphasis added)).)

The parties ultimately executed a new joint operating agreement in July 1991, which, like the Napo JOA, provided a complete mechanism for the internal operations of the Consortium.  A new agreement was necessary at that time because, with Petroecuador as the Operator, TexPet needed the right to forego participation in Consortium projects that would not become profitable before the Concession's termination in 1992.  (Sawyer Aff. ¶ 14 & Ex. C (letter from TexPet to Petroecuador, 12/19/89).)  During the 1970s and 1980s, when the parties discussed possible changes to the operating structure of the Consortium, they had never completely negotiated or agreed on a replacement or amended joint operating agreement, and the parties continued to operate the Consortium under the Napo JOA, until the 1991 replacement agreement was executed.  For this reason, the Republic and Petroecuador make no headway by referring to Clause 8 in the 1974 contract through which Petroecuador entered the Consortium. Even if the provision could be read as contemplating the execution of a new operating agreement, which is far from clear, the parties, as stated, always understood that the Napo JOA would govern unless and until a new agreement was executed.  (Bucaram Aff. ¶ 29; Pérez Aff. ¶ 37.)

TEXACO Consortium are *governed by the Napo Joint Operating Agreement*." (Ex. 4 (1990 Annual Report (emphasis added)).)

Furthermore, the Napo JOA's binding effect on Petroecuador was expressly admitted by both the Republic and Petroecuador in a 1995 agreement with TexPet concerning environmental remediation for the Consortium's operations. (*See* Veiga Aff. Ex. C (1995 Settlement).)[13]  The 1995 Settlement made clear that Petroecuador was a successor-in-interest of the Napo JOA's signatories: "WHEREAS, Compañía Texaco de Petróleos del Ecuador, C.A., and Gulf Ecuatoriana de Petróleo, S.A., which were ultimately succeeded by TexPet and Petroecuador . . . signed a Joint Operating Agreement with TexPet on January 1, 1965 . . . ." (*Id.* at 2.)[14]  The 1995 Settlement also referred to TexPet and Petroecuador as the "Consortium" and identified the Napo JOA as one of the "agreements related to the *Consortium*'s exploration for and production, transportation and handling of petroleum." (*Id.* ¶ 1.1 (emphasis added).)  Finally, the 1995 Settlement confirmed that Petroecuador had invoked its rights under the Napo JOA to become the Operator: "WHEREAS, Petroecuador exercised its rights under the Napo [Joint Operating[15]]

---

[13] The 1995 Settlement was prompted by environmental audits, conducted voluntarily by TexPet and Petroecuador, of the areas in which the Consortium had operated.  Those audits concluded that TexPet, as Operator of the Consortium, generally had adhered to standard and acceptable industry practices and that there was no lasting or significant environmental impact from the former Consortium operations.  Nonetheless, the audits identified certain areas in which environmental remediation would be appropriate.  (Veiga Aff. ¶¶ 7-9.)

[14] A contract's "recital of an acknowledged fact . . . represents a classic example of an admission . . . which binds" the parties. *Kolson v. Vembu*, 869 F. Supp. 1315, 1334 (N.D. Ill. 1994); *accord Hardie v. United States*, No. 01-5005, 2001 WL 1154557, at *5 (Fed. Cir. Oct. 1, 2001) (U.S. government bound by joint venture agreement where settlement agreement, entered into by the government, expressly acknowledged continuing effect of joint venture agreement after government acquired interest in venture).

[15] The 1995 Settlement separately defined the "Napo Agreement" as the Napo Joint Operating Agreement between TexPet and Gulf.  (Veiga Aff. Ex. B at 2 (1995 Settlement).)

Agreement, and replaced Texpet as the operator of the Consortium on July 1, 1990." (*Id.* at 2-3 (emphasis added).)[16]

Significantly, Petroecuador's express admissions and acknowledgements do not stand alone in establishing that Petroecuador is bound by the Napo JOA. Rather, they reflect an *abundance* of *undisputed* evidence on the Consortium's actual operations during Petroecuador's membership, conclusively demonstrating Petroecuador's assumption of the Napo JOA.

### 2.    Petroecuador Directly Benefited From The Napo JOA

From the moment it entered the Consortium, Petroecuador unquestionably derived direct and substantial benefits from the rights of the parties under the Napo JOA. For example, even though the 1974 and 1977 contracts granted Petroecuador a share of the Napo Concession, mere ownership of that share did not get the oil out of the ground. It was only because Petroecuador was part of the Consortium with TexPet, governed by the Napo JOA, that Petroecuador daily received thousands of barrels of oil that it had no direct role in exploring for or extracting, since the oil was produced at cost by the personnel, expertise, and operating skill of TexPet in its role as Operator. (*See* Pérez Aff. Ex. C (Napo JOA ¶¶ 6.1-6.3, 13.1, 14.1); Bucaram Aff. ¶ 38; Pareja Aff. ¶ 9; Sawyer Aff. ¶ 7; Pérez Aff. ¶ 20 & Ex. O.) And because TexPet, not Petroecuador, was the Operator for most of the Consortium's existence, Petroecuador also benefited from the risk of liability that TexPet bore in the first instance—the very circumstance present in the underlying

---

[16] Substantively, the 1995 Settlement provided that TexPet would conduct environmental remediation, consistent with its 37.5% ownership interest, in a portion of the sites in which the Consortium had operated. (Veiga Aff. Ex. B at Annex A.) In exchange, the 1995 Settlement released TexPet from responsibility for the environmental condition of the remaining sites, and also provided for the same release with regard to the sites on which TexPet would conduct remediation work, once TexPet satisfactorily performed that work. (*Id.* at 9-11.) In 1998, after the Republic of Ecuador and Petroecuador reviewed and certified each site that TexPet had remediated, the parties then entered into a final contract that released, without qualification, TexPet from any further remediation or restoration obligations at the sites it had remediated. (Veiga Aff. Ex. D (Final Release of Claims).) Together, the 1995 and 1998 agreements fully released TexPet from any further remediation or restoration obligations related to its participation in the Napo Concession.

Lago Agrio litigation that has prompted the arbitration demand to enforce Petroecuador's contractual obligation to indemnify TexPet.  (*See* Pérez Aff. Ex. C (Napo JOA ¶ 6.4 (indemnification provision)).)  Finally, under the terms of the Napo JOA that allowed non-Operator parties to review and approve the Consortium's budgets and programs prepared by the Operator, Petroecuador—as the majority shareholder—enjoyed ultimate control and oversight over the approval of the Consortium's financial and programming affairs.  (*See id.*  (Napo JOA ¶¶ 5.2(a)-(b), 8.2-8.6); Pareja Aff. ¶¶ 9-10; Bucaram Aff. ¶ 35; Pérez Aff. ¶ 40.)

Under "ordinary principles of contract," an agreement binds those who accept its benefits; in particular, "when a signatory to an arbitration agreement seeks to bind a non-signatory to it[,] . . . the non-signatory may be compelled to arbitrate [if] it has derived other benefits under the agreement containing the arbitration clause."  *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97-98 (2d Cir. 1999).[17]  Thus, under this estoppel analysis alone, Petroecuador, having directly benefited from the Napo JOA, is bound by it.

---

[17] In applying the direct-benefits rule, "a court looks to the parties' conduct after the contract was executed."  *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 n.7 (3d Cir. 2001).  The rule binds parties "who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate" it.  *Id.* at 200.

The Second Circuit regularly compels parties to arbitrate under the direct-benefits rule.  For example, in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999), the owners of a ship reaped the benefits of a contract between the ship's builder and a ship "classification society."  Pursuant to that contract, the society provided a certificate that allowed the ship to obtain less expensive insurance and to sail under the French flag.  *Id.* at 351.  Because it was "patent that . . . the Owners received direct benefits" from the issuance of the certificate, they were "required to arbitrate" pursuant to a clause in the contract between the builder and the society.  *Id.* at 353.  The Second Circuit similarly concluded in *Deloitte Noraudit A/S v. Deloitte, Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993), that a non-signatory was bound to an arbitration provision.  The provision was in an agreement governing the rights of accounting firms worldwide to use the "Deloitte" name.  *Id.* at 1061.  Because Noraudit, a Norwegian accounting firm, "knowingly accepted the benefits of the Agreement through its continuing use of the name 'Deloitte,'" *id.* at 1064, the firm could not "avoid its obligations under that agreement, including the obligation to arbitrate," *id.* at 1063.

-16-

### 3.    Petroecuador Adhered To The Precise Obligations Of The Napo JOA

Not surprisingly, Petroecuador's acceptance of the Napo JOA's benefits took place

alongside its consistent adherence to the agreement's precise terms.  For example, when TexPet

routinely presented to Petroecuador budgets and programs in the form prescribed by the Napo

JOA, Petroecuador, in return, reviewed, commented upon, vetoed portions of, and approved the

proposed budgets and plans, also in conformity with the Napo JOA.  (*See* Pérez Aff. Ex. C

(Napo JOA ¶¶ 5.2(a)-(b), 8.2-8.6 (allowing members' representatives to review, modify, and

approve proposed programs of operations and related proposed budgets)); Sawyer Aff. ¶ 9;

Bucaram Aff. ¶ 35 & Ex. C (composite exhibit containing letter from TexPet to CEPE, 11/11/81

(Operator submitting work program and budget to CEPE for review and approval); letter from

CEPE to TexPet, 11/30/79 (indicating that CEPE had studied and approved the preliminary

budget presented by the Consortium and stating that CEPE wanted certain projects considered

and included); letter from CEPE to TexPet, 12/12/80 (approving 1981 proposed work program

and budget)).)

Petroecuador also adhered to the Napo JOA's financing provisions by providing, in

response to monthly "cash calls" from the Operator, Petroecuador's share of funding for the

coming month's exploration and production efforts.  (*See* Pérez Aff. Ex. C (Napo JOA Art. 8);

Sawyer Aff. ¶ 10; Bucaram Aff. ¶ 39 & Ex. D (providing several examples of cash-call letters

from TexPet to CEPE).)  Indeed, when Petroecuador believed that TexPet was not adhering to

the cash-call provisions, Petroecuador expressly invoked those provisions and insisted that

TexPet follow them with greater precision.  (Bucaram Aff. ¶ 42 & Ex. F (letter from CEPE to

TexPet, 11/26/86, at 2-3 (stating that TexPet had "failed to observe Article 8 . . . of the Napo

-17-

Joint Operating Agreement" and that it had "become essential to rationalize cash calls pursuant to Article 8 of the Napo Agreement")).)[18]

Yet another example of Petroecuador's adherence to the Napo JOA is its compliance with the indemnification provisions that allocated risk among all Consortium members.  (*See* Pérez Aff. Ex. C (Napo JOA ¶¶ 6.4 and 7.2 (requiring each non-Operator party to "indemnify and save the Operator harmless" from all third-party claims arising out of the Operator's performance under the Napo JOA, including settlements negotiated by the Operator)).)  Petroecuador routinely paid its respective share of liability and otherwise indemnified TexPet for the cost of tort and labor claims that TexPet bore as Operator.  (*Id.*; Bucaram Aff. ¶ 40; Pareja Aff. ¶ 11.)

All of these actions by Petroecuador adhering to the Napo JOA demonstrate that, upon its entry into the Consortium, Petroecuador became bound by the agreement.

### 4.    Petroecuador Asserted Rights Under The Napo JOA

Finally, Petroecuador's assertion of rights under the Napo JOA further demonstrates that Petroecuador is bound by the agreement.  In particular, as the parties later expressly acknowledged in the 1995 Settlement, Petroecuador's assumption of the role of Operator resulted from an exercise of its right to do so under the Napo JOA.  (Bucaram Aff. ¶ 43; Pérez Aff. Ex. C (Napo JOA ¶ 6.5 (providing for 10-year Operator term expiring on December 31, 1984, and requiring 2 years' notice of intent to become Operator)); *id.* Ex. K (giving 2 years' notice that Petroecuador intended to become Operator on January 1, 1985); Sawyer Aff. ¶ 11 & Ex. A at 3-4 (1985 Agreement incorporating resolution, adopted by Petroecuador's Board of Directors, "reaffirming" Petroecuador's right to assume the position of Operator when legal,

---

[18] Similarly, when TexPet was dissatisfied with Petroecuador's performance, it too invoked the Napo JOA to seek Petroecuador's compliance, and Petroecuador never disavowed the Napo JOA's enforceability.  (Bucaram Aff. ¶ 41 & Ex. E (letter from TexPet to CEPE, 4/16/84).)

administrative, and operating conditions presented the best opportunity to permit efficient operation of the Consortium).)[19]  Indeed, Petroecuador asserted its intention to assume the role in precisely the manner required by the Napo JOA.  (*See* Pérez Aff. Ex. C (Napo JOA ¶ 6.5) & Ex. K.)[20]  Petroecuador also asserted its right, under the Napo JOA, to demand that TexPet, as Operator, perform exploration programs desired and funded solely by Petroecuador.  (*See id.* Ex. C (Napo JOA Art. 10); Bucaram Aff. ¶ 36.)

*     *     *

In short, all of these actions, which Petroecuador does not attempt to contradict, confirm Petroecuador's assumption of the obligations of the Napo JOA when it joined the Consortium. *See Thomson-CSF, S.A.*, 64 F.3d at 777 ("In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate."); *see also Hardie*, 2001 WL 1154557, at *5 (in binding government to joint venture agreement, emphasizing that government had recognized co-venturer's "right of first refusal" on any sale of government's venture interest, which was significant because co-venturer's "right of first refusal" "exist[ed] solely by virtue of [an] explicit provision in the Joint venture agreement"); *Fyrnetics (Hong Kong) Ltd. v. Quantum Group*, No. 99 C 4704, 2003 WL 164220, at *3 (N.D. Ill. Jan. 23, 2003) (holding non-signatory to obligations of license agreement, because all parties' conduct in compliance with the agreement "demonstrate[d] that all concerned understood that they were acting pursuant to the license agreement").

---

[19] Had Petroecuador not regarded itself as a party to the Napo JOA, its insistence on becoming the "Operator" would have made no sense.  *See Hardie*, 2001 WL 1154557, at *5 (government's proposal that trustee assume the duties of the joint venture's "Administrative Officer" was a telling admission that the joint venture agreement continued to govern, because "[t]he 'Administrative Officer' . . . was a position that existed solely by virtue of an explicit provision in the Joint venture agreement").

[20] When Petroecuador initially asserted its right in 1982, the parties agreed to delay Petroecuador's assumption of the role of Operator.  (*See* Sawyer Aff. ¶ 11 & Ex. A.)  The delay was prompted by concerns about the potential consequences of a transition at that juncture.  (*Id.*)

Accordingly, Petroecuador cannot now avoid the obligations imposed by the Napo JOA, including its obligation to arbitrate.[21]

### C.    The Republic's And Petroecuador's Act Of State Argument Is Merely A Recharacterization Of Their Meritless Claim About The 1973 Concession

The Republic's and Petroecuador's invocation of the act of state doctrine, based on the 1973 Concession, is a diversion that should be ignored. The arbitration demand is based on the Napo JOA, not the 1973 Concession, and the 1973 Concession did not extinguish the Napo JOA or override its arbitration clause. Accordingly, it does not matter whether the Concession was valid or not, and the act of state doctrine—which, in appropriate circumstances, precludes an American court from declaring a foreign act of state invalid—has no reason to operate. The Republic and Petroecuador make the same act of state arguments in their motion for summary judgment as in their motion to dismiss the counterclaims. For the reasons stated in Section II.A of ChevronTexaco's and TexPet's opposition to the motion to dismiss, the act of state doctrine would not defeat Petroecuador's arbitration obligation even if the doctrine were relevant here.

## II.    The Right To Arbitrate Has Not Been Waived

The Republic's and Petroecuador's waiver arguments are not properly before the Court. In all events, none of ChevronTexaco's or TexPet's actions in the prior New York litigation or in this litigation has "waived" the right to arbitrate under the Napo JOA.

The question of waiver of the right to arbitrate is for the arbitrators, not this Court, to decide. *See Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002) ("'Ordinarily a defense of waiver brought in opposition to a motion to compel arbitration . . . is a matter to be decided by

---

[21] At the very least, even if the facts as presented by the attached affidavits and documents do not establish that Petroecuador is bound to arbitrate, ChevronTexaco and TexPet are entitled to discovery, and for that reason as well, the motion for summary judgment should be denied. *See* Fed. R. Civ. P. 56(f); *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) (party opposing summary judgment motion "must have had the opportunity to discover information that is essential to his opposition to the motion" (internal quotation marks omitted)).

the arbitrator.'" (quoting *S&R Co. v. Latona Trucking, Inc.*, 159 F.3d 80, 82-83 (2d Cir. 1998))).

The cases cited by the Republic and Petroecuador (p. 12) are inapt because this is not a situation

where "the party seeking arbitration ha[s] already participated in litigation *on the dispute* [*that it*

*seeks to arbitrate*]." *Id.* (quoting *S&R Co.*, 159 F.3d at 83). The indemnification dispute has not

been litigated. Indeed, the Republic's and Petroecuador's waiver arguments rely on the *absence*

of litigation on the indemnification claims, which they contend—incorrectly—constituted

prejudicial delay. Accordingly, under Second Circuit law, the waiver arguments must be decided

in the pending arbitration.

Even if this Court were to consider the waiver arguments, it is clear that ChevronTexaco

and TexPet never waived the right to arbitrate their indemnification claims.

*First*, contrary to the Republic's and Petroecuador's contention (pp. 13-14),

ChevronTexaco and TexPet did not improperly "delay" their claims for indemnification by not

demanding indemnification during the prior New York litigation. That case began in 1993 when

a group of residents of the Oriente (the "Aguinda Plaintiffs") filed a class-action lawsuit in this

Court against Texaco, Inc., asserting tort claims based on the Consortium's exploration and

drilling operations in the Oriente. (*See* Veiga Aff. Ex. E (Compl., *Aguinda [sic] v. Texaco*, No.

93-7527 (S.D.N.Y.) ¶ 55, 11/3/93).) The Aguinda Plaintiffs, and the class they sought to

represent, alleged that they had suffered injuries to themselves and their property, and their

request for relief focused on compensation for these injures. On Texaco's motion to dismiss

based on, among other things, the Aguinda Plaintiffs' failure to join the Republic of Ecuador and

Petroecuador as indispensable parties, this Court dismissed the case, *Aguinda [sic] v. Texaco,*

*Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), and denied the plaintiffs' motion for reconsideration,

175 F.R.D. 50 (S.D.N.Y. 1997). After the Second Circuit remanded, *see Jota v. Texaco, Inc.*,

157 F.3d 153 (2d Cir. 1998), this Court dismissed again on *forum non conveniens* grounds, *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), and, on a second appeal, the Second Circuit affirmed the dismissal, 303 F.3d 470 (2d Cir. 2002).

The Lago Agrio case, which prompted the arbitration, is distinct from the prior New York litigation, for which no indemnification is sought.  To be sure, this Court's dismissal of the New York case specifically contemplated that the Aguinda Plaintiffs would re-file in Ecuador (the more convenient forum), and there is substantial overlap between the Aguinda Plaintiffs and the Lago Agrio Plaintiffs.  But the Aguinda Plaintiffs did *not* re-file their New York case in Lago Agrio.  They sued a different defendant (ChevronTexaco) and, more importantly, they relied on an Ecuadorian environmental law not passed until *1999*.  That law permits private citizens to bring "public action[s]" in order to protect "collective environmental rights," even where the plaintiffs' "own rights have not been infringed."  (Ex. 5 (Law of Environmental Management, Law No. 37, RP 245, 7/30/99).)  Accordingly, the Lago Agrio Plaintiffs bring suit in their "capacity as members of the affected communities and in safeguarding its collective recognized rights," and they seek extensive environmental remediation and restoration.  (Veiga Aff. Ex. H (Lago Agrio Compl., 5/7/03, at 22).)  These claims and requested remedies, which are founded on assertions of public rights, contrast sharply with the individual tort claims that were the focus of the prior New York litigation.

Even if the Lago Agrio case were merely a continuation of the New York litigation, ChevronTexaco and TexPet did not delay their claims for indemnification by not demanding indemnification during the prior New York litigation.  We agree with the Republic and Petroecuador that "[n]o procedural bar *prevented*" an indemnification claim during the earlier New York litigation.  (Pls.' Mem. Supp. Summ. J. at 13 (emphasis added).)  But, as the Republic

and Petroecuador themselves argued in the New York case, it is entirely legitimate—not to mention common—to seek indemnification in a separate, and later, proceeding.  (*See* Ex. 6 (Br. For Movants-Appellants The Republic Of Ecuador And Petroecuador, at 22-24, *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) (No. 97-9102(L))); *see also, e.g.*, *McCabe v. Queensboro Farm Prods.*, 239 N.E.2d 340, 342 (N.Y. 1968) (obligation to indemnify does not accrue until party seeking indemnification actually suffers loss through a determination of liability, such as payment of a judgment).)  Furthermore, during the New York litigation, Petroecuador was notified of its indemnification obligations and did not dispute them.  (Veiga Aff. ¶ 25.)[22] Petroecuador ultimately incurred no indemnification obligation because the New York litigation was dismissed before any proceedings on the merits.[23]  But even if there were delay, the Republic's and Petroecuador's bare assertions do not demonstrate any prejudice, much less prejudice sufficient to overcome the strong presumption in favor of arbitrability.

*Second*, a sovereign-immunity argument that Texaco made in the New York litigation does not establish that the right to arbitrate the indemnification claims has been waived.  There is no dispute that, in the New York litigation, Texaco urged that the failure of the Aguinda Plaintiffs to join Petroecuador and the Republic of Ecuador as indispensable parties, due to their sovereign immunity, required dismissal of the case.  But Plaintiffs incorrectly assert (pp. 13-14)

---

[22] Especially lacking in merit is the assertion that, by not bringing an arbitration claim in the New York litigation, Texaco "recogni[zed] that there was no operative agreement under which either the Republic or Petroecuador had agreed to arbitrate."  (Pls.' Mem. Supp. Summ. J. at 13.)  This is directly contradicted by the fact that, contemporaneous with the New York litigation, the 1995 Settlement was entered into by TexPet, Petroecuador, and the Republic.  As discussed above, the 1995 Settlement contains numerous admissions that the parties were bound by the residual force of the Napo JOA, the source of the right to arbitrate.  (Veiga Aff. Ex. B at 2-3.)

[23] In the Lago Agrio litigation, by contrast, the court has proceeded to the merits after that court, in October 2003, considered but did not rule on ChevronTexaco's motion to dismiss; currently, judicial site inspections and other fact-finding are taking place.  (Veiga Aff. ¶¶ 31-34.)  With that development, ChevronTexaco sought indemnification from Petroecuador, and, upon Petroecuador's repudiation of its obligations, the arbitration demand was filed immediately.  (*Id.* ¶ 37 & Ex. I (letter from ChevronTexaco asking Petroecuador to acknowledge its clear indemnification rights); Ex. 1 (Arbitration Demand).)

that Texaco's argument permitted "settled expectations" that Petroecuador was immune not only from the New York litigation but also from the pending arbitration. While Texaco recognized Petroecuador's sovereign immunity in the New York litigation, it did so with respect to the claims of the Aguinda Plaintiffs—not with respect to any *claims to enforce Petroecuador's obligation to arbitrate*. (*See* Ex. 7 (Br. for Def.-Appellee Texaco at 25-29, *Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998) (No. 97-9102(L)) (recognizing that Petroecuador's and the Republic's absence from the case, based on their sovereign immunity, would prevent the Court from granting the complete relief the Aguinda Plaintiffs sought, given that the two entities controlled the land and the operations that would be affected by any court order)).) As the Republic and Petroecuador themselves argued in *Aguinda*, Petroecuador's indemnification obligations—and, thus, its arbitration obligations—did not make it a necessary party, so it was irrelevant whether sovereign immunity barred enforcement of those obligations. (*See* Ex. 6 at 21-24.) Thus, Texaco never conceded that the Republic and Petroecuador generally "enjoy sovereign immunity in the United States" (Pls.' Br. Supp. Summ. J. at 13), much less that they enjoy sovereign immunity with respect to the pending arbitration. Accordingly, Plaintiffs have failed to establish "waiver" on the basis of Texaco's sovereign-immunity argument in the New York litigation.

*Third*, and finally, none of ChevronTexaco's and TexPet's actions in this litigation—neither the assertion of counterclaims nor the decision thus far not to move to compel arbitration—has waived the right to arbitrate. The counterclaims against Petroecuador make clear that they are operative *only if* the indemnification claims submitted for arbitration are determined by this Court to be nonarbitrable. (Defs.' Answer & Countercls. ¶ 5.) A conditional counterclaim does not waive arbitration. *See John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48,

60 (2d Cir. 2001). Likewise, by not filing a motion to compel Petroecuador's participation in the pending arbitration, ChevronTexaco and TexPet have not waived arbitration. As the Republic and Petroecuador well know, ChevronTexaco and TexPet have consistently gone forward with the arbitration. The absence of a motion to compel neither prevents Petroecuador from voluntarily participating nor prevents the arbitration from going forward in Petroecuador's absence.[24] The limited issue before this Court, therefore, is not whether Petroecuador should be compelled to arbitrate but whether the arbitration should be permanently stayed.

For these reasons, the Republic's and Petroecuador's "waiver" argument does not shield Petroecuador from the arbitration clause or the indemnification obligation that it assumed when it entered the Consortium and accepted the Napo JOA.

## CONCLUSION

The motion for summary judgment should be denied.

---

[24] Notably, an *ex parte* arbitration proceeding, in the event that Petroecuador does not appear, does not prevent confirmation or enforcement of an award. *See, e.g.*, *In re Arbitration of Waterspring, S.A. & Trans Mktg. Houston Inc.*, 717 F. Supp. 181, 184-85 (S.D.N.Y. 1989); *In re Arbitration of A/S Ganger Rolf & Zeeland Transp., Ltd.*, 191 F. Supp. 359, 363 (S.D.N.Y. 1961).

Dated:  February 28, 2005

**ChevronTexaco Corporation and
Texaco Petroleum Company**

By their attorneys,

Thomas E. Lynch (TL-7540)
**JONES DAY**
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939


/s/ Louis K. Fisher_____
Thomas F. Cullen, Jr. (admitted *pro hac vice*)
Gregory A. Castanias (admitted *pro hac vice*)
Michael Kolis (admitted *pro hac vice*)
Louis K. Fisher (admitted *pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939

<u>DECLARATION OF SERVICE</u>

Louis K. Fisher, an attorney admitted *pro hac vice* to practice before the bar of this Court, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that on February 28, 2005, he served a true and correct copy of the attached **CHEVRONTEXACO CORPORATION'S AND TEXACO PETROLEUM COMPANY'S  MEMORANDUM IN OPPOSITION TO THE REPUBLIC OF ECUADOR'S AND PETROECUADOR'S MOTION FOR SUMMARY JUDGMENT SEEKING A PERMANENT STAY OF ARBITRATION PROCEEDINGS**, dated February 28, 2005, by transmitting copies of that document to the following attorney via hand delivery at:

> Terry Collingsworth, Esq.
> INTERNATIONAL LABOR RIGHTS FUND
> 733 15th Street, N.W., Suite 920
> Washington, D.C.  20005
> (Counsel for the Republic of Ecuador and Petroecuador)
>
> Robert A. Skirnick, Esq.
> MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
> One Liberty Plaza
> 35th Floor
> New York, NY 10006
> (Counsel for the Republic of Ecuador and Petroecuador)

Dated: February 28, 2005
      Washington, D.C.

/s/ Louis K. Fisher           
Louis K. Fisher
