UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                           :

THE REPUBLIC OF ECUADOR and PETROECUADOR, :
                                           :       04 CV 8378 (LBS)

          Plaintiffs,                   :

                                           :       ECF CASE

    - v. -                              :

                                           :

CHEVRONTEXACO CORPORATION and       :
TEXACO PETROLEUM COMPANY,            :

                                         :

          Defendants.                  :
-----------------------------------------------------------------------x

## THE REPUBLIC OF ECUADOR AND PETROECUADOR'S REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT SEEKING A PERMANENT STAY OF ARBITRATION PROCEEDINGS

**INTERNATIONAL LABOR RIGHTS FUND**
733 15th Street, N.W. Suite 920
Washington. D.C. 20005
T: (202) 347-4100
F: (202) 347-4885

**Attorneys for the Republic of Ecuador and Petroecuador**

**MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.**
One Liberty Plaza. 35th Floor
New York, NY 10006
T: (212) 240-0020
F: (212) 240-0021

**Attorneys for the Republic of Ecuador and Petroecuador**

# TABLE OF CONTENTS

**Page**

I.   Texaco has failed to raise a genuine issue of material fact as to the arbitrability of this dispute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Texaco's exhibits reveal that the contractual and quasi-contractual relationship between Texaco and the Republic and Petroecuador is ambiguous and that neither the Republic nor Petroecuador ever agreed to arbitrate this matter with Texaco. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.   The 1973 Contract was an act of state that exploded the prior contractual arrangement governing the Consortium, erasing any clear distinctions originally drawn between "concession contracts" and "operating agreements." . 4

    C.   The record shows no evidence that either the Republic or Petroecuador ever voluntarily assumed the obligations of or knowingly exploited the benefits of the 1965 JOA between Texaco and Gulf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  The Lago Agrio case is the Ecuadorian law continuation of *Aguinda v. Texaco*, and the Republic and Petroecuador's waiver claim is properly before this Court. . . . . . . . . . 8

III. The 1973 Contract requires Texaco to submit its indemnification claims to the laws and courts of Ecuador, both because it is an operative contract between the parties containing a forum selection clause and because it was a public act of the Ecuadorian State implementing its oil policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    **Texaco has failed to raise a genuine issue of material fact as to the arbitrability of this dispute.**

In an attempt to convince this Court that there are numerous factual issues in dispute in this case, ChevronTexaco Corporation and Texaco Petroleum Company (collectively "Texaco") have filed three volumes of exhibits in response to the Republic's and Petroecuador's[1] (collectively "the Republic") dispositive motions. However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issues of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 – 48 (1986).

Texaco does not challenge the validity of the 1973, 1974, or 1977 Contracts through which the Republic and Petroecuador purchased shares of the Napo Consortium. Rather, Texaco maintains that Petroecuador "necessarily" became a party to a 1965 Joint Operating Agreement between Texaco and Gulf merely by purchasing a share of the Napo Consortium.[2] Despite Texaco's voluminous submissions, the record here shows no evidence sufficient to create a genuine issue of material fact as to the arbitrability of Texaco's indemnification claims.

A.    **Texaco's exhibits reveal that the contractual and quasi-contractual relationship between Texaco and the Republic and Petroecuador is ambiguous and that neither the Republic nor Petroecuador ever agreed to arbitrate this matter with Texaco.**

Texaco's exhibits reveal that the relationship between Texaco and the Republic and Petroecuador was both contractual and quasi-contractual, and that it was far more ambiguous than Texaco suggests. One of the few aspects of the relationship that is clear from the exhibits is that neither the Republic nor Petroecuador ever agreed to arbitrate this matter with Texaco.

Texaco has filed a 1974 letter that allegedly shows that "Petroecuador was provided a

---

[1] For ease of reference, all references to "Petroecuador" include all times relevant to this case, including such times that Petroecuador existed under the name CEPE.

[2] *See* Defs.' Mem. in Opp'n to Pls. Mot. for Summ. J. at 11 fn.9.

copy of the Napo JOA as the agreement that governed the operations of the Consortium."[3]  A

close reading of the letter indicates, however, that there were actually *two* "Napo Agreements" –

the 1965 Joint Operating Agreement ("JOA") between Texaco and Ecuadorian Gulf ("Gulf") and

*another agreement* executed years later.[4]  Texaco has not filed a copy of this second Napo

Agreement or even acknowledged that this letter references the existence of two separate "Napo

Agreements." Furthermore, despite Texaco's current claims, the 1974 letter is revelatory in that

it does not claim that Petroecuador is a party to the JOA; the letter merely requests that

Petroecuador begin to participate in the "cash call" procedure contained therein.[5]  The letter

states that Petroecuador should begin participating in this procedure, but says nothing about

Petroecuador being bound to all terms of either of the two Napo Agreements.[6]

Other exhibits filed by Texaco also demonstrate considerable ambiguity concerning the

precise contours of the contractual relationship between Petroecuador and Texaco.  For example,

a 1984 letter from Texaco to Petroecuador references "the Napo Agreement" in ambiguous terms

as "the only Operating Agreement that can be considered to be in force."[7]  This statement

directly contradicts the statement of Texaco's affiant that "there was no question" as to the

applicability of the Napo Agreement to Petroecuador.[8]

Texaco's affiants make the bare assertion that Texaco and Petroecuador engaged in

regular negotiations throughout the 1970's and 1980's on possibly modifying the "Napo

Operating Agreement,"[9] but Texaco has produced no documentary evidence to substantiate these

---

[3] Defs.' Aff. Perez para. 36.

[4] *See* Defs.' Aff. Perez Ex. G ("Later on, the Companies prepared a new draft Operating
Agreement, which included the experience obtained during [the intervening years].").
[5] *Id.*

[6] *Id.*

[7] Defs.' Aff. Bucaram Ex. E.  Texaco did not file Petroecuador's response to this letter.

[8] *See* Defs.' Aff. Pareja para. 8.  This Court also should note that Jorge Pareja Cucalon is a
former employee of Gulf and a current petroleum-industry consultant. *See id.* para. 1, 4.

[9] Defs.' Aff. Bucaram para. 29; Defs.' Aff. Perez para. 37.

claims. Texaco and Petroecuador did, however, enter an "Agreement Concerning the CEPE-Texaco Consortium Operations" in 1985.[10] This agreement clearly states that Petroecuador's ownership in the Consortium derives from the 1973, 1974, and 1977 Contracts.[11] The 1985 Operations Agreement makes no reference to the 1965 JOA between Texaco and Gulf nor to any other "Napo Operating Agreement."[12] Rather, the 1985 Operations Agreement suggests there was no formal operating agreement in place, stating that "[t]he parties shall within 30 days commence negotiations for a final Joint Operations Agreement to continue the Consortium's operations."[13] Until this formal agreement became effective, however, "the Consortium's operations [were to] be carried out according to the standards and procedures that have been in force up to now."[14] This reference to prevailing "standards and procedures" suggests that the true nature of Texaco and Petroecuador's relationship up to that time was quasi-contractual.

In 1990, Texaco and Petroecuador entered into an agreement whereby Petroamazonas, a Petroecuador subsidiary, became the new Operator of the Napo Consortium.[15] The 1990 Change of Operator Agreement makes no reference to the 1965 JOA or any other "Napo Agreement."[16] Texaco's affiant claims that at that time "the parties finally entered into a new joint operating agreement . . . [that] was *nearly identical* to the Napo JOA."[17] Texaco has filed no such document, however, nor has it explained how this supposed agreement was different from the 1965 JOA or whether this supposed agreement extinguished, modified, or even referenced the 1965 JOA. Texaco's failure to file this supposed agreement is not surprising, since a search of

---

[10] Defs.' Aff. Sawyer Ex. A.
[11] *Id.* para. 1.1 – 1.3.
[12] *See generally id.*
[13] *Id.* para. 3.3.1.
[14] *Id.* para. 3.3.2.
[15] Defs.' Aff. Perez Ex. N.
[16] *Id.*
[17] Defs.' Aff. Perez para. 48 (emphasis added).

the Republic's records indicates that *it does not exist*.[18]

Texaco's failure to file with this Court the supposed 1990 Operating Agreement between Petroamazonas and Texaco is fatal to its case for arbitration. Nothing in the record establishes that either the Republic or Petroecuador ever agreed to arbitrate this matter with Texaco, ratified the 1965 JOA, or knowingly adopted its arbitration obligation. Rather, the record shows that prior to the 1985 Operations Agreement, the parties' relationship was quasi-contractual, governed by an ambiguous amalgam of prevailing "standards and procedures."[19]

**B.    The 1973 Contract was an act of state that exploded the prior contractual arrangement governing the Consortium, erasing any clear distinctions originally drawn between "concession contracts" and "operating agreements."**

Texaco's contention that contractual silence indicates an intent to perpetuate the prior contractual arrangement – which clearly distinguished between "concession contracts" and "operating agreements" – is belied by the circumstances under which the Republic and Petroecuador bought into the Napo Consortium. The 1973, 1974, and 1977 Contracts were the contractual veneer under which the military government of Ecuador compelled government participation in Napo Consortium operations through its agency Petroecuador.[20] The 1973 Contract rescinded the Republic's original grant of the Napo Concession and re-granted it on wholly different terms. (Pls.' Ex. C.) Texaco's evidence concerning oil industry custom and

---

[18] The 1992 Deed Record of the transfer of the Napo Consortium's assets back to the Republic, which is attached hereto as Plaintiffs' Exhibit 5, contains no references to the 1965 JOA, the supposed 1990 joint operating agreement, or any other Napo Operating Agreement. *See* Pls.' Ex. 5 (summary translation). The Deed Record does refer to the 1973 Contract and contains the 1990 Change of Operator Agreement in its entirety. *See id.* Thus, the supposed 1990 joint operating agreement does not appear to exist.

[19] Texaco's claim that the Republic "expressly admitted" through the 1995 Settlement Agreement that it was a party to the 1965 JOA, *see* Defs.' Mem. in Opp. to Mot. for Summ. J. 14, is without merit. Texaco's affiant in support of this claim omits the section in the preamble to the 1995 Settlement Agreement that states that the 1973 Contract was a "unification, replacement and amendment of . . . contracts previously executed . . . ." *Compare* Defs.' Aff. Veiga Ex. B, at 2, *with* Defs.' Aff. Veiga para. 14.

[20] *See* Pls.' Mem. in Supp. of Mot. for Summ. J. at Part III.C; Pls.' Mem. in Supp. of Mot. to Dismiss Countercl. at Part II.B.1.

4

practice with respect to concession contracts and operating agreements[21] is immaterial to this case, because the Republic's participation in the Napo Consortium was compelled by military expropriation.[22] Texaco would have this Court believe that in the 1970's, Ecuador's military government expropriated certain rights and assets of the Napo Consortium, dictated new terms by which the Consortium could operate, and forced government participation in Consortium operations – but also simultaneously accepted oil industry customs and practices as binding on it and voluntarily assumed the risk of arbitration in a foreign forum. This argument is speculative at best, and Texaco has offered no evidence that directly supports it.

On the contrary, that the 1973, 1974, and 1977 Contracts were acts of state is crucial to understanding their effect on the contractual arrangement between the parties in this case. Even if certain "standards and procedures" derived from one or more documents denominated as a "Napo Operating Agreement" governed the business relationship between Petroecuador and Texaco (whether contractually or quasi-contractually),[23] there is nothing in the record to indicate that the Republic agreed that Petroecuador's status as a Consortium member automatically made it a party to the 1965 JOA.[24]

---

[21] *See* Defs.' Mem. in Opp. to Mot. for Summ. J. 5 – 7.

[22] Texaco essentially admits that the 1973, 1974, and 1977 Contracts were acts of state but argues that this is immaterial to this case. *See* Texaco Counterstmt. of Undisputed Facts 27 – 38.

[23] *See supra* Part I.A.

[24] Moreover, the 1973, 1974, and 1977 Contracts demonstrate that the Republic acted jointly with its agency Petroecuador in compelling Petroecuador's participation in the Consortium. *See* Pls.' Ex. C, O, Q. *See also Phoenix Canada*, 658 F. Supp. at 1072 (referring to the 1974 Contract, the Republic's Minister of Natural Resources and Energy Gustavo Jarrin Ampudia testified in a deposition that "I was responsible and I implemented oil policy and I established it"). Not only did the Republic and Petroecuador act jointly in executing the contracts, but the funds for the Republic's 1974 purchase of a share of the Napo Consortium came entirely from the Republic's international currency reserves. *See* Pls.' Ex. R, S; Texaco Counterstmt. of Facts 34. The 1977 Contract directed the Central Bank of Ecuador to assist Petroecuador in buying out Gulf's share of the Napo Consortium. *See* Pls.' Ex. O para. 2.5 – 2.7. Together with the undisputed evidence that Petroecuador's entry into the Consortium was a public act of the Ecuadorian State, these facts render Texaco's evidence that Petroecuador had the capacity to contract independently of the Republic immaterial to this case.

Even if it had been Texaco's subjective intent that oil industry customs and practices would become binding on the Republic after its forced entry into the Consortium – which is far from clear from Texaco's exhibits[25] – the Republic is not bound by Texaco's subjective intent, but only by the objective terms of the contracts to which it is a party.[26] Here, Texaco's intent that the Republic be bound by the 1965 JOA's arbitration clause is not supported by any evidence that the Republic was even aware of this intent, let alone that it knowingly accepted it.

**C.    The record shows no evidence that either the Republic or Petroecuador ever voluntarily assumed the obligations of or knowingly exploited the benefits of the 1965 JOA between Texaco and Gulf.**

The Second Circuit recognizes five (and only five) theories by which a non-signatory can be compelled to arbitrate as if it were a party to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel/direct-benefits theory.[27] Of these five theories, Texaco argues that Petroecuador became a party to the 1965 Joint Operating Agreement between Texaco and Gulf by theories of assumption and estoppel/direct benefits.[28]

A non-signatory to an arbitration agreement may be bound by that agreement "if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF*, 64 F.3d at 777. In order for conduct to give rise to assumption of an arbitration agreement by implication, however, the conduct must specifically relate to the particular contract containing an arbitration clause and not simply give rise to the implication that *some* contractual or quasi-contractual relationship exists between the parties. *See, e.g.*, *Hardie v. United States*, 367 F.3d

---

[25] *See supra* Part I.A.

[26] *See, e.g.*, Restatement (Second) of Contracts § 201 (1981). *See also id.* cmt. c ("The objective of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding . . . .").

[27] *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).

[28] *See* Defs.' Mem. in Opp'n to Pls. Mot. for Summ. J. at 11 – 16.

1288, 1291 (Fed. Cir. 2004) (compelling government to arbitrate under partnership agreement containing arbitration clause where it had "elected to step into the shoes" of a general partner by acquiring its interest through civil forfeiture).[29]

This case is distinguishable from cases in which courts have found that a non-signatory assumed an obligation to arbitrate. Unlike in *Hardie*, the Republic of Ecuador and Petroecuador did not simply acquire an interest in a going concern through civil forfeiture. Rather, the Republic of Ecuador and Petroecuador acquired their interest in the Napo Consortium through the 1973, 1974, and 1977 Contracts.[30] Petroecuador never entered into a formal operating agreement with Texaco until the execution of the 1985 Operations Agreement.[31]

Under the estoppel/direct-benefits theory, a non-signatory "*knowingly* exploiting [an] agreement [with an arbitration clause can be] estopped from avoiding arbitration despite having never signed the agreement."[32] Moreover, "[t]he benefits must be direct – which is to say, flowing directly from the agreement."[33]

Texaco produced no evidence that Petroecuador *knowingly* exploited the 1965 Joint Operating Agreement between Texaco and Gulf. Texaco's unsupported claim to the contrary

---

[29] *See also Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) (compelling flight attendants to arbitrate who sent representative to participate in the arbitration): *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 219 – 20 (E.D.N.Y. 2003) (compelling non-signatory to arbitrate where contract containing arbitration clause was expressly adopted).

[30] None of these contracts contain arbitration clauses, and none of them refer to the 1965 Joint Operating Agreement between Texaco and Gulf. (Pls.' Ex. C, O, Q.) Rather than referencing any prior operating agreements, the 1973 Contract directs the Consortium members to enter into a new operating agreement. (Pls.' Ex. C cl. 53.3.) Meanwhile, the 1974 Contract states that the Napo Consortium "*will* be regulated by an operating agreement entered into by the parties." (Ex. Q para. 8 (emphasis added).)

[31] *See supra* Part I.A. *Gvozdenovic* and *Ryan, Beck* are also distinguishable from this case. Unlike in *Gvozdenovic*, neither the Republic nor Petroecuador ever engaged in any conduct that specifically identified themselves as parties to the 1965 JOA between Texaco and Gulf. *See* 933 F.2d at 1105. Unlike in *Ryan, Beck*, neither the Republic nor Petroecuador ever expressly adopted the 1965 JOA between Texaco and Gulf. *See* 268 F. Supp. 2d at 219 – 20.

[32] *Thomson-CSF*, 64 F.3d at 778 (emphasis added).

[33] *MAG Portfolio Consult*, 268 F.3d at 779.

begs the question of whether Petroecuador ever became a party to that contract. This case is thus distinguishable from cases cited by Texaco to support their contention that the Republic directly benefited from the 1965 JOA. Unlike in *Smith/Enron Cogeneration Ltd. P'ship Inc. v. Smith Cogeneration Int'l Inc.*,[34] this is not a case in which the original parties to the 1965 JOA simply assigned a percentage of their interest to Petroecuador.[35] It is undeniable that Petroecuador derived benefits from its co-ownership of the Napo Consortium, but as noted above that ownership was acquired through the 1973, 1974, and 1977 Contracts. These contracts, together with an amalgam of quasi-contractual "standards and procedures," defined Petroecuador's relationship with Texaco. Petroecuador did not directly benefit from the 1965 JOA.

Therefore, for the reasons stated above and in the Republic's Memorandum of Law in Support of its Motion for Summary Judgment Seeking a Permanent Stay of Arbitration Proceedings, the arbitration that Texaco commenced against Petroecuador before the American Arbitration Association should be permanently stayed under the Federal Arbitration Act because there is no valid agreement to arbitrate between the parties.

## II.    The Lago Agrio case is the Ecuadorian law continuation of *Aguinda v. Texaco*, and the Republic and Petroecuador's waiver claim is properly before this Court.

The case currently being litigated against Texaco in Lago Agrio, Ecuador is the continuation of *Aguinda v. Texaco* following its dismissal from this District for *forum non conveniens*.[36] Additionally, the Republic's waiver claim is properly before this Court.[37]

---

[34] 198 F.3d 88 (2d Cir. 1999).

[35] *See Smith/Enron*, 198 F.3d at 97 – 98 (compelling non-signatories to arbitrate where they received economic benefits directly from a contract acknowledged to be operative). *Accord Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); *Deloitte Noraudit A/S v. Deloitte, Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993).

[36] In support of this point, Plaintiffs incorporate by reference Part III of their Reply in Support of their Motion to Dismiss Defendants' Counterclaims under Rule 12(b), filed with this Court on March 14, 2005.

[37] Texaco's citation of *Bell v. Cendant*, 293 F.3d 563 (2d Cir. 2002) for the proposition that the Republic's waiver claim is not properly before the Court is inapposite. *See Bell*, 293 F.3d at 566

Moreover, Texaco provides no evidence beyond bare assertions that it asserted a right to indemnification in this matter before 2004.[38]

Therefore, for the reasons stated above and in the Republic's Memorandum of Law in Support of its Motion for Summary Judgment Seeking a Permanent Stay of Arbitration Proceedings, the arbitration that Texaco commenced against Petroecuador before the American Arbitration Association should be permanently stayed because Texaco has waived its right to arbitrate under the Federal Arbitration Act.

III.    **The 1973 Contract requires Texaco to submit its indemnification claims to the laws and courts of Ecuador, both because it is an operative contract between the parties containing a forum selection clause and because it was a public act of the Ecuadorian State implementing its oil policy.**

The forum selection clause of the 1973 Contract should be enforced in this case, because whether it is viewed as an act of state or simply as a provision in an operative contract between the parties, it provides an independent ground at law for a stay of the arbitration here.[39]

For the reasons stated above and in the Republic's Memorandum of Law in Support of its Motion for Summary Judgment Seeking a Permanent Stay of Arbitration Proceedings, the arbitration that Texaco commenced against Petroecuador before the American Arbitration Association should be permanently stayed because the 1973 Contract requires Texaco to submit

---

– 67 (noting that the court was applying Connecticut law to a contract with a Connecticut choice-of-law provision). Even if *Bell* does apply here, *Bell* holds that a district court can decide a waiver claim "to prevent forum shopping . . . when the party seeking arbitration had already participated in litigation on the dispute." *Id.* at 569 (internal quotation marks omitted).  Texaco has been forum shopping in this dispute since it moved to dismiss *Aguinda* for *forum non conveniens* and international comity shortly after it was filed in 1993.  *See Aguinda v. Texaco,* 1994 U.S. Dist. LEXIS 4718 (S.D.N.Y. 1994).

[38] *See* Defs.' Aff. Veiga para. 36 (stating, without accompanying evidentiary support, that Texaco has asserted a right to indemnification in this matter since 1993); *Anderson,* 477 U.S. at 249 – 50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

[39] In support of this point, Plaintiffs incorporate by reference Part II of their Reply in Support of their Motion to Dismiss Defendants' Counterclaims under Rule 12(b), filed with this Court on March 14, 2005. *See also* Pls.' Mem. in Supp. of Mot. for Summ. J. at Part III.C.

9

this dispute to the laws and courts of Ecuador.

**IV.    Conclusion**

      The arbitration that Texaco commenced against Petroecuador before the American

Arbitration Association should be permanently stayed.

Dated:  March 14, 2005
Respectfully submitted,

/s/ Terry Collingsworth
Terry Collingsworth, Esq.
Thomas Cmar, Esq.
Natacha Thys, Esq.
Derek Baxter, Esq.
INTERNATIONAL LABOR RIGHTS FUND
733 15th Street, N.W., Suite 920
Washington, D.C. 20005
T: (202) 347-4100  F: (202) 347-4885

/s/ Robert A. Skirnick
Robert A. Skirnick (RS-2636)
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
One Liberty Plaza, 35th Floor
New York, NY 10006
T: (212) 240-0020  F: (212) 240-0021

Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
117 S. 17th Street, 22nd Floor
Philadelphia, PA 19103
T: (215) 564-5182  F:(215) 569-0958

Dr. José María Borja Gallegos, Procurador General del Estado Ecuatoriano
Dra. Martha Escobar Koziel, Subdirectora de Contencio Administrativo
Dirección General de Patrocinio, Procuraduría Nacional del Estado
Calle Robles 731 y Avenida Amazonas
Quito, Ecuador
Tel. 011-593-22-562-059/011-593-22-562-029  Fax. 011-593-22-562-080

Dr. Fernando Castro Barrios, Asesor del Presidente Ejecutivo
PETROECUADOR
Avenida 6 de Diciembre y Alpallana
Quito, Ecuador
Tel. 011-593-22-505-550  Fax. 011-593-22-669-738

Attorneys for the Republic of Ecuador and Petroecuador