UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE REPUBLIC OF ECUADOR and     :
PETROECUADOR,                           :
                                             :

               Plaintiffs,        :        **OPINION**
                                           :        **AND ORDER**
         -against-           :
                                         :        04 Civ. 8378 (LBS)
CHEVRONTEXACO CORPORATION and  :
TEXACO PETROLEUM COMPANY,    :
                                         :
          Defendants.       :
------------------------------------------------------------x
CHEVRONTEXACO CORPORATION and  :
TEXACO PETROLEUM COMPANY,    :
                                         :
          Counterclaim Plaintiffs,  :
                                         :
         -against-           :
                                         :
THE REPUBLIC OF ECUADOR and     :
PETROECUADOR,                           :
                                         :
         Counterclaim Defendants.  :
------------------------------------------------------------x


APPEARANCES:

INTERNATIONAL LABOR RIGHTS FUND
733 15th Street, N.W., Suite 920
Washington, D.C. 20005
TERRY COLLINGSWORTH
THOMAS CMAR
NATACHA THYS
DEREK BAXTER

MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
One Liberty Plaza, 35th Floor
New York, NY 10006
ROBERT A. SKIRNICK

MEREDITH COHEN GREENFOGEL & SKIRNICK, P.C.
117 S. 17th Street, 22nd Floor
Philadelphia, PA 19103
DANIEL B. ALLANOFF

> Attorneys for Plaintiffs / Counterclaim Defendants the Republic of Ecuador and
> Petroecuador


JONES DAY
222 East 41st Street
New York, New York  10017-6702
THOMAS E. LYNCH

JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001-2113
LOUIS K. FISHER
GREGORY A. CASTANIAS
MICHAEL KOLIS

> Attorneys for Defendants / Counterclaim Plaintiffs ChevronTexaco Corporation
> and Texaco Petroleum Company


HONORABLE LEONARD B. SAND, U.S.D.J.

SAND, District Judge.

In this action, the Republic of Ecuador ("Ecuador" or "the Republic"), and its state-owned oil company Petroecuador, seek a permanent stay of an arbitration proceeding commenced by defendants ChevronTexaco Corporation ("ChevronTexaco") and Texaco Petroleum Company ("TexPet"), as well as other injunctive and declaratory relief. ChevronTexaco and TexPet (collectively "Defendants") counterclaim against Ecuador and Petroecuador (collectively "Plaintiffs"), alleging breach of contract and failure to indemnify an implied agent, and seeking damages as well as injunctive and declaratory relief.

The matter is currently before the Court on two motions by Plaintiffs: a motion for summary judgment on their own claims, and a motion to dismiss Defendants' counterclaims under Rule 12(b) for lack of subject matter jurisdiction and failure to state a claim. Also before the Court are various motions incidental to these two dispositive motions, such as applications to strike certain filings as untimely and for permission to file sur-replies. For the reasons stated below, Plaintiffs' motion for summary judgment is denied, and Plaintiffs' motion to dismiss the counterclaims is granted in part, denied in part, and in part left unresolved pending supplemental briefing regarding Ecuadorian law.

## I. Background

Because of the different legal standards governing the various motions before the Court, it is impossible to establish a single and complete set of facts that can be assumed to be true for purposes of this entire Opinion and Order. Before turning to the individual

motions, however, it is useful to outline the basic facts regarding which the parties agree,[1] and the procedural history of this action, in order to place the motions and specific factual disputes in context.

### A.  The Napo Concession

In 1965, following a grant to them by Ecuador of an oil concession in the Oriente region of that country, known as the "Napo Concession," TexPet and the Ecuadorian Gulf Oil Company ("Gulf") entered into a Joint Operating Agreement (the "1965 JOA").[2]  TexPet was named the first "Operator" under the 1965 JOA.  The 1965 JOA contained an arbitration clause, requiring the parties to submit disputes to the American Arbitration Association ("the AAA") in New York.  It contained an indemnification clause providing as follows:

> If the Operator shall exercise its best judgment and care to select competent personnel and competent contractors to carry out and discharge its duties and obligations under this Agreement, the Operator shall not be liable to the Parties in damages or otherwise for its acts or omissions in carrying out and discharging or failing to carry out and discharge its duties and obligations under this Agreement. The Parties shall indemnify and save the Operator harmless from all claims and demands which may be made against Operator by third parties due to, arising out of, or related to the performance by the Operator of its duties under this Agreement.

(Perez Aff. Ex. C ¶ 6.4.)  It also contained a choice-of-law clause stating that "[t]his Agreement and the relationship of the Parties hereunder shall be governed by and

---

[1] The factual background in this section is drawn largely from the Local Rule 56.1 statement of undisputed material facts submitted by Plaintiffs in support of their motion for summary judgment, and Defendants' response thereto, as well as the allegations of Plaintiffs' Amended Complaint insofar as they are admitted in Defendants' Answer.  In certain instances the contents of documents submitted in connection with the motions for summary judgment and to dismiss the counterclaims, the authenticity of which neither side has disputed, are also described.

interpreted in accordance with the laws of the State of New York... except for those matters which are necessarily governed by the laws of the Republic of Ecuador." (Id. ¶ 23.1.) The 1965 JOA provided that it would "inure to the benefit of and be binding upon the successors and assigns of the parties hereto and each of them respectively." (Id. ¶ 26.1.)

In February 1972, a military government took power in Ecuador. The military government wished to increase the Ecuadorian state's control over, and participation in, the development of Ecuador's oil reserves. In furtherance of this goal, on June 6, 1972, the government issued Supreme Decree No. 430, which, *inter alia*, required TexPet and Gulf "to agree to new oil concession contracts with the Republic and to relinquish a substantial percentage of Napo Concession lands." (Pl. R. 56.1 Stmt. ¶ 52; Def. R. 56.1 Resp. ¶ 52.) The Ecuadorian state-owned oil company Compañia Estatal Petrolera Ecuatoriana or CEPE, which after reorganization later became plaintiff Petroecuador, immediately began to exploit those portions of the relinquished land where oil production was already ongoing. TexPet and Gulf requested compensation for the land they had relinquished, but these requests were rejected.

On or about March 27, 1973, Ecuador published Decree No. 317,[3] which established a Model Contract containing certain new terms to which TexPet and Gulf were required to agree. A modified version of this contract was published on or about August 4, 1973 in Decree No. 925, and signed by Ecuador, TexPet and Gulf on or about

---

[2] The concession was originally granted to companies related to, but not identical to, those that possessed it in 1965. As no party appears to consider the distinction significant, it will not be pursued further.
[3] Plaintiffs' Local Rule 56.1 statements of undisputed facts vary with respect to whether the various decrees of the Ecuadorian government are described as "Decree No. ___" or "Supreme Decree No. ___." In the

August 6, 1973.

The contract published in Decree No. 925 and signed on August 6, 1973 (the "1973 Contract") substituted for certain previous contracts; whether the 1965 JOA was among those contracts replaced by it is one of the main points of contention in this case. As had been mandated by Supreme Decree 430 in 1972, "the 1973 Contract incorporated the terms of a 1971 Hydrocarbons Law that gave the Republic greater control over oil pricing and a larger percentage of royalties." (Pl. R. 56.1 Stmt. ¶ 58; Def. R. 56.1 Resp. ¶ 58.) The 1973 Contract also mandated that CEPE be allowed an option to purchase a stake in the Napo Concession, or Napo Consortium (as Plaintiffs describe the organization formed to explore the Napo Concession), in 1977. The 1973 Contract did not contain an arbitration clause.

On or about January 10, 1974, Ecuador issued Supreme Decree No. 9, mandating that CEPE would begin participating in the Napo Concession or Consortium in 1974, rather than in 1977 as had been indicated by the 1973 Contract. In ensuing negotiations, "the Republic informed Texaco[4] and Gulf that CEPE's 25% participation in the Napo Consortium would begin on June 6, 1974, whether or not the Republic and the companies had reached an agreement on compensation." (Pl. R. 56.1 Stmt. ¶ 63; Def. R. 56.1 Resp. ¶ 63.) Given this ultimatum and fearing complete expropriation of the Napo Consortium by the Republic if it did not comply, TexPet executed a contract or "Acta" on or about

---

absence of any suggestion that the distinction matters, the Court follows Plaintiffs' usage.
[4] Plaintiffs often refer to ChevronTexaco and TexPet collectively as "Texaco," <u>see</u> Am. Compl. ¶ 1, and with respect to certain portions of Plaintiffs' Local Rule 56.1 statement where the distinction makes little or no substantive difference, Defendants have admitted the truth of statements that refer to Texaco collectively when a reference to TexPet might have been more appropriate.

June 14, 1974 (the "1974 Contract").[5]  The other signatories to the compelled 1974

Contract were Gulf, CEPE, and the Republic; Plaintiffs assert that the Republic and

CEPE were "acting jointly as one party" (Pl. R. 56.1 Stmt. ¶ 68), but Defendants deny

this.

Under the 1974 Contract, CEPE acquired a 25% share of all of the Napo

Concession's operations, including "proportional parts of all investments, operational

costs, obligations, royalties, [and] sales of crude for internal consumption...."  (Pl. R. 56.1

Stmt. ¶ 23, quoting Pls.' Ex. Q. cl. 10; Def. R. 56.1 Resp. ¶ 23.)  The 1974 Contract also

provided for acquisition of a share of the Trans-Ecuadorian Pipeline by either CEPE or

the Republic of Ecuador, but this provision was unilaterally voided by the Republic in

1975.  The 1974 Contract did not itself contain a clause providing for arbitration; it did,

however, contain a clause stating that "[t]he totality of the activities that will develop in

the Joint Operation will be regulated by an operating agreement entered into by the

parties"[6] (Pl. R. 56.1 Stmt. ¶ 24, quoting Pls.' Ex. Q. cl. 8; Def. R. 56.1 Resp. ¶ 24), the

effect of which the parties dispute.

By 1976, Gulf became uncomfortable with its position with respect to the

Republic, and began to withhold certain funds from the Republic.  The Republic

responded by threatening expropriation of Gulf's Napo Consortium assets.  Fearing that

it would lose its stake in the Consortium without receiving any compensation, Gulf

---

[5] Defendants object to Plaintiffs' characterization of the 1974 Contract as a "purchase agreement," on the ground that the June 14, 1974 "Acta" was "a government edict" rather than an agreement involving "some semblance of negotiation."  (Def. R. 56.1 Resp. ¶ 22.)

[6] The 1974 Contract, like most of the documents other than the 1965 JOA that are at issue in this case, was originally written in Spanish rather than English.  This quotation is from the English translation, as are many of the other quotations in this Opinion and Order.

negotiated an agreement, finalized on May 27, 1977, by which Gulf's remaining 37.5% stake in the Consortium was transferred to CEPE (which Plaintiffs assert was again acting as one party with the Republic). This agreement (the "1977 Contract") contained clauses addressing CEPE's lack of obligation for certain claims of or against Gulf, the effect of which the parties again dispute.

From 1977 to 1990, the Napo Concession or Consortium continued to operate with TexPet and CEPE/Petroecuador as the only partners and TexPet as the Operator. On January 22, 1985, however, TexPet and CEPE entered into an agreement providing for CEPE to take over as Operator on one year's notice (the "1985 Agreement").

On July 1, 1990, pursuant to an agreement signed by representatives of Petroecuador and TexPet the previous day (the "1990 Agreement"), Petroamazonas, a subsidiary of Petroecuador, replaced TexPet as the Operator of the Napo Concession. On March 25, 1991, Petroecuador, TexPet, and Petroamazonas entered into an "Operating Agreement" for the "Petroecuador-Texaco Consortium" (the "1991 Agreement"), which agreement specified that it would "be effective [retroactively] as of the first day of July 1990 and remain in effect until the termination of the [1973] Contract." (Supplementary Kolis Decl. Ex. 1.) The expiration date of the Napo Concession as provided in the 1973 Contract was June 6, 1992.

### B.  Aguinda v. Texaco, the 1995 Settlement, and the Lago Agrio Action

In 1993, an action captioned Aguinda v. Texaco was brought in the United States District Court for the Southern District of New York by a group of residents of the

Oriente region of Ecuador (the "Aguinda Plaintiffs"), against Texaco, Inc., which has

since become a wholly owned subsidiary of defendant ChevronTexaco by merger.  The

Aguinda Plaintiffs "alleged that between 1964 and 1992 Texaco's oil operation activities

polluted the rain forests and rivers in Ecuador...."  Aguinda v. Texaco, Inc., 303 F.3d

470, 473 (2d Cir. 2002).  They "sought money damages under theories of negligence,

public and private nuisance, strict liability, medical monitoring, trespass, civil

conspiracy, and violations of the Alien Tort Claims Act," as well as

> extensive equitable relief to redress contamination of the water supplies and
> environment, including: financing for environmental cleanup to create access to
> potable water and hunting and fishing grounds; renovating or closing the Trans-
> Ecuadorian Pipeline; creation of an environmental monitoring fund; establishing
> standards to govern future Texaco oil development; creation of a medical
> monitoring fund; an injunction restraining Texaco from entering into activities
> that risk environmental or human injuries, and restitution.

Id. at 473-474.

The procedural history of the Aguinda litigation is outlined in detail in Aguinda v.

Texaco, Inc., 303 F.3d 470 (2d Cir. 2002), and Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir.

1998).  Although it would be duplicative to recite that entire history here, a brief

summary is appropriate.  In November 1996, on Texaco's motion, the case was dismissed

by the district court (Rakoff, J.) on grounds of forum non conveniens, international

comity, and failure to join indispensable parties, specifically Ecuador and Petroecuador,

whose presence was held to be necessary to effectuate the extensive equitable relief

requested, but impossible to obtain in light of their sovereign immunity.  Aquinda[7] v.

Texaco, Inc., 945 F. Supp. 625 (S.D.N.Y. 1996).  The Second Circuit in 1998 vacated the

---

[7] "The caption of this order incorrectly spells the plaintiffs' name 'Aquinda,' instead of 'Aguinda.'"  Jota,
157 F.3d at 157 n.5.

dismissal and remanded the case for reconsideration, <u>Jota</u>, 157 F.3d at 163, holding that a forum non conveniens dismissal was inappropriate absent a requirement that Texaco consent to Ecuadorian jurisdiction, <u>id.</u> at 159; that the comity determination had potentially been undermined by Ecuador's change from opposing litigation of the issue in a United States court to supporting that litigation, <u>id.</u> at 160-161; and that the indispensable-party theory, while perhaps correct as to some of the relief requested, was insufficient to support dismissal of the entire complaint, <u>id.</u> at 162.  On remand, Texaco having consented to jurisdiction in Ecuador, the district court again dismissed the case on grounds of forum non conveniens.  <u>Aguinda v. Texaco, Inc.</u>, 142 F. Supp. 2d 534 (S.D.N.Y. 2001).  The Second Circuit affirmed.  <u>Aguinda v. Texaco, Inc.</u>, 303 F.3d 470 (2d Cir. 2002).

During the pendency of the <u>Aguinda</u> litigation, TexPet, Ecuador and Petroecuador entered into several agreements regarding environmental remediation.  Following a December 1994 Memorandum of Understanding, those parties in May 1995 signed a contract the name of which has been translated as "Contract For Implementing Of Environmental Remedial Work and Release From Obligations, Liability and Claims" (hereinafter referred to as the "1995 Settlement").  In the 1995 Settlement, TexPet agreed to perform specified environmental remedial work in exchange for a release of claims by the Government of Ecuador and Petroecuador.  This release, granted to TexPet, Texaco, Inc., and other related companies, encompassed by its terms "all the Government's and Petroecuador's claims against the Releasees for Environmental Impact arising from the Operations of the Consortium, except for those related to the obligations contracted"

under the 1995 Settlement itself, which were to be "released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador." (Veiga Aff. Ex. B at 9.) By a "Final Document" dated September 30, 1998 (the "1998 Final Release"), the 1995 Settlement was declared to be "fully performed and concluded," and the Government and Petroecuador "proceed[ed] to release, absolve, and discharge" TexPet and related companies "from any liability and claims by the Government of the Republic of Ecuador, PETROECUADOR and its Affiliates, for items related to the obligations assumed by TEXPET in" the 1995 Settlement. (Veiga Aff. Ex. D at Part IV.)

In May 2003, following the final dismissal of the <u>Aguinda</u> litigation, a group of individuals that Plaintiffs allege included "a substantial number of the Aguinda Plaintiffs" filed claims against ChevronTexaco in Lago Agrio, Ecuador. One of the laws upon which the plaintiffs in this Lago Agrio litigation based their claims, although not the only law, was an Ecuadorian environmental law enacted in 1999. Defendants contend that this law in effect allows the plaintiffs in the Lago Agrio litigation to assert, as private attorneys general, claims that belonged to Ecuador but were released by the 1995 Settlement and 1998 Final Release.

### C. Procedural History of This Litigation

On June 11, 2004, ChevronTexaco and TexPet commenced an arbitration proceeding against Petroecuador before the AAA, claiming a right to indemnification for their costs and expenses in connection with the Lago Agrio litigation. They sought a

monetary award for breach of contract, specifically breach of the 1965 JOA, which they alleged "require[d] Petroecuador to indemnify ChevronTexaco and TexPet for Petroecuador's share of all claims arising out of TexPet's role as Operator of the Napo Concession." (Kolis Decl. Additional Docs. Ex. 1 ¶ 54.) This award was to be in the amount of "the total value of their costs, fees, and any adverse judgment rendered in the Lago Agrio lawsuit, plus interest." (Id. ¶ 59.) ChevronTexaco and TexPet further sought "injunctive relief requiring Petroecuador to pay all fees, costs, and expenses associated with the Lago Agrio litigation that may be incurred in the future, including the amount of any potential adverse final judgment rendered against ChevronTexaco in the Lago Agrio litigation." (Id. ¶ 62.) TexPet, although purportedly not ChevronTexaco, further sought "a declaratory judgment that the [1965] JOA's indemnity provision is valid and binding, and that Petroecuador is responsible to indemnify and hold harmless TexPet and ChevronTexaco... for... all fees, costs and expenses relating to the Ecuadorian lawsuit, including any final judgment that may be rendered against ChevronTexaco in Ecuador." (Id. ¶ 66.)

On October 15, 2004, Plaintiffs commenced an action in New York State Supreme Court, New York County, against Defendants and the AAA, seeking an order and judgment staying the arbitration proceeding that had been brought by Defendants against Petroecuador. Proceeding by petition under section 7503 of the New York Civil Practice Law and Rules (CPLR) and "the exception to CPLR § 7503(c) that was established by the New York Court of Appeals in *Matarosso v. Continental Casualty Company*, 56 N.Y.2d 264, 436 N.E.2d 1305 (1982)," they asserted as the basis for their

petition that "the Petitioners never agreed to arbitrate." (Notice of Removal Ex. 3 ¶ 25.) Defendants removed the action to this Court by notice of removal filed on October 22, 2004.

Following removal, Defendants ChevronTexaco and TexPet responded to the petition by filing first a Memorandum of Law in Opposition to Motion for Preliminary Injunction (Defendants having interpreted Plaintiffs' actions in state court as a request for such a preliminary injunction), and then an Answer. The AAA responded by filing a motion to dismiss the petition pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In a Memorandum and Order dated December 7, 2004, this Court granted the AAA's motion and dismissed the action insofar as it named the AAA as a party defendant, finding the AAA to be neither a necessary or proper party under the well-established legal principle of arbitral immunity.

Plaintiffs then moved for leave to amend their complaint, see Fed. R. Civ. Pro. 15(a), and leave to file an amended complaint was granted without opposition. Plaintiffs' Amended Complaint, filed on December 8, 2004, restates their demand for a permanent stay of arbitration proceedings, and asserts several additional claims for relief as well. At oral argument, Plaintiffs' counsel represented that these additional claims are contingent, such that the Court need address them only if it concludes that the arbitration should not be dismissed; the Amended Complaint, however, does not explicitly make the additional claims contingent upon failure of the arbitration claim.

The additional claims for relief all focus on alleged inconsistencies between positions purportedly taken by Defendants in demanding arbitration and positions taken

by Texaco during the <u>Aguinda</u> litigation. First, Plaintiffs claim that collateral estoppel precludes relitigation of the issue of "the Republic of Ecuador and Petroecuador's sovereign immunity in this matter," because this issue "was actually litigated and determined in the District Court's 1996 *Aguinda v. Texaco* decision" and "[t]he District Court's 1996 holding that the Republic of Ecuador and Petroecuador enjoyed sovereign immunity in the United States was essential to the District Court's ultimate dismissal of the case under the doctrine of *forum non conveniens* and the affirmance of that decision by the Second Circuit." (Am. Compl. ¶¶ 64-67.) Second, Plaintiffs claim that the doctrine of judicial estoppel prevents Defendants from asserting that Petroecuador agreed to arbitration, because this assertion is inconsistent with the position taken by Texaco in the <u>Aguinda</u> litigation regarding the sovereign immunity of Ecuador and Petroecuador. Third, Plaintiffs claim that Texaco's failure to seek arbitration against Petroecuador during the pendency of the <u>Aguinda</u> litigation constituted a waiver of the right to arbitrate.

The prayer for relief in Plaintiffs' Amended Complaint[8] requests both "a permanent and final injunction, staying the arbitration proceedings... before the AAA" (Am. Compl. Prayer for Relief ¶(C)), and other injunctive and declaratory relief with respect to various aspects of Plaintiffs' claims. Plaintiffs request a ten-part declaratory judgment, the substance of which can be understood as comprising six parts: (1) that their collateral estoppel, judicial estoppel, and waiver theories are meritorious; (2) that

---

[8] Perhaps because of a typographical error, the Prayer for Relief in Plaintiffs' Amended Complaint states not that Plaintiffs request the relief described, but rather that "the Aguinda Plaintiffs" request such relief. Neither party has suggested, in the briefing on any of the motions currently before the Court, that this error should have substantive consequences.

"[n]either... Ecuador nor Petroecuador has ever agreed to arbitrate any disputes with Texaco[9] in any American forum" and "there are no valid grounds upon which Texaco may demand arbitration against... Ecuador or Petroecuador" (id. ¶¶(A)(i)-(A)(j)); (3) that the 1973 Contract and not the 1965 JOA controls the contractual relationship between Plaintiffs and Defendants; (4) that Plaintiffs are "a single party for the purposes of their contractual relationship with Texaco" (id. ¶ (A)(f)); (5) that neither Ecuador nor Petroecuador has waived sovereign immunity in the United States in this matter; and (6) that "*Aguinda v. Texaco* involved the same claims, brought by many of the same plaintiffs, as the case currently pending in Lago Agrio, Ecuador on which Texaco seeks indemnification from Petroecuador in this matter" (id. ¶ (A)(c)).  Plaintiffs further request that the Court "[i]ssue... permanent and final injunction[s], estopping Texaco from denying that the Republic of Ecuador and Petroecuador enjoy sovereign immunity in the United States in this matter.... [and] barring Texaco from asserting a right to indemnification against the Republic of Ecuador and Petroecuador in this matter."  (Id. ¶ (B)-(C).)

In response to this Amended Complaint, Defendants, on January 10, 2005, filed an Answer containing several counterclaims.  The counterclaims brought against Petroecuador are explicitly conditional, in the sense that Defendants commit not to litigate them in this Court unless "the arbitrability question raised by the Amended Complaint is decided in favor of Petroecuador."  (Countercls. ¶ 5.)  The counterclaims against the Republic of Ecuador are not conditional.

---

[9] When Plaintiffs use the term "Texaco," they generally refer not to Texaco, Inc., but to "Defendants ChevronTexaco Corporation and Texaco Petroleum Company (collectively 'Texaco')," as they describe the

The first counterclaim, asserted against Petroecuador only, is for "indemnification of [an] implied agent." (Countercls. ¶¶ 65-70.) Petroecuador, Defendants allege, is bound to indemnify ChevronTexaco and TexPet for their costs and expenses in the Lago Agrio litigation, and any final judgment therein, because after Petroecuador's entry into the Napo Consortium "TexPet... operated the Consortium as Petroecuador's agent" and "[t]he litigation expenses and costs of any judgment in the Lago Agrio litigation have been and will be incurred within the scope of the agency relationship." (Countercls. ¶¶ 66-67.)

The second and third counterclaims are asserted against both Ecuador and Petroecuador, and concern alleged breaches of the 1995 Settlement and 1998 Final Release. Specifically, Ecuador and Petroecuador are said to have breached those agreements by "allowing the Lago Agrio lawsuit to proceed as a private-attorney-general action," by "refusing to inform the court in Lago Agrio that they owned and released all rights to environmental remediation or restoration by TexPet in the concession area," and by not "indemnifying ChevronTexaco and TexPet for any of their costs" in the Lago Agrio litigation. (Countercls. ¶ 75.) Defendants seek damages for costs that they have incurred in the Lago Agrio litigation or that they will incur in the future, and an injunction "requiring the Republic of Ecuador and Petroecuador to pay all fees, costs and expenses associated with the Lago Agrio litigation that may be incurred in the future, including the amount of any potential adverse final judgment rendered against ChevronTexaco in the Lago Agrio litigation" (Countercls. ¶ 81).

---

parties from whom they seek relief. (Compl. ¶ 1.)

In Defendants' fourth counterclaim, they seek a declaratory judgment addressing the same subject matter as the first three counterclaims. The judgment that they request would declare

> that Petroecuador is in breach of its obligations to indemnify TexPet for Consortium operations, that the Republic of Ecuador and Petroecuador are in breach of their obligations under the 1995 Settlement and 1998 Final Release... and that the Republic of Ecuador and Petroecuador are obligated to intervene in the Lago Agrio litigation and inform the Ecuadorian court that they owned and released all rights to environmental remediation or restoration by TexPet in the concession area, and to indemnify and hold harmless TexPet and ChevronTexaco for any and all fees, costs and expenses relating to the Ecuadorian lawsuit, including any final judgment that may be rendered against ChevronTexaco in Ecuador.

(Countercls. ¶ 84.) That is, the judgment requested by Defendants would declare the correctness of Defendants' positions with respect to both the implied-agency claim against Petroecuador and the settlement-based claims against Ecuador and Petroecuador.

Plaintiffs responded to the counterclaims, as has already been mentioned, not by answer but by motion to dismiss pursuant to Rule 12(b), asserting both lack of subject-matter jurisdiction and failure to state a claim. Shortly after filing this motion on January 31, 2005, they filed, on February 7, the motion for summary judgment that is now before the Court. On February 28, Plaintiffs filed an additional motion to stay discovery pending resolution of the two dispositive motions. Defendants also having filed their responses to the two dispositive motions on February 28, Plaintiffs then filed, on March 1, a motion to strike Defendants' responses as untimely, or, in the alternative, for a preliminary injunction and additional time to reply. Following a telephone conference on March 2, the Court ordered all proceedings in the arbitration stayed until the pending motions for permanent stay of arbitration proceedings were decided or until further order

of this Court.  The subsequent briefing on both dispositive motions led to a motion by Defendants for permission to file sur-replies in opposition, in response to which Plaintiffs moved for permission to file a response to the sur-replies.  Oral argument was then held, and the Court reserved decision.

## II. Jurisdiction and Venue

### A. Subject Matter Jurisdiction Over Plaintiffs' Claims

Although no party has disputed that this Court has subject-matter jurisdiction over plaintiffs' claims, the Court must nevertheless determine whether such jurisdiction exists. Da Silva v. Kinsho Int'l Corp., 229 F.3d 358, 361 (2d Cir. 2000).  Plaintiffs have alleged two sources of federal subject-matter jurisdiction for the claims contained in their Amended Complaint: diversity jurisdiction under 28 U.S.C. § 1332, and federal-question jurisdiction pursuant to 28 U.S.C. § 1331 and 9 U.S.C. §§ 201-08, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  Defendants initially removed the action pursuant to the same claimed sources of jurisdiction, as well as two others: federal-question jurisdiction pursuant to the Inter-American Convention on International Commercial Arbitration, specifically 9 U.S.C. § 302, and general federal-question jurisdiction due to the applicability of the federal substantive law of arbitration.  Because the source of the Court's jurisdiction may determine the appropriate choice of governing law, see Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 95 (2d Cir. 1999), and Part III.B.1.a infra, it is prudent to examine all of the potential sources.

**1. Diversity Jurisdiction**

The Court has diversity jurisdiction over the subject matter of Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(4), which allows such jurisdiction "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between... a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a state or different states."  28 U.S.C.A. § 1332(a) (West 2005).  Plaintiffs and Defendants agree that the amount in controversy exceeds the value of $75,000 (Not. of Removal ¶ 2(e); Am. Compl. ¶ 14; Ans. ¶ 14), and this appears to be so.  Defendants, both corporations incorporated in Delaware and with principal places of business in California, are "citizens of a state or of different States" for diversity purposes.  And whatever the outcome of the dispute between Plaintiffs and Defendants regarding whether Petroecuador is legally distinct from the Republic, the foreign-state-as-plaintiff condition of § 1332(a)(4) jurisdiction is also met.

Plaintiffs are foreign states as that term is defined in 28 U.S.C. § 1603(a), whether or not Petroecuador has a legal identity independent from the Republic.  Ecuador is a foreign state in the simplest meaning of that term.  On Plaintiffs' view, Petroecuador is a kind of doing-business-as name for Ecuador.  On Defendants' view, Petroecuador is "a separate legal person... a majority of whose... ownership interest is owned by a foreign state... and... which is neither a citizen of a State of the United States... nor created under the laws of any third country," 28 U.S.C.A. § 1603(b), and thus is "an agency or instrumentality of a foreign state as that term is defined in [28 U.S.C. § 1603](b)," 28

U.S.C.A. § 1603(a).  In either case, Petroecuador, like the Republic of Ecuador, is covered by § 1332(a)(4).

Furthermore, while § 1332(a)(4) only speaks of an action in which "a foreign state" is plaintiff, not an action in which two foreign states are plaintiffs, it would nevertheless apply even if Petroecuador were considered to be a legal entity distinct from the Republic.  The Second Circuit's statement that in the § 1603(a) context "agencies and instrumentalities... are subsumed within the 'foreign state'.... [and] deemed *part of* the foreign state," <u>Filler v. Hanvit Bank</u>, 378 F.3d 213, 219 (2d Cir. 2004) (emphasis in original), strongly suggests that Petroecuador would be deemed part of the single "foreign state" of Ecuador for purposes of § 1332(a)(4) despite any independent legal identity it might have.  Even assuming *arguendo* that Petroecuador did qualify as a § 1603(a) "foreign state" separate from Ecuador, § 1332(a)(4) would still apply because of the rule that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise... words importing the singular include and apply to several persons, parties, or things."  1 USCS § 1 (2005).  There is no apparent contextual reason why a suit should not be subject to diversity jurisdiction simply because it is brought by both a foreign state and an instrumentality of that same foreign state.[10]  Thus, all of the conditions for § 1332(a)(4) jurisdiction are satisfied here.

---

[10] The constitutional grant of alienage jurisdiction extends to "Controversies... between a State, or the Citizens thereof, and foreign States, Citizens or Subjects," U.S. Const. Art. III. § 2, so it is certainly constitutionally permissible to follow 1 USC § 1 and construe § 1332(a)(4) as extending to suits brought by two or more "foreign States [or] Citizens."  The inclusion of suits brought by foreign states *or* foreign citizens in the constitutional grant of jurisdiction also renders it immaterial whether one considers an

## 2. Federal-Question Jurisdiction

The Court would have federal-question jurisdiction over the subject matter of this action if the action were governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the New York Convention"[11]), 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted at 9 U.S.C.A. § 201 note (West 2004), or the Inter-American Convention on International Commercial Arbitration of January 30, 1975 ("the Inter-American Convention"), O.A.S.T.S. No. 42, reprinted at 9 U.S.C.A. § 301 note.  Chapter Two of the Federal Arbitration Act (FAA), implementing the New York Convention, provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States... [and] [t]he district courts of the United States... shall have original jurisdiction over such action or proceeding, regardless of the amount in controversy," 9 U.S.C.A. § 203, and also provides for removal to federal court "[w]here the subject matter of an action or proceeding pending in a state court relates to an arbitration agreement or award falling under the Convention," 9 U.S.C.A. § 205.  Chapter Three of the FAA, implementing the Inter-American Convention, makes the original-jurisdiction and removal provisions of Chapter Two applicable to that Convention as well.  9 U.S.C.A. § 302 (stating that 9 U.S.C. §§ 202-205, and § 207, "shall apply to this chapter as if specifically set forth herein, except that for purposes of this chapter 'the Convention'

---

instrumentality of a foreign state, such as Petroecuador is according to Defendants' view, to be more aptly described in a constitutional sense as a foreign state or as a citizen of that foreign state.

[11] The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 is often referred to as the "New York Convention" because it was drafted, enacted, and opened for signature in New York City.  Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 18 (2d Cir. 1997);  Spier v. Calzaturificio Tecnica, S.p.A., 663 F. Supp. 871, 872 n.1 (S.D.N.Y. 1987).

shall mean the Inter-American Convention").

Defendants' suggestion that the mere applicability of the federal substantive law of arbitration would be sufficient to provide federal-question jurisdiction under 28 U.S.C. § 1331 is incorrect, however.  The original FAA, now Chapter One of that statute, "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet... does not create any independent federal-question jurisdiction under 28 U. S. C. § 1331... or otherwise."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 (1983).  Thus, whether federal-question jurisdiction exists depends upon whether either the New York Convention or the Inter-American Convention (collectively "the Conventions") applies.

As a general matter, the Conventions are enforceable in United States courts where, as here, a written agreement purportedly exists that provides for arbitration in the United States (or another signatory nation), and the legal relationship out of which the alleged arbitration agreement arises is a commercial one with a significant connection to a foreign country.  See 9 U.S.C.A. §§ 201-202, 301-302; Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999); Productos Mercantiles E Industriales, S.A. v. Faberge USA, 23 F.3d 41, 44-45 (2d Cir. 1994).  It is immaterial that the alleged arbitration agreement, comprised of the 1965 JOA and Petroecuador's purported accession thereto in the early 1970s, partially predates the New York Convention (which entered into force in the United States in 1970, see 9 U.S.C.A. § 201 note), and completely predates the Inter-American Convention (which began its existence in 1975 and did not enter into force in the United States until 1990, see 9

U.S.C.A. § 301 note).  The Second Circuit has observed with respect to the New York

Convention that "the Convention contains no prospective language and should be applied

retroactively to existing arbitration agreements and awards."  Fotochrome, Inc. v. Copal

Co., 517 F.2d 512, 515 n.3 (2d Cir. 1975).  The Inter-American Convention contains no

"prospective language" not present in the New York Convention, and the Second Circuit

has stated that "[t]he legislative history of the Inter-American Convention's

implementing statute... clearly demonstrates that Congress intended the Inter-American

Convention to reach the same results as those reached under the New York Convention,"

Productos Mercantiles, 23 F.3d at 45.[12]  Thus, Fotochrome's retroactivity holding should

apply to the Inter-American Convention as well.  The fact that "the United States acceded

to the Convention[s] after the contract in suit was signed," Fotochrome, 517 U.S. at 515

n.3, therefore does not alter the general applicability of either of the Conventions to the

legal relationship at issue here.

The more difficult question is whether either or both of the Conventions are

applicable to provide jurisdiction over this particular action.  Article II of the New York

Convention provides for recognition of an "agreement in writing" to submit to

arbitration, and further provides that a court having before it "an action in a matter in

---

[12] Productos Mercantiles quotes the House Report on the Inter-American Convention as stating that
    The New York Convention and the Inter-American Convention are intended to achieve the same
    results, and their key provisions adopt the same standards, phrased in the legal style appropriate for
    each organization. It is the Committee's expectation, in view of that fact and the parallel legislation
    under the Federal Arbitration Act that would be applied to the Conventions, that courts in the United
    States would achieve a general uniformity of results under the two conventions.
23 F.3d at 45 (quoting H.R. Rep. No. 501, 101st Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N.
675, 678).  The President's transmittal message also described the Inter-American Convention as "similar in
purpose and effect to the New York Convention."  Id. (quoting President's Message to the Senate
Transmitting the Inter-American Convention on Commercial Arbitration, 1981 Pub. Papers 517 (June 15,
1981)).

respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless the said agreement is null and void, inoperative or incapable of being performed." 9 U.S.C.A. § 201 note (West 2004). In this action, however, Plaintiffs do not request the Court to refer the parties to arbitration, but rather ask the Court to *prevent* arbitration, and to grant them other injunctive and declaratory relief as well. It is not at all clear that an action seeking such relief "fall[s] under the [New York] Convention" within the meaning of 9 U.S.C. § 203, so as to provide this Court with original jurisdiction. The Inter-American Convention says still less about judicial intervention before the stage at which an arbitration award exists, stating only that "[a]n agreement in which the parties undertake to submit to arbitral decision any differences that may arise or have arisen between them with respect to a commercial transaction is valid," 9 U.S.C.A § 301 note,[13] so it would seem if anything less likely to provide jurisdiction (under § 203 as incorporated by § 302) for a petition to stay arbitration. That the implementing law for both the New York Convention and the Inter-American Convention incorporates chapter one of the FAA to the extent it is not inconsistent with them, 9 U.S.C.A. §§ 208, 307, does not change this result, as "the FAA does not provide for petitions (such as [Plaintiffs']) brought by the party seeking to stay arbitration." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).

The Second Circuit has suggested that "the [New York] Convention [is] inapplicable... [where] the party invoking its provisions did not seek either to compel

---

[13] Unlike the New York Convention, the Inter-American Convention contains no specific instruction that a court should refer parties to arbitration when seized of an action involving such an agreement.

arbitration or to enforce an arbitral award."  International Shipping Co., S.A. v. Hydra

Offshore, Inc., 875 F.2d 388, 391 n.5 (2d Cir. 1989).  This suggestion would preclude

invocation of the New York Convention – and presumably the Inter-American

Convention as well, see Productos Mercantiles, 23 F.3d at 45 – by a party simply seeking

to stay arbitration, let alone one also seeking to obtain broader declaratory and injunctive

relief.  In Borden v. Meiji Milk Products Co., 919 F.2d 822, 826 (2d Cir. 1990), the

Second Circuit expanded the category of parties allowed to invoke the New York

Convention somewhat when it "h[e]ld that entertaining an application for a preliminary

injunction in aid of arbitration is consistent with the court's powers pursuant to [the

Convention]."  This holding, however, was coupled with an emphasis on the fact that "far

from trying to bypass arbitration, Borden sought to have the court *compel* arbitration."

919 F.2d at 826.  There appears to be little or no basis in Second Circuit case law for

invocation of the New York Convention or the Inter-American Convention by a party

seeking to *avoid* arbitration, rather than compel or aid it.

 In this case, however, the parties who initially sought the exercise of federal

jurisdiction were Defendants, under the removal provision applicable to the Conventions.

 That provision, 9 U.S.C. § 205 (made applicable to the Inter-American Convention by 9

U.S.C. § 302), allows removal "[w]here the subject matter of an action or proceeding

pending in state court relates to an arbitration agreement or award falling under the

Convention," whether or not this relationship "appear[s] on the face of the complaint."  9

U.S.C.A. § 205.  The logic of Borden suggests that this aspect of Convention jurisdiction

was available to Defendants: they were seeking to allow arbitration to continue, while

Plaintiffs were the ones who sought to "bypass" it by their application for a stay of arbitration pursuant to Article 75 of the CPLR.

The fact that Plaintiffs dispute the existence of any "arbitration agreement" between the parties is irrelevant to the question of subject matter jurisdiction under the Conventions. In Sarhank Group v. Oracle Corp., 404 F.3d 657, 660 (2d Cir. 2005), the Second Circuit rejected the argument that "the district court lacked subject matter jurisdiction in the absence of a signed written arbitration agreement between the parties," where the dispute before the court concerned whether respondent Oracle Corp. was legally bound to arbitrate by a contract entered into between petitioner Sarhank and a *subsidiary* of Oracle. According to Sarhank, "[w]hen a party challenges the court's subject matter jurisdiction based upon the merits of the case," such as by disputing whether it is bound by an arbitration agreement it did not itself sign, "that party is merely arguing that the adversary has failed to state a claim... [and] [t]he court has and must assume subject matter jurisdiction and hear the merits of the case." 404 F.3d at 660. Thus, this Court had federal-question removal jurisdiction, pursuant to 9 U.S.C. § 205, over Plaintiffs' application to stay the arbitration.

Plaintiffs' decision to file an amended complaint after removal should not alter the jurisdictional situation with regard to their application for a stay of arbitration. The amended complaint still contains the same application for a stay under Article 75 of the CPLR (specifically CPLR § 7503), a New York procedural rule that the Court is requested to "borrow" as an alternative to issuing a stay under the FAA and the All Writs Act. (Am. Compl. ¶ 13.) That Plaintiffs have chosen to add other claims for relief and

other proposed sources of jurisdiction, *in addition* to what was present in the removed action, should not operate to deprive the Court of any federal-question jurisdiction it had upon removal. This is so both as a matter of logic,[14] and because it would be incompatible with the basic purpose of a removal provision for the addition of other claims to deprive Defendants of any protection granted them by the existence of federal-question jurisdiction under 9 U.S.C. § 205.

With respect to Plaintiffs' requests for broader injunctive and declaratory relief pertaining to their waiver and estoppel theories, however, federal-question jurisdiction is lacking. Those claims for relief were not part of the removed action, do not fall within 9 U.S.C. § 203 as interpreted in International Shipping and Borden, and do not raise a jurisdiction-bestowing federal question in any other respect. The Court's jurisdiction over those claims for relief must therefore stem solely from 28 U.S.C. § 1332, or perhaps from 28 U.S.C. § 1367(a) (supplemental jurisdiction). This implies that New York choice of law rules apply to those claims. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).


**B.  Subject Matter Jurisdiction Over Defendants' Counterclaims**

Unlike the existence of subject-matter jurisdiction over Plaintiffs' claims, the existence of subject-matter jurisdiction over Defendants counterclaims is vehemently contested: Plaintiffs have moved pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss Defendants' counterclaims for, *inter alia*, lack of such jurisdiction.

---

[14] An analogous addition of state claims to a complaint that had originally stated only a federal question would not deprive the Court of federal-question jurisdiction; the only issue would be whether to exercise

Because the issue has been raised by a distinct motion so briefed by the parties, and because deferring consideration of it is more analytically appropriate in other respects, the question of jurisdiction over the counterclaims will be addressed in a subsequent portion of this Opinion and Order.  See infra Part IV.A.

### C.  Personal Jurisdiction and Venue

Defendants do not dispute the existence of personal jurisdiction, any objection with respect to which is therefore waived.  Defendants also do not dispute the appropriateness of venue in the Southern District of New York, any objection to which is also waived.  Plaintiffs, too, do not raise, and therefore waive, any objection as to personal jurisdiction or venue with respect to Defendants' counterclaims.

## III. Plaintiffs' Motion for Summary Judgment

### A.  Legal Standard

The standard under which Rule 56 motions for summary judgment are evaluated is a familiar one.  "Summary judgment is appropriate only where... the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Carroll v. United States, 339 F.3d 61, 67 (2d Cir. 2003); Steel Partners II, L.P. v. Bell Indus., Inc., 315 F.3d 120, 123 (2d Cir. 2002) (internal quotations omitted).  "In assessing the record, all ambiguities and reasonable inferences are viewed in a light most favorable to the nonmoving party."  Vona v. County of

---

supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

<u>Niagara</u>, 119 F.3d 201, 206 (2d Cir. 1997). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." <u>Marvel Characters v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002).

While "[t]he mere existence of a scintilla of evidence in support of the [nonmovants'] position will be insufficient" to defeat a motion for summary judgment, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986), "[s]ummary judgment is improper if there is any evidence in the record that could reasonably support a.... verdict for the non-moving party," <u>Marvel Characters</u>, 310 F.3d at 286. "On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." <u>United States v. Rem</u>, 38 F.3d 634, 644 (2d Cir. 1994).

## B. Analysis

Plaintiffs raise three distinct arguments in support of their contention that no genuine issue of material fact precludes the determination that Defendants' dispute with Petroecuador is not arbitrable. Their primary argument is that Petroecuador never agreed to arbitrate disputes such as the one at issue. Plaintiffs also assert that the doctrine of waiver, and the act of state doctrine as applied to the 1973 Contract, provide independent grounds on which to find that Defendants are barred from seeking arbitration against Petroecuador, even if an otherwise-valid arbitration agreement exists.

### 1. Agreement to Arbitrate

"In considering whether 'a particular dispute is arbitrable,' a court must first decide 'whether the parties agreed to arbitrate.'"  Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 95 (2d Cir. 1999) (quoting Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999)).  The Second Circuit "ha[s] held that whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate."  Id. At issue here is whether Petroecuador is, or was, a party to an arbitration agreement covering the dispute in question.

It is common ground between the parties that Petroecuador "never signed an arbitration agreement with [either defendant], the customary implementation of an agreement to arbitrate," Sarhank Group v. Oracle Corp., 404 F.3d 657, 662 (2d Cir. 2005).  Defendants contend, however, that Petroecuador became a party to the 1965 JOA, which contained an arbitration clause, when Petroecuador acquired its stake in the Napo Consortium.  As they explain it, the 1973 Contract that accompanied Petroecuador's entry into the Consortium replaced the 1964 concession agreement between Ecuador and the concessionaires, but did not affect the 1965 JOA, which continued to govern relations among the members of the Consortium (one of which, after 1973, was Petroecuador). Even though Petroecuador did not sign the 1965 JOA, Defendants assert, it knowingly accepted benefits from the 1965 JOA and proceeded as if the 1965 JOA controlled its relationship with TexPet.  Thus, Defendants conclude, Petroecuador is bound by the arbitration clause within the 1965 JOA.

Plaintiffs, in contrast, assert that the 1973 Contract was a novation that replaced the 1965 JOA, and that the 1973, 1974 and 1977 Contracts – none of which contain an arbitration clause – governed Petroecuador's relationship with the other members of the Napo Consortium.  According to Plaintiffs, the notion that the 1965 JOA and the arbitration clause within it apply to Petroecuador is "purely a recent invention of Chevron[T]exaco's lawyers."  (Oral Ar. Tr. at 3.)  The 1965 JOA and the arbitration clause within it, Plaintiffs contend, do not in any way bind Petroecuador.

### a. Governing Law

To decide whether sufficient issues of material fact exist to preclude the grant of summary judgment on the theory that Petroecuador never agreed to arbitrate, it is necessary to ascertain what law governs this Court's determination of whether Petroecuador became bound by the 1965 JOA and the arbitration clause within it.  "We first look to the substantive law of the action to determine which facts are material," Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004), and to do so, we must know to what substantive law we shall look.  Specifically, we must determine whether New York law, federal common law, or Ecuadorian law should govern the question of whether Petroecuador is bound by an agreement to arbitrate.[15]

---

[15] Plaintiffs' position on this issue is relatively clear: they contend that "the federal substantive law of arbitration applies to this dispute" and that "[w]hen one party claims the existence of an arbitration agreement and the other party denies it, federal law employs 'generally accepted principles of contract law' to determine whether there is a valid agreement to arbitrate."  (Pl. Mem. in Supp. of Mot. for Summ. J. at 4-5 (quoting Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987)).  Defendants, in contrast, cite to cases applying New York substantive law, cases applying federal common law, and an affidavit regarding Ecuadorian law (presumably made relevant by the application of either New York or federal choice of law rules), while not explicitly arguing for the application of any particular one of the three.  No party has contended that significant differences exist between the applicable portions of these three

Several recent Second Circuit cases support the application of state law to the question of whether a party is bound by a purported agreement to arbitrate. Bell v. Cendant Corp., 293 F.3d 563 (2d Cir. 2002), held that "[b]ecause an agreement to arbitrate is a creature of contract... the ultimate question of whether the parties agreed to arbitrate is determined by state law," and applied Connecticut law to ascertain if the parties had agreed to allow the arbitrator to determine arbitrability. 293 F.3d at 566. Bell cited the Supreme Court's statement in First Options v. Kaplan, 514 U.S. 938, 944 (1995), that "when deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally... should apply ordinary state-law principles that govern the formation of contracts." Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, (2d Cir. 2003), in turn cited Bell and First Options for the proposition that "[w]hether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability, is determined by state law." 322 F.3d at 120. Similarly, Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999), described "the determination that parties have contractually bound themselves to arbitrate disputes" as "a determination involving interpretation of state law." Accord Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 45-46 (2d Cir. 1993) (citing Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987)). Following these cases here could result in the application of New York substantive law, or possibly the application of Ecuadorian substantive law under New York or federal

_____

different possible sources of substantive law. We nonetheless proceed to resolve the question of which law applies because of its critical role in our analysis, and because in a case that comes to this Court under both diversity jurisdiction and federal-question jurisdiction, it is not at all clear whether forum-state law or federal law would be the default option where a true conflict was not demonstrated.

choice of law rules, Ecuador being a "state" with a significant connection to the relevant contracts.

There is also, however, a line of Second Circuit authority supporting the application of federal common law to questions such as the one at issue here, particularly in cases arising under the New York Convention. Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987), held, with respect to a motion under the FAA and New York Convention to stay an action pending arbitration, that whether a party was "bound by the arbitration clause of... sales confirmation forms [including some it did not sign] is determined under federal law, which comprises generally accepted principles of contract law." In Thomson-CSF, S.A. v. American Arbitration Association, 64 F.3d 773, 776 (2d Cir. 1995), the Second Circuit stated that "[the] theories under which nonsignatories may be bound to the arbitration agreements of others... arise out of common law principles of contract and agency law."[16] Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 96-98 (2d Cir. 1999), followed Thomson-CSF's common law principles in a New York Convention case after holding that "[w]hen we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable." 198 F.3d at 96. "Where there is little connection to the forum and the Agreements between the parties state an intention to be governed by the FAA," Smith/Enron explains, "proceeding otherwise would introduce a degree of parochialism and uncertainty into international arbitration that would subvert the goal of

simplifying and unifying international arbitration law." Id. Quite recently, citing

Smith/Enron, the Second Circuit reaffirmed that "[i]t is American federal arbitration law

that controls" the question of whether an American nonsignatory can be bound to

arbitrate in a New York Convention case, because "[t]o hold otherwise would defeat the

ordinary and customary expectations of experienced business persons." Sarhank Group

v. Oracle Corp., 404 F.3d 657, 661-662 (2d Cir. 2005).

Strictly speaking, this is probably not a case covered by the New York

Convention. The United States and Ecuador are both members of the Organization of

American States and parties to the Inter-American Convention, see 9 U.S.C.A. § 301

note, so that "a majority of the parties are citizens of a State or States that have ratified or

acceded to the Inter-American Convention and are member States of the Organization of

American States," 9 U.S.C.A. § 305, and thus that Convention rather than the New York

Convention appears to apply. This does not alter the choice of law analysis, however.

Given Congress's expectation "that courts in the United States would achieve a general

uniformity of results under the two conventions," Productos Mercantiles E Industriales,

S.A. v. Faberge USA, 23 F.3d 41, 45 (2d Cir. 1994) (quoting H.R. Rep. No. 501, 101st

Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 675, 678), and given that the

policy concerns motivating the rule in Smith/Enron and Sarhank apply to Inter-American

Convention cases as much as to New York Convention cases, Smith/Enron and Sarhank

strongly suggest that federal common law should govern arbitrability issues in an Inter-

American Convention case as well.

---

[16] Neither the Second Circuit's opinion in Thomson-CSF nor the district court's opinion in that case, Thomson-CSF v. Evans & Sutherland Computer Corp., 94 Civ. 6181, 1994 U.S. Dist. LEXIS 15501

If the rule of <u>Smith/Enron</u> and <u>Sarhank</u> were settled with regard to Convention cases, it would be appropriate to follow it here even though this action comes to the Court under *both* Convention jurisdiction *and* diversity jurisdiction, <u>see supra</u> Part II.A.1. "[T]he goal of simplifying and unifying international arbitration law," <u>Smith/Enron</u>, 198 F.3d at 96, would not be any less relevant simply because the parties could also get into court another way. There appears at first glance to be tension between different Second Circuit authorities regarding whether federal common law governs the validity of a party's purported agreement to arbitrate where, as here, the case arises under one of the Conventions and the contract manifesting the purported agreement contains a choice-of-law clause: <u>Sarhank</u> held that such a choice-of-law clause was to be ignored in favor of federal common law, while <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39 (2d Cir. 2004), held that the choice-of-law clause governed. <u>Sarhank</u> and <u>Motorola</u> can, however, be reconciled.

The appellee in <u>Sarhank</u>, proceeding under the district court's 9 U.S.C. § 203 jurisdiction pursuant to the New York Convention, had successfully petitioned for confirmation of "a commercial arbitration award rendered jointly and severally against Oracle [Corporation] and its wholly owned subsidiary Oracle Systems, Inc. ('Systems')," despite the fact that Oracle was not a signatory to either the agreement under which arbitration had been demanded or any other agreement to arbitrate with the petitioner-appellee. 404 F.3d at 658. The arbitration agreement at issue, "a bilateral executory contract" between petitioner-appellee Sarhank and Systems, <u>id.</u>, contained a choice-of-

---

(S.D.N.Y. Oct. 28, 1994), specified the basis of jurisdiction.

law clause stating that "[t]his agreement shall be construed and governed in all respects in accordance with the laws of the Republic of Egypt and the parties hereto hereby agree to submit to the jurisdiction of the Courts of Cairo." 404 F.3d at 661. The arbitrators had concluded, based on Egyptian contract law, that Oracle was bound by its subsidiary's signature, id. at 662. Notwithstanding the Egyptian choice-of-law clause, the Court of Appeals held that "[i]t is American federal arbitration law that controls" and that "[a]n American nonsignatory cannot be bound to arbitrate in the absence of a full showing of facts supporting an articulable theory based on American contract law or American agency law." Id. The case was remanded to the district court "to find as a fact whether Oracle agreed to arbitrate, by its actions or inaction... or on any other basis recognized by American contract law or the law of agency." Id. at 662-63.

The defendants in Motorola "sought to compel arbitration under 9 U.S.C. § 206"[17] pursuant to agreements that had been signed by plaintiffs and by certain companies controlled by the defendants' family, but to which the defendants themselves were not parties. 388 F.3d at 42-43, 49. The agreements in question contained Swiss choice-of-law clauses, and the Court of Appeals held that "if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the... choice-of-law clauses that govern those agreements." Concluding "that under Swiss law... defendants, as nonsignatories, have no right to invoke those agreements," the Court of Appeals "affirm[ed] the District Court's denial of defendants' motion to compel arbitration." 388 F.3d at 53.

---

[17] As its section designation makes apparent, 9 U.S.C. § 206 is part of Chapter Two of the FAA, implementing the New York Convention.

The most reasonable way to reconcile Motorola and Sarhank is to conclude that a choice-of-law clause will govern where a nonsignatory to a particular arbitration agreement seeks to enforce that agreement against a signatory, but not where a signatory seeks to enforce the agreement against a nonsignatory. In the former case, exemplified by Motorola, the party seeking arbitration must implicitly accept that the contract under which arbitration is sought is valid and binding on it, and the party opposing arbitration has signed the contract, so both parties can reasonably be bound by the choice-of-law clause. In the latter case, exemplified by Sarhank, the nonsignatory party opposing arbitration is in essence contending that it is not subject to the contract at all; thus, applying the choice-of-law clause from that contract to determine the issue would beg the question in a manner potentially unfair to the nonsignatory. Cf. Thomson-CSF, 64 F.3d at 779 (stating that while "the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," this does not logically imply that a signatory can compel a nonsignatory in similar fashion, inasmuch as holdings that "the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves" cannot be extended to "estop[] [a nonsignatory] from denying the existence of an arbitration clause to which it is a signatory because no such clause exists.") Here, TexPet, signatory to the 1965 JOA, seeks arbitration, and nonsignatory Petroecuador opposes arbitration. Thus, Sarhank rather than Motorola controls, and the federal common law of arbitration

agreements applies.

One might argue that the holding of <u>Sarhank</u> is inapplicable to this case because that holding dealt with the circumstances under which "an American nonsignatory [could] be bound to arbitrate," 404 F.2d at 662, and this case deals with whether a *foreign* nonsignatory can be bound to arbitrate. <u>Motorola</u>, in contrast, dealt with whether a foreign signatory could be bound to arbitrate. If the difference between an American party and a foreign party were more significant than the difference between a signatory and a nonsignatory, therefore, the <u>Motorola</u> choice-of-law rule would be applicable here. A reconciliation of <u>Sarhank</u> and <u>Motorola</u> that would have the choice of governing law in a Convention case depend on the nationality of the party sought to be forced into arbitration, however, is not consistent with the <u>Smith/Enron</u> principle that "parochialism" in international arbitration should be avoided in furtherance of "the goal of simplifying and unifying international arbitration law," 198 F.3d at 96. Nothing in either of the Conventions suggests that the validity of an alleged arbitration agreement involving citizens of nations that are signatories to the convention should depend on which signatory nation's citizens resist arbitration. The Second Circuit has attached great weight to the distinction between signatories and nonsignatories, <u>see</u>, <u>e.g.</u>, <u>Merrill Lynch Inv. Managers v. Optibase, Ltd.</u>, 337 F.3d 125, 131 (2d Cir. 2003) (declaring the distinction to be "decisive" and stating that "it matters whether the party resisting arbitration is a signatory or not"); <u>Thomson-CSF</u>, 64 F.3d at 779, and a reconciliation of <u>Sarhank</u> and <u>Motorola</u> based on this distinction is significantly more consistent with the <u>Smith/Enron</u> anti-parochialism principle. Therefore, we will follow <u>Sarhank</u> and apply

federal common law to the question of whether Petroecuador is bound by the arbitration clause in the 1965 JOA.

### b. Evidence for Agreement to Arbitrate Under Federal Common Law

Under federal common law, the Second Circuit "ha[s] recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Thomson-CSF, 64 F.3d at 776. "[A] willing signatory (such as [TexPet]) seeking to arbitrate with a non-signatory that is unwilling (such as [Petroecuador]) must establish at least one of the five theories described in *Thomson-CSF*." Merrill Lynch Inv. Managers, 337 F.3d at 131.

Of the five Thomson-CSF theories, the most likely to apply in this case is estoppel. "A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (citing Thomson-CSF, 664 F.3d at 778-79). Direct benefits are those "flowing directly from the agreement," while "the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." MAG Portfolio Consultant, GMBH, v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001). "To prevail, then, [Defendants] must show that [Petroecuador] 'knowingly exploited' the... contract and thereby received a direct benefit from the contract." Id. at 62 (quoting Thomson-CSF, 64 F.3d at 778).

If Defendants' view of the events surrounding the entry of CEPE/Petroecuador into the Napo Consortium were accepted, it would be reasonable to conclude that Petroecuador knowingly received "direct benefits" from the 1965 JOA, and thereby became estopped from denying agreement to arbitrate under it.  As Defendants describe the situation, it was only within the framework of the 1965 JOA that TexPet acted as "Operator" of the Napo Consortium.  That is, when TexPet took the lead role in extracting oil from the land covered by the Napo Concession, this action was – on Defendants' account – taken under and because of the 1965 JOA, which all parties understood to govern.  On this view, Petroecuador received oil extracted by TexPet, at cost, and had control over various aspects of the extraction of that oil, only because of the 1965 JOA, and knew that it received those benefits because of the 1965 JOA.  It was thus analogous to the shipowners in <u>American Bureau of Shipping</u>, who received lower insurance rates and registration under the French flag only because of an agreement containing an arbitration clause, and were therefore bound to that arbitration clause despite not being a signatory to the agreement.  170 F.3d at 353.

If one were to accept Plaintiffs' version of the facts, on the other hand, there would be no basis for subjecting Petroecuador to arbitration.  If the 1973 Contract was a novation intended by the parties to replace the 1965 JOA, and the subsequent relationship among the Napo Consortium parties was understood to be "quasi-contractual, governed by an ambiguous amalgam of prevailing 'standards and procedures'" (Pl. Reply in Supp. of Mot. for Summ. J. at 4), then there was no extant contract containing an arbitration clause from which Petroecuador could be said to have derived a direct benefit.  Nor

would any of the other <u>Thomson-CSF</u> theories be applicable, if, as Plaintiffs contend, the 1965 JOA and its arbitration clause have been dead and buried for forty years.

The question, then, is whether there is sufficient evidence in the record supporting Defendants' version of events to raise a genuine issue of material fact regarding whether Petroecuador became bound by the arbitration clause in the 1965 JOA. We answer this question in the affirmative. In so doing, we address only those portions of the record necessary to demonstrate clearly that genuine issues of material fact do exist, and do not attempt an exhaustive description of the voluminous evidence submitted by the parties.

### i. Pareja Affidavit

The first significant piece of evidence that the 1965 JOA was understood to govern the operations of the Napo Consortium after Petroecuador entered it, and that Petroecuador derived significant benefits from the 1965 JOA, is the affidavit of Jorge Pareja Cucalón submitted by Defendants. Mr. Pareja, according to his affidavit, was an employee of Gulf involved in the Texaco-Gulf Consortium from 1969 to 1970, the General Manager of CEPE from 1981 to 1982, and the President of Petroecuador in 1999. He has also served at various times as Chairman of the Petroleum Policy Commission in the Ecuadorian Ministry of Energy, Ecuador's Ambassador to Austria, Ecuador's representative to OPEC, and Ecuador's Minister of Energy and Mines.

Mr. Pareja avers that because of his duties at Gulf from 1969 to 1970, he "knew about the Napo Joint Operating Agreement entered into by subsidiaries of Texaco and Gulf in 1965 ("Napo JOA")." (Pareja Aff. ¶ 4.) He further avers that "[t]here was no

question that, when CEPE became an interest holder in the Napo Concession, CEPE also became a party to the [1965] Napo JOA, as that contract controlled the relationship and operations of the parties to the concession" and that he "always understood, as did CEPE, that the [1965] Napo JOA was the agreement that governed the relationship between TexPet and CEPE regarding oil exploration and production in the Napo Concession." (Pareja Aff. ¶ 9.)  The 1965 JOA, according to Mr. Pareja, "delineated the joint rights of CEPE and TexPet, with respect to each other."  (Pareja Aff. ¶ 9.)

The Pareja Affidavit also details benefits that CEPE is asserted to have received from the 1965 JOA.  The 1965 JOA, Mr. Pareja says, not only "enabled CEPE... to enjoy its share of the oil produced in the Napo Concession by the Operator, TexPet, but also allowed CEPE, through its representatives, to have significant input into the exploration and production efforts by the Operator."  (Pareja Aff. ¶ 9.)  According to Mr. Pareja, CEPE was able to approve all "annual work plans and budgets" and to "approve (or not) significant contractual relationships that the Operator wished to enter into with various contractors."  (Id.)  It could thereby "have a voice in the petroleum exploration and production plans and activities" and "address its own budgetary concerns by being able to seek limits on the programs that the Operator wanted to pursue."  (Pareja Aff. ¶ 10.)

### ii. Other Affidavits

Although Mr. Pareja is perhaps the most compelling of Defendants' affiants insofar as he worked for CEPE/Petroecuador during a portion of the relevant time period, other affidavits have also been provided in support of Defendants' contention that the

Consortium of which CEPE became a part was understood to operate under the 1965 JOA. It would serve little purpose at this stage to reiterate in detail the averments of former Consortium Operations Manager René Bucaram, former TexPet Chief Counsel Rodrigo Pérez Pallares, or the former manager of TexPet's separate (non-Consortium) office, Donald Sawyer. For summary judgment purposes, it is sufficient to note that they tend to corroborate the statements made by Mr. Pareja.

Defendants have also offered affidavits from proposed expert witnesses Norman N. Anderson and Owen L. Anderson. These affiants address usual practice in the oil industry, and conclude that the Napo JOA was a typical joint operating agreement, and that such operating agreements are generally considered essential where more than one oil-extraction company shares rights under a concession from a host government. They further conclude that pursuant to usual practice in the oil industry, Petroecuador would have been understood to enter the Napo Concession subject to the existing JOA.

### iii. Lack of Explicit Abrogation of 1965 JOA in 1973 Contract

Another piece of evidence that the 1973 Contract was not, as Plaintiffs claim, a novation replacing the 1965 JOA is that the 1973 Contract explicitly replaced several other contracts, but did not mention the 1965 JOA. Paragraph 53.1 of the 1973 Contract stated in relevant part that "the contract executed on August 26, 1961 in its applicable portion, and the contracts executed on March 5, 1964 and June 27, 1969 are completely substituted by the present contract. Consequently, the parties shall hereinafter be governed only by the stipulations set forth in this public instrument." (Perez Aff. Ex. E.)

While Plaintiffs focus on the latter sentence, Defendants focus on the former, and the fact that it mentions previous concession contracts between Ecuador and the concessionaires but does not mention the 1965 JOA. Particularly in light of the fact that the 1965 JOA contained a provision declaring itself "binding on the successors and assigns of the Parties" (Perez Aff. Ex. C. ¶ 26.1), this omission of any reference to the 1965 JOA makes it at least ambiguous whether the 1973 Contract was intended to render the 1965 JOA inoperative. And on summary judgment, "all ambiguities... are viewed in a light most favorable to the nonmoving party." Vona, 119 F.3d at 206.

Plaintiffs contend that "the underlying intent behind the 1973 Contract was that all disputes involving the Napo Consortium be resolved in Ecuador" (Pl. Mem. in Supp. of Mot. for Summ. J. at 8), so that at least the arbitration provision of the 1965 JOA must have been abrogated even if some other portions of the 1965 JOA survived. They cite in support of this contention paragraph 50.1 of the 1973 Contract, which states that "[t]he contractors shall submit to the laws, courts, and judges of Ecuador, to summary verbal proceeding, and expressly waive any claim through diplomatic channels." (Pl. Ex. C. ¶ 50.1.) "The general rule in cases containing forum selection clauses," however, "is that 'when only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive.'" John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc., 22 F.3d 51, 52 (2d Cir. 1994) (quoting Docksider, Ltd. v. Sea Technology, Ltd., 875 F.2d 762, 764 (9th Cir. 1989)). In particular, a clause stating that the parties "submit to the jurisdiction of" a particular state's courts will not be read as exclusive, Keaty v. Freeport

Indonesia, Inc., 503 F.2d 955, 956 (5th Cir. 1974); one stating that the parties "submit to the ... courts[] and judges" of a particular forum would seem to be closely analogous. Moreover, the inclusion of this clause referring to submission of "the contractors" to Ecuadorian courts, in a model contract promulgated by the Ecuadorian government and alleged by Defendants to have been in essence a *concession* contract, could be construed as requiring only that the concessionaires submit to Ecuadorian jurisdiction and laws if disputes arose in their relationship with Ecuador. The clause is not sufficiently clear to preclude the possibility that CEPE/Petroecuador could be estopped from denying the applicability of the 1965 JOA's arbitration clause if CEPE and TexPet had in fact proceeded on the assumption that the 1965 JOA governed their relationship.

The effect of paragraph 43.2 of the 1973 Contract, also cited by Plaintiffs to support their contention that the intent behind that Contract was for all disputes to be resolved in Ecuador, is similarly unclear. It states that "indemnities to be paid by the contractors for the damages caused on lands, crops, buildings or other properties due to the exploration, exploitation or any other phase of the oil industry, shall be determined by experts designated by the parties" and that "[i]n case of disagreement, the Ministry concerned shall appoint a third expert, whose verdict shall be unappealable." (Pl. Ex. C. ¶ 43.2.) This paragraph immediately follows, and is contained within the same "Clause" as, one concerning "[e]xpropriation of lands, buildings, and other properties," which it is provided "shall be effected by the Ministry concerned." (Pl. Ex. C. ¶ 43.1) Viewed in context, therefore, paragraph 43.2 appears to regulate the legal relationship between the concessionaires and the Republic on the one hand, and the local population on the other.

It might have been relevant to the question whether the Aguinda Plaintiffs could sue Texaco in the United States, but it does not unambiguously bear on the question whether the 1965 JOA governs the relationship between Petroecuador and TexPet.

### iv. Conflicting and Ambiguous References to 1973 Contract and 1965 JOA in Subsequent Agreements Between the Parties

If the subsequent written agreements entered into by the parties unambiguously clarified that the relationship between CEPE/Petroecuador and TexPet after 1973 was not governed or thought to be governed by the 1965 JOA, then it might be doubtful whether Defendants could survive summary judgment by pointing to their contrary evidence. While some of the subsequent agreements tend to indicate that the 1973 Contract and not the 1965 JOA controlled, however, the overall picture is not so clear as to justify summary judgment in the face of the evidence offered by Defendants.

### (a.) 1974 Contract

The 1974 Contract contains a passing reference to the 1973 Contract, but does not state that the 1973 Contract regulates the relationship between CEPE and the other concessionaires of the Napo Concession. Rather, the 1974 Contract, as translated by Plaintiffs, states that "[t]he totality of the activities that will develop in the Joint Operation will be regulated by an operating agreement entered into by the parts [sic]." (Pl. Ex. Q ¶ 8.) Plaintiffs cite this clause and assert that "neither the Republic nor CEPE/Petroecuador ever entered into such a formal operating agreement with Texaco and/or Gulf." (Pl. Mem. in Supp. of Mot. for Summ J. at 8.)

The lack of mention of the 1965 JOA in the 1974 Contract may tend to suggest that the 1965 JOA was not understood to continue in effect. The 1974 Contract's implication that an operating agreement separate from the 1973 and 1974 Contracts would be required, however, tends to support Defendants' argument that the 1973 Contract did not itself function as an operating agreement, and that industry convention would require one. The 1974 Contract does not address the question of what contract or other legal framework would govern "the activities that will develop in the Joint Operation" in the period before the parties entered into the future operating agreement to which the 1974 Contract refers. It thus does not decisively resolve the conflict between Defendants' contention that the 1965 JOA was understood to apply in the interim, and Plaintiffs' assertion that the interim relationship was "quasi-contractual, governed by an ambiguous amalgam of prevailing 'standards and procedures'" (Pl. Reply in Supp. of Mot. for Summ. J. at 4).

### (b.) 1977 Contract

The 1977 Contract by which CEPE bought out Gulf's remaining portion of the Napo Concession tends to support Plaintiffs' position in this case, but not so definitively as to permit summary judgment in the face of Defendants' contrary evidence. Most favorable to Plaintiffs is paragraph 2.13, which states:

> With respect to any obligations Gulf may have to third parties and which do not appear in its accounts, neither the Ecuadorian government nor CEPE shall assume any responsibility whatsoever, and these must be taken care of by Gulf. Therefore CEPE shall assume only those obligations that are in accordance with this agreement.

(Pl. Ex. O ¶ 2.13.)  The arbitration clause of the 1965 JOA could be described as an obligation Gulf had to TexPet, and there has been no showing that it appeared in Gulf's accounts.  And although TexPet was not a signatory to the 1977 Contract, paragraph 2.13 could still serve as evidence that CEPE/Petroecuador believed the 1965 JOA to be inapplicable and thus did not "knowingly exploit[]" it, MAG Portfolio Consultant, 268 F.3d at 62 (quoting Thomson-CSF, 64 F.3d at 778).

By the time of the 1977 Contract, however, CEPE had been part of the Napo Concession/Consortium for several years.  If the parties understood the obligations of the 1965 JOA to have attached to CEPE, those obligations would have been in place before the 1977 Contract entered the picture.  Furthermore, it is not clear that an operating agreement is the sort of "obligation" that would be expected to "appear in [Gulf's] accounts"; it is likely that this wording was meant to refer to monetary liabilities.


### (c.)  1985 Agreement

The 1985 Agreement also tends to support Plaintiffs' position that the 1973 Contract and not the 1965 JOA was seen as controlling the relationship between members of the Napo Consortium.  The background section of the 1985 Agreement mentions only the 1973 Contract and not the 1965 JOA, although it does not specifically state that the 1973 Contract controlled the relationship between Consortium members or abrogated the 1965 JOA.  Even more suggestive are clauses 3.3.1 and 3.3.2 of the 1985 Agreement, which provide respectively that "[t]he parties shall within 30 days commence negotiations for a final Joint Operations Agreement to continue the Consortium's

operations" and that "[u]ntil the Joint Operations Agreement becomes effective, the Consortium's operations shall be carried out according to the standards and procedures that have been in force up to now."  (Perez Aff. Ex. L, at 5.)  Taken together, these clauses seem most consistent with Plaintiffs' view that no Joint Operations Agreement was in force in 1985 – which would explain why one had to be negotiated – and that the relationship of the Consortium parties was instead "quasi-contractual, governed by an ambiguous amalgam of prevailing 'standards and procedures'" (Pl. Reply in Supp. of Mot. for Summ. J. at 4).

It is also possible, however, to read clauses 3.3.1 and 3.3.2 as indicating dissatisfaction by the parties with the then-governing legal regime, and a desire to replace it, while leaving open the question of what the then-governing legal regime actually *was*.  The 1985 Agreement does not specify whether the "standards and procedures that have been in place" were quasi-contractual, or contractual and derived from the 1973 Contract, or contractual and derived from the 1965 JOA.  One can imagine a scenario in which Mr. Pareja is correct that during his time as the General Manager of CEPE from 1981 to 1982 the parties believed the 1965 JOA to govern the operations of the Consortium, and yet by the time of drafting of the 1985 Contract, there was sufficient uncertainty in the mind of the drafter regarding what contract or other legal framework governed the Consortium that language was chosen to avoid the question entirely.  The 1985 Agreement tends to suggest that the 1965 JOA was not understood to govern the relationship of the parties to the Consortium, but it does not establish that proposition so conclusively as to justify disregarding contrary evidence on a motion for summary judgment.

**(d.) 1991 Agreement**

Perhaps most favorable to Plaintiffs' position is the 1991 Agreement. The 1991 Agreement does not reference the 1965 JOA at all, or contain any reference to arbitration. It defines the "Contract" as the 1973 Contract, and states that "'Consortium'... means the de facto company made up of Petroecuador and Texaco, for the exploration and exploitation of the oil fields assigned hereto by the State, in accordance with the Contract." (Suppl. Kolis Decl. Ex. 1 ¶¶ 1.1-1.2.) It further provides that "[i]f disputes arise between the Parties with respect to the application and/or interpretation of this Agreement, such disputes shall be heard in the Special Court [*Juzgado Especial*], in accordance with Section 10 of the Hydrocarbons Act" and that "this Agreement and the operations contemplated shall be subject to the laws of Ecuador, and the rules, regulations, contracts and other agreements signed by the parties." (Suppl. Kolis Decl. Ex. 1 ¶¶ 13.1-13.2 (alterations in original).)

This language certainly, as Plaintiffs contend, tends to suggest that their version of events is the correct one. It is conceivable, however, that "the de facto company made up of Petroecuador and Texaco, for the exploration and exploitation of the oil fields assigned hereto by the State, in accordance with the Contract" might refer to the de facto company for the exploration of oil fields that were "assigned by the State... in accordance with the [1973] Contract" – consistent with Defendants' argument that the 1973 Contract was understood to be a concession contract only – rather than to a "de facto company made up of Petroecuador and Texaco... in accordance with the 1973 Contract." And

while the forum selection clause is helpful to Plaintiffs, particularly because it is "mandatory rather than permissive," <u>John Boutari & Son</u>, 22 F.3d at 53, and "[t]he Supreme Court... has indicated that forum selection... clauses are presumptively valid where the underlying transaction is fundamentally international in character," <u>Roby v. Corporation of Lloyd's</u>, 996 F.2d 1353, 1362-63 (2d Cir. 1993) (citing <u>The Bremen v. Zapata Offshore Co.</u>, 407 U.S. 1, 15 (1972)), the temporal extent of the clause is not so clear as to necessarily wipe out any right of arbitration that TexPet might previously have acquired by estoppel. The 1991 Agreement states that it "shall be effective as of the first day of July 1990." (Suppl. Kolis Decl. Ex. 1 ¶ 3.) Disputes among the parties with respect to their relations before that date therefore may not qualify as "disputes... between the Parties with respect to the application and/or interpretation of th[e] [1991] Agreement" (Suppl. Kolis Decl. Ex. 1 ¶ 13.1).

### (e.) 1995 Settlement

Unlike the 1985 Agreement and the 1991 Agreement, the 1995 Settlement, signed by representatives of Petroecuador, TexPet and Ecuador, tends to suggest that Petroecuador and TexPet understood their relationship as members of the Consortium to have been based on the 1965 JOA. The 1995 Settlement recites that "Compañia Texaco de Petróleos del Ecuador, C.A., and Gulf [Ecuador], which were ultimately succeeded by Texpet and Petroecuador (hereinafter referred to as the 'Consortium'), signed a Joint Operating Agreement with Texpet on January 1, 1965, covering the operation of the Consortium's facilities (hereinafter referred to as the 'Napo Agreement')." (Veiga Aff.

Ex. B at 2.)  It further recites that "Petroecuador exercised its rights under the Napo

Agreement, and replaced Texpet as the operator of the Consortium on July 1, 1990."

(Veiga Aff. Ex. B at 3.)  The reference to Petroecuador as one of the successors of the

1965 JOA's signatories, and the reference to Petroecuador exercising rights under the

1965 JOA in 1990, both support Defendants' contention that the 1965 JOA was

understood to survive with Petroecuador as a party.


### v.  Letter From Marco Herrera Balarezo

The 1995 Settlement is not the only post-1973 writing that implies a belief on the

part of CEPE/Petroecuador that the 1965 JOA continued to govern.  Another such

writing, attached as Exhibit F to the affidavit of René Bucaram, is a letter sent to Mr.

Bucaram by Marco Herrera Balarezo, "CEPE GENERAL AUDITOR," in November of

1986.  In relevant part, the letter, as translated, first complains that

> Operator TEXACO failed to observe Article 8 section 8) of the Napo Joint
> Operating Agreement, give[n] that cash calls to CEPE were not made "...in
> writing at least 30 days in advance of the start of the month to which the budget
> relates..." but rather generally complied [sic] in the second two weeks of the
> previous month.

The letter goes on to allege "significant shortages between the amounts in sucres

provided by TEXACO and those spent in [various months]... in which CEPE, on the

contrary, had surpluses," and to state that "[i]t has become essential to rationalize cash

calls pursuant to Article 8 of the Napo Agreement."

Article 8, section 8 of the 1965 JOA did pertain to the timing of requests for funds

by the Operator, and did require such requests to be made 30 days in advance.  The

wording of article 8, section 8 as quoted in Mr. Herrera's letter does not correspond precisely to the wording of the 1965 JOA, which states in relevant part that "[t]he Operator shall make written requests at least 30 days in advance of due date" (Perez Aff. Ex. C at ¶ 8.8), but it is possible that the difference is a result of translation from English to Spanish and back to English. In the absence of any other "Napo Agreement" in the record that contains an article 8, section 8, applicable to requests for funds, it is a reasonable inference that the Napo Agreement quoted is the 1965 JOA.

Plaintiffs have suggested, in the course of disputing the significance of a different portion of Defendants' evidence, that "there were actually *two* 'Napo Agreements' – the 1965 Joint Operating Agreement ("JOA") between Texaco and... Gulf... and *another agreement* executed years later." (Pl. Reply Mem. in Supp. of Mot. for Summ. J. at 2.) Their evidence for this proposition is a statement in a 1974 letter sent by a TexPet manager to the then General Manager of CEPE, that has been translated as follows:

> As you know, some years ago our Companies reached an agreement on operations that we call the "Napo Operating Agreement." Later on, the Companies prepared a new draft Operating Agreement, which included the experience obtained during that time. Copies of both texts have been sent to you for your review.

(Perez Aff. Ex. G at 1.) The reference to a "new draft Operating Agreement," however, could well refer to an agreement that had not yet been executed by the parties, and there is no evidence in the record that such a new operating agreement was in fact executed until 1991. At the summary judgment stage, where "all ambiguities... are viewed in a light most favorable to the nonmoving party," Vona, 119 F.3d at 206, the 1974 letter therefore cannot be read to indicate the existence of another Napo Agreement that was

binding on the parties during the 1970s and 1980s.  It is more significant insofar as it implies that CEPE was provided with a copy of the 1965 JOA, as Mr. Perez states in his affidavit (Perez Aff. ¶ 36).

At this stage, therefore, the November 1986 letter from Mr. Herrera must be read to suggest that CEPE's auditor believed that the 1965 JOA had survived the 1973 Contract and continued to bind the parties, and believed that CEPE was entitled to benefits under the 1965 JOA.  Admittedly, as Plaintiffs point out, the letter made no specific reference to the arbitration clause of the 1965 JOA.  But on an estoppel theory, the test is whether CEPE/Petroecuador "'knowingly exploited' the... contract and thereby received a direct benefit from the contract," MAG Portfolio Consultant, 268 F.3d at 62 (quoting Thomson-CSF, 64 F.3d at 778), not whether it explicitly acknowledged the existence of the contract's arbitration clause.


### 2. Doctrine of Waiver

Plaintiffs assert that even if Petroecuador did at some point agree to arbitration, "Texaco" has waived its right to arbitrate by its conduct during the Aguinda litigation. Even leaving aside any potential complications arising from the different identities of the parties to which Plaintiffs collectively refer as "Texaco" in the context of the instant case, the Aguinda litigation, and the Lago Agrio litigation, the evidence viewed in the light most favorable to ChevronTexaco and TexPet does not demonstrate a waiver sufficiently clearly to preclude arbitration under the relevant legal standard.

### a. Governing Law

As previously discussed, see supra Parts II.A.2 and III.B.1.a, the contract under

which arbitration is sought in this case is subject to either the New York Convention or

the Inter-American Convention, both of which have been incorporated into the FAA and

both of which explicitly incorporate Chapter One of the FAA to the extent that it is not

"in conflict" with their more specific provisions, 9 U.S.C.A. §§ 208, 307 (West 2005).

The Second Circuit "ha[s] long held that 'once a dispute is covered by the [FAA], federal

law applies to all questions of interpretation, construction, validity, revocability, and

enforceability.'" Gutfreund v. Weiner (In re Salomon Inc. Shareholders Derivative

Litig.), 68 F.3d 554, 559 (2d Cir. 1995) (quoting Coenen v. R. W. Pressprich & Co., 453

F.2d 1209, 1211 (2d Cir. 1972)) (alteration in original).  Nothing in the specific

provisions of either of the Conventions is in conflict with the Coenen rule, which

therefore applies here.

The question of whether a right to arbitrate has been waived goes to the continued

"enforceability" of the arbitration contract.  Therefore, under Coenen, it is governed by

federal law.  In applying that law,

> the Supreme Court has instructed that 'any doubts concerning the scope of
> arbitrable issues should be resolved in favor of arbitration, whether the problem at
> hand is the construction of the contract language itself or an allegation of waiver,
> delay, or a like defense to arbitrability.'  Moses H. Cone Mem'l Hosp. v. Mercury
> Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983). This
> bias in favor of arbitration, 'is even stronger in the context of international
> transactions.'  Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d
> 1060, 1063 (2d Cir. 1993).

Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289 (2d Cir.

1999).

### b. Merits

Plaintiffs' waiver argument is not strong enough to overcome the bias in favor of arbitration established by <u>Moses H. Cone</u>, <u>Deloitte Noraudit</u>, and <u>Chelsea Square Textiles</u>. Plaintiffs contend that Texaco should have moved in <u>Aguinda</u> to compel arbitration against Petroecuador. Unfair prejudice resulted, Plaintiffs say, when Texaco instead relied on the fact that the Republic and Petroecuador could not be impleaded in the United States as a ground for transfer of the case to Ecuador, and then reversed its position on the sovereign immunity of Ecuador and Petroecuador after they had spent eleven years basing their litigation strategy on its former position. Although this argument is superficially attractive, its logic does not survive close scrutiny.

Sovereign immunity for purposes of arbitration, and sovereign immunity for other purposes, do not necessarily go hand in hand. An FSIA provision cited by Plaintiffs abrogates sovereign immunity where

> the action is brought... to enforce an agreement made by the foreign state with... a private party to submit to arbitration... any differences... which may arise between the parties with respect to a defined legal relationship... concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration... is intended to take place in the United States, [or] (B) the agreement... is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards....

28 U.S.C.A. § 1605(a)(6)(A) (West 2005). By its terms, however, this abrogation applies only to an action brought to enforce the arbitration agreement or confirm the arbitration award. It is perfectly consistent to say that a foreign state is immune from jurisdiction in

a context *other than* a petition to enforce an arbitration agreement or confirm an

arbitration award, but may nevertheless be compelled to arbitrate under § 1605(a)(6)(A).

That being the case, Plaintiffs are left to argue that Texaco should have responded

to the Aguinda lawsuit by seeking to compel arbitration against Petroecuador. As

Defendants do not claim a right to arbitration against the Republic of Ecuador, however,

they can reasonably answer that such arbitration would not have solved the problems

created in Aguinda by the inability to implead Ecuador itself, see Aguinda v. Texaco,

Inc., 142 F. Supp. 2d 534, 542 (S.D.N.Y. 2001). Moreover, such arbitration would not

even have enabled the Aguinda Plaintiffs, or Texaco, to implead Petroecuador in the

Aguinda litigation, because Petroecuador would have been subject to jurisdiction under

28 U.S.C. § 1605(a)(6)(A) *only* with respect to the arbitration. Thus, the Aguinda court's

perceived inability to order effective equitable relief, see 142 F. Supp. 2d at 542, likely

would not have been significantly altered.

While it might have been possible for Texaco to somehow have invoked its

purported right to arbitration on behalf of the Aguinda Plaintiffs and brought their claims

into the arbitration, the legal feasibility of such an action is unclear at best. It is also

unclear whether, even if this could have been done, Texaco would have had any

obligation to assist the Aguinda Plaintiffs in joining parties that the Aguinda Plaintiffs

could not themselves join, so as to enable litigation in a forum that Texaco opposed;

litigants do not generally have an obligation to provide procedural aid to their

adversaries. Texaco's failure to attempt such a maneuver is therefore insufficient basis

for a finding of waiver.

Plaintiffs also suggest that Defendants have also waived any right to arbitrate through their conduct in this litigation, by asserting counterclaims seeking indemnification, rather than immediately moving to compel arbitration. The counterclaims against Petroecuador, however, are explicitly conditional: Defendants state in their Answer that they "will not seek to litigate these counterclaims against Petroecuador in this Court unless the arbitrability question raised by the Amended Complaint is decided in favor of Petroecuador." (Countercls. ¶ 5.) In a procedural system that explicitly permits pleading in the alternative, see Fed. R. Civ. Pro. 8(e)(2), such conditional claims do not constitute a waiver of rights that will exist if the condition is not met. Plaintiffs would likely argue that the (unconditional) counterclaims against the Republic of Ecuador are also, in reality, counterclaims against Petroecuador, because on their view the two parties are legally the same. But Defendants have provided sufficient evidence in opposition to this proposition that it does not make sense to find a waiver based upon their refusal to accept it without question. On Defendants' reasonably supported view of the situation, they have sought arbitration while bringing a conditional counterclaim against the party involved in the arbitration, in case arbitrability is found lacking, and a related unconditional counterclaim against a party not involved in the arbitration. This is not sufficient to create a waiver, given the governing law's strong bias in favor of arbitration.

To the extent that Plaintiffs complain of Texaco's failure, during the pendency of the Aguinda litigation, to initiate arbitration against Petroecuador simply seeking indemnification for Texaco's costs in defending that litigation, they do not state the sort

of waiver claim that this Court may properly evaluate. "Ordinarily a defense of waiver brought in opposition to a motion to compel arbitration... is a matter to be decided by the arbitrator." Bell v. Cendant Corp., 293 F.3d 563, 564 (2d Cir. 2002); S & R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 82-83 (2d Cir. 1998). This rule does not apply where "the party seeking arbitration ha[s] already participated in litigation on the dispute" that it seeks to arbitrate. Bell, 293 F.3d at 564; S & R Co., 159 F.3d at 83. Here, however, where litigation enters the picture purely as the subject of a claim for indemnification from a third party, it cannot be said that "the party seeking arbitration ha[s] already participated in litigation on the dispute" that it seeks to arbitrate, Bell, 293 F.3d at 564; S & R Co., 159 F.3d at 83. Such an ordinary waiver claim is therefore "a matter to be decided by the arbitrator." Bell, 293 F.3d at 564; S & R Co. , 159 F.3d at 83.


### 3. Act of State Doctrine Applied to 1973 Contract

Plaintiffs' final argument for summary judgment is that allowing arbitration would contravene the 1973 Contract, and that because the 1973 Contract was "an official act of the Ecuadorian State implementing its oil policy" (Pl. Mem. in Supp. of Mot. for Summ. J. at 15), the act of state doctrine compels that it must be followed as a rule of decision. The 1973 Contract, Plaintiffs contend, requires that all disputes related to the Napo Consortium be resolved in Ecuador. Thus, to allow arbitration in the United States, according to Plaintiffs, would be to treat the 1973 Contract as invalid, which would violate the act of state doctrine given the 1973 Contract's official status.

The act of state doctrine, however, does not apply here.  The FAA explicitly provides that "[e]nforcement of arbitration agreements... shall not be refused on the basis of the Act of State doctrine."  9 U.S.C.A. § 15 (West 2005).  Although this provision is located in Chapter One of the FAA rather than in the Convention-implementing Chapters Two and Three, Chapter One of the FAA applies to actions brought under the New York and Inter-American Conventions unless it is "in conflict" with Chapters Two or Three or the Conventions as ratified.  9 U.S.C.A. §§ 208, 307.  No reason is apparent why 9 U.S.C. § 15 would be in conflict with either of the Conventions or either of the FAA Chapters that implemented them.  Thus, 9 U.S.C. § 15 applies here, and enforcement of the arbitration agreement at issue, if otherwise appropriate, "shall not be refused on the basis of the Act of State doctrine."  Plaintiffs' third and final argument in favor of summary judgment therefore fails, and their motion for summary judgment must be denied.


## IV.  Plaintiffs' Motion to Dismiss Counterclaims Under Rule 12(b)

Although Plaintiffs have styled their motion to dismiss the counterclaims under Rule 12(b) as a single motion, it is in substance two conceptually distinct motions, the first seeking to dismiss the counterclaims for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), and the second seeking to dismiss the counterclaims for failure to state a claim, pursuant to Rule 12(b)(6).  Plaintiffs' success with regard to lack of subject matter jurisdiction would moot the portion of their motion to dismiss that asserts failure to state a claim: if this Court lacked subject-matter jurisdiction over Defendants' counterclaims,

it would have no authority to determine whether or not they state claims for which relief can be granted.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Thus, the portion of Plaintiffs' motion claiming lack of subject matter jurisdiction will be addressed first.

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

#### 1.  Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  As a general matter, "[t]he burden of proving jurisdiction is on the party asserting it."  Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).  "Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003); Shipping Fin. Servs. Corp v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

"When... a jurisdictional challenge under Fed. R. Civ. P. 12(b)(1) is addressed to the complaint, a court accepts as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff."  Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003).  "Where jurisdictional facts are placed in dispute," however, "the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."  APWU, 343 F.3d at 627; LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999).  Plaintiffs' motion to dismiss the

counterclaims under Rule 12(b) comes at the initial pleading stage, but both parties have submitted affidavits in connection with the motion. Thus, the Court will assume unchallenged allegations to be true but will not automatically assume the truth of any disputed jurisdictional facts.

### 2. Analysis

The Foreign Sovereign Immunities Act (FSIA), which establishes a background rule of sovereign immunity accompanied by a specifically enumerated list of exceptions, "provides the sole basis for obtaining [subject matter] jurisdiction over a foreign sovereign in the United States." Virtual Countries, Inc. v. Republic of S. Afr., 300 F.3d 230, 236 (2d Cir. 2002) (alteration in original) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)). There is no dispute that Ecuador and Petroecuador both qualify as foreign states for FSIA purposes. (Am. Compl. ¶¶ 16-17; Ans. ¶¶ 16-17; Countercls ¶ 1.[18]) Thus, the FSIA governs the presence or absence of subject-matter jurisdiction here.

The FSIA bestows upon district courts

original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in [28 USC § 1603(a)] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under [28 USC §§ 1605-1607] or under any applicable international agreement.

---

[18] Defendants do not dispute Plaintiffs' allegation that "Petroecuador is an agency and instrumentality of the Republic of Ecuador and a foreign state as defined by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603" (Compl. ¶ 17), except insofar as they describe that allegation as "stat[ing] legal conclusions to which no response is required" (Ans. ¶ 17). In their counterclaims, Defendants then describe Petroecuador as Ecuador's "state-owned oil company" (Countercls. ¶ 1), which implies that Petroecuador is an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b) (and thus a "foreign state" under 28 U.S.C. § 1603(a)) because "a majority of [its] shares or other ownership interest is owned by a foreign state," 28 U.S.C.A. § 1603(b)(2) (West 2005). See supra Part II.A.1.

28 U.S.C.A. § 1330(a) (West 2005).  The general rule, however, is that "[s]ubject to... international agreements [predating the FSIA]... a foreign state shall be immune from the jurisdiction of the courts of the United States except as provided in [28 U.S.C. §] 1605 to [28 U.S.C.§] 1607."  28 U.S.C.A. § 1604.  Thus, this Court has subject matter jurisdiction if, and only if, plaintiffs Ecuador and Petroecuador are stripped of immunity under 28 U.S.C. §§ 1605-1607, or an applicable international agreement, with respect to Defendants' counterclaims—that is, if and only if one of the FSIA's enumerated exceptions applies.  ChevronTexaco and TexPet, as counterclaim plaintiffs, "have the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged [here conceded] foreign sovereign[s]."  Cabiri v. Government of the Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993).

 The sole exception claimed by Defendants to be applicable to this case is 28 U.S.C. § 1607(b), known as "the counterclaim exception to the FSIA," Cabiri, 165 F.3d at 196.  That section provides in relevant part that "[i]n any action brought by a foreign state... in a court of the United States... the foreign state shall not be accorded immunity with respect to any counterclaim... arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state."  28 U.S.C.S. § 1607(b) (2005).

In construing the "transaction or occurrence" test of § 1607(b), the Second Circuit has "look[ed] for guidance" to the identically worded test for compulsory counterclaims under Fed. R. Civ. Pro. 13(a).  Cabiri, 165 F.3d at 197.  The Rule 13(a) test is

"construed... liberally," as "'not requiring an absolute identity of factual backgrounds... but only a logical relationship between them.'" <u>Cabiri</u>, 165 F.3d at 197 (quoting <u>United States v. Aquavella</u>, 615 F.2d 12, 22 (2d Cir. 1980)). "The transaction or occurrence standard.... 'looks to the logical relationship between the claim and the counterclaim, and attempts to determine whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" <u>Cabiri</u>, 165 F.3d at 197 (quoting <u>Aquavella</u>, 615 F.2d at 22).

To apply the <u>Cabiri</u> test, we must first determine the nature and "essential facts" of Plaintiffs' claims. The contents of the Amended Complaint are foreshadowed in its first paragraph, where Plaintiffs are described as

> seek[ing] injunctive and declaratory relief against Defendants ChevronTexaco Corporation and Texaco Petroleum Company (collectively "Texaco") for making a meritless arbitration demand against... Petroecuador before the American Arbitration Association ("AAA"); for asserting a position before this... Court that directly contradicts the position upon which Texaco prevailed in *Aguinda v. Texaco*... and for making a claim for indemnification against... Petroecuador which Texaco waived through its conduct in the *Aguinda* case.

(Am. Compl. ¶ 1.) That is, the first paragraph of the Amended Complaint indicates that three things are at issue: an allegedly meritless arbitration demand, an alleged inconsistency between Defendants' positions in this case and Texaco's positions in the <u>Aguinda</u> litigation, and a waiver of any claim Defendants might otherwise have had for indemnification against Petroecuador that Texaco allegedly effected by its conduct in the <u>Aguinda</u> litigation.

In accordance with this introduction, essentially all of the allegations that follow

the first paragraph of the Amended Complaint fall into one of two categories. The first set of allegations pertains to the contractual relationship among CEPE/Petroecuador, TexPet, Gulf, and the other related companies involved in the exploitation of the Napo Concession, or between those companies and the Republic of Ecuador. This set of allegations is offered to establish the lack of an arbitration agreement binding Petroecuador. The second set of allegations recounts the history of the <u>Aguinda</u> litigation and related post-1993 events such as the 1995 Settlement, the 1998 Final Release, and the Lago Agrio litigation. This set of allegations forms the basis for Plaintiffs' claims of waiver and inconsistency.

These two categories of allegations correspond to the two categories of claims for relief that Plaintiffs put forward. Recall that according to the Claims for Relief section of the Amended Complaint, Plaintiffs purport to state four claims. The first three, for collateral estoppel, judicial estoppel, and waiver, assert that Texaco's conduct in the <u>Aguinda</u> litigation has caused the Defendants to lose certain rights against Plaintiffs that Defendants might otherwise have had. The fourth claim asserts that Defendants have no valid grounds upon which to demand arbitration against Plaintiffs in the United States, and that Plaintiffs are entitled to a permanent stay of arbitration. That is, the fourth claim corresponds approximately to what we have described as the first set of allegations (pertaining to lack of a contractual obligation to arbitrate), and the first three claims correspond approximately to what we have described as the second set of allegations (pertaining to Texaco's conduct in the <u>Aguinda</u> litigation and related post-1993 events).

The Prayer for Relief in Plaintiffs' Amended Complaint, while extensive, is not

inconsistent with this view of their claims and allegations. The first two prongs of their requested ten-part declaratory judgment address their collateral estoppel and judicial estoppel claims, both based on Plaintiffs' view of Texaco's conduct in the <u>Aguinda</u> litigation. The third prong states that <u>Aguinda</u> "involved the same claims, brought by many of the same plaintiffs, as the case currently pending in Lago Agrio, Ecuador on which Texaco seeks indemnification in this matter," which is a logical element of Plaintiff's waiver argument based on the <u>Aguinda</u> litigation and related post-1993 events, and the fourth prong states specifically that "Texaco waived any right it may have had to seek indemnification" from Ecuador or Petroecuador in a U.S. forum "[t]hrough its conduct in the *Aguinda* case." (Am. Compl. Prayer for Relief ¶¶ (A)(c)-(A)(d).) The fifth prong states that the 1973 Contract "controls the contractual relationship between the Plaintiffs and the Defendants" (<u>id.</u> ¶ (A)(e)), and the seventh prong that "[n]either the Republic of Ecuador nor Petroecuador has ever become a party to the October 22, 1965 Joint Operating Agreement between the Texaco Petroleum Company and the Ecuadorian Gulf Company" (<u>id.</u> ¶ (A)(g)). These two statements embody key elements of Plaintiffs' argument that no arbitration agreement binding on Petroecuador exists, an argument that the Court is requested to explicitly confirm by declaring further in the ninth prong that "[n]either the Republic of Ecuador nor Petroecuador has ever agreed to arbitrate any disputes with Texaco in any American forum" and in the tenth prong that "[u]nder either the Federal Arbitration Act or Article 75 of the New York Civil Practice Law and Rules, there are no valid grounds upon which Texaco may demand arbitration against the Republic of Ecuador or Petroecuador in this matter." (<u>Id.</u> ¶¶ (A)(i)-(A)(j).) The two

prongs of the requested declaratory judgment least obviously related to the waiver argument and the argument against arbitration are the sixth, demanding judgment that "[t]he Republic of Ecuador and Petroecuador are a single party for the purposes of their contractual relationship with Texaco" (id. ¶ (A)(f)), and the eighth, demanding judgment that "[n]either the Republic of Ecuador nor Petroecuador has ever made a clear statement waiving its sovereign immunity in the United States in this matter, and there are no grounds upon which to find such a waiver by implication" (id. ¶ (A)(h)). Even these, however, both seek to establish portions, if somewhat tangential portions, of the arguments Plaintiffs have put forward in support of their claims that Petroecuador has no obligation to arbitrate and that Defendants have waived or otherwise forfeited any claim to indemnification from Petroecuador. Thus, all portions of the requested declaratory judgment can be understood as related to those two sets of claims and allegations.

The three injunctions requested by the Prayer for Relief in Plaintiffs' Amended Complaint have a similar relationship with those same two sets of claims and allegations. The request for a permanent injunction staying the arbitration proceedings clearly relates to the claim that arbitration is inappropriate. The request for an injunction "barring Texaco from asserting a right to indemnification against the Republic of Ecuador and Petroecuador in this matter" (id. ¶ C), broad as it is, can be understood in the context of the Amended Complaint as stemming from the claim that any such right was lost because of Texaco's conduct in the Aguinda litigation. The request for an injunction "estopping Texaco from denying that the Republic of Ecuador and Petroecuador enjoy sovereign immunity in the United States in this matter" (id. ¶ B) adds little to the corresponding

declaratory-judgment request discussed above.

Having ascertained "the essential facts of [Plaintiffs'] claims," we can now determine whether they "are so logically connected" with the essential facts of the counterclaims "that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." Cabiri, 165 F.3d at 197. Following the example of the Second Circuit in Cabiri, this determination shall be made separately with respect to each substantively distinct counterclaim. 165 F.3d at 198 (stating that "[w]e analyze the applicability of the counterclaim exception to each of the claims separately"). Where nominally distinct claims are based "essentially on the same allegations," however, they may be treated together in determining the applicability of the counterclaim exception to the FSIA. Id.

Here, although Defendants nominally bring four counterclaims, there are in substance two sets of counterclaims. Defendants' first counterclaim, and a portion of Defendants' fourth counterclaim for declaratory judgment, allege that Petroecuador is obligated to indemnify Defendants for litigation expenses, costs, and any final judgment in the Lago Agrio litigation because of an implied agency relationship between TexPet and Petroecuador with respect to TexPet's operation of the Napo Consortium. Defendants' second and third counterclaims, as well as the remaining portion of the fourth counterclaim for declaratory judgment, are based on alleged breaches by Ecuador and Petroecuador of the 1995 Settlement and 1998 Final Release. The implied-agency counterclaims are based "essentially on the same allegations" as one another, Cabiri, 165 F.3d at 198, and the same can be said of the settlement-based counterclaims. Thus, only

two separate determinations are necessary regarding the applicability of the counterclaim exception to the FSIA.

### a. Counterclaims Based on an Implied Agency Relationship Between Petroecuador and TexPet

In analyzing whether subject matter jurisdiction is present as to the counterclaims based on an implied agency relationship between Petroecuador and TexPet, it is important to note that because those counterclaims run against Petroecuador only, they have explicitly been made conditional on the Court's finding for Plaintiffs with respect to the arbitrability issue. Thus, the implied-agency counterclaims would only be litigated in the event that the arbitration petition filed by Defendants was determined to lack merit. In analyzing the presence or absence of jurisdiction over the implied-agency counterclaims, we may therefore assume that the initial arbitration petition was meritless. If this is determined not to be the case, then the implied-agency counterclaims will vanish of their own accord and our analysis will be moot.

Proceeding on that assumption, the Court is unwilling to conclude that the FSIA permits what would be colloquially referred to as "sandbagging." Defendants are ultimately responsible for the initiation of this litigation, in that it would not have occurred had Defendants not commenced arbitration proceedings against Petroecuador. If those arbitration proceedings were meritless, then finding Plaintiffs' reaction to them to have created jurisdiction over counterclaims going to the merits of the underlying dispute would result in a significant and unreasonable gap in the wall of sovereign immunity established by the FSIA. Such a result is not compelled by the text of the FSIA

or by a proper application of the <u>Cabiri</u> standard.

To find counterclaim jurisdiction here would be to say that a would-be plaintiff who wishes to sue an entity possessing sovereign immunity may simply take the following steps. First, file a meritless arbitration petition against that entity in the United States, and wait for that entity to go to court in an effort to stop the groundless arbitration. Second, if the immune entity chooses to sue in state court to stop the arbitration, remove to federal court, either on the basis of diversity, or on the basis that you have alleged the existence of "an arbitration agreement... falling under the [New York or Inter-American] Convention," 9 U.S.C.A. §§ 205, 302 (West 2005); <u>see</u> <u>Sarhank Group v. Oracle Corp.</u>, 404 F.3d 657, 660 (2d Cir. 2005) (holding that a challenge to the existence of any binding arbitration agreement does not defeat subject matter jurisdiction under the New York Convention). Third, utilize the counterclaim exception to the FSIA to bring an action against the otherwise immune entity. On the theory implied by Defendants' position, this counterclaim will be within the district court's jurisdiction, so long as it is logically related to the reasons why the arbitration petition lacked merit in the first instance. By alleging that an arbitration agreement existed with respect to any particular contractual relationship, for example, one could utilize this maneuver to obtain federal-court jurisdiction over the merits of a dispute regarding that relationship.

It seems apparent that the policy underlying the FSIA would be frustrated if such a maneuver were allowed to succeed, which suggests that a foreign state lured into the United States courts by a meritless arbitration proceeding should not be stripped of its immunity by the counterclaim exception with respect to counterclaims going beyond the

issue of arbitrability. The text of § 1607(b) and the standard enunciated by the Second Circuit in <u>Cabiri</u> lead to the same conclusion. Where a foreign state has been lured into court by a meritless arbitration proceeding that it seeks to halt, the "transaction or occurrence that is the subject matter of the claim of the foreign state," 28 U.S.C.A. § 1607(b) (West 2005), is really the meritless arbitration proceeding itself, as distinct from the underlying dispute with respect to which the meritless arbitration proceeding was brought. Therefore, any counterclaims going to the merits of a dispute rather than to arbitrability are not counterclaims "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state," <u>id.</u>, and "considerations of... fairness" do not "dictate that all the issues be resolved in one lawsuit," <u>Cabiri</u>, 165 F.3d at 197. The entrapped foreign state thus does not lose its sovereign immunity in such a case.

With respect to the counterclaims based on an implied agency relationship between TexPet and Petroecuador, this must be considered as such a case. Although we do not hold that the arbitration demand in this case was meritless, the conditional implied-agency counterclaims against Petroecuador will become effective only if we eventually so hold. Thus, the jurisdictional viability of those counterclaims must be analyzed on the assumption that we *will* so hold, because that is the only circumstance under which those counterclaims are actually asserted.

Admittedly, even on the assumption that the arbitration demand in this case lacked merit, Defendants can be held responsible for the initiation of this litigation only insofar as it seeks to enjoin the arbitration, and not insofar as Plaintiffs have chosen to state broader claims. To the extent that Plaintiffs have freely chosen to avail themselves

of this Court's jurisdiction with regard to matters other than the (possibly meritless) petition for arbitration, and have thereby created jurisdiction over counterclaims, they have only themselves to blame. Defendants' arguments in favor of finding a logical relationship between Plaintiffs' claims and the implied-agency counterclaims, however, are not significantly stronger because of Plaintiffs' broader claims for relief than they would have been if Plaintiffs had restricted themselves to requesting a permanent stay of arbitration.

As discussed above, Plaintiffs' allegation and claims for relief fall into two substantive categories: those challenging the applicability of the 1965 JOA and its arbitration clause, and those asserting waiver or forfeiture of any indemnification rights that Defendants may previously have possessed, based on Texaco's conduct in the Aguinda litigation and related post-1993 events. It is only the first class of allegations and claims to which Defendants could reasonably suggest their implied-agency counterclaims are related. That first set of allegations and claims, however, is precisely the set that Defendants provoked by making their arbitration demand. Plaintiffs' gratuitous additions in their Amended Complaint relate to the Aguinda litigation and other "occurrences" dating from 1993 onward; they do not have a logical relationship to counterclaims regarding the Petroecuador-TexPet relationship over the life of the Napo Concession.

Thus, with respect to counterclaims regarding the Petroecuador-TexPet relationship over the life of the Napo Concession, such as the implied-agency counterclaims at issue here, Defendants can invoke in support of jurisdiction only those

claims and allegations by Plaintiffs that relate to Plaintiffs' request for a permanent stay of arbitration. Having themselves provoked that request by filing an arbitration petition that for these purposes we must assume was meritless, Defendants cannot rely on it to breach Plaintiffs' sovereign immunity.

### b. Counterclaims Based on the 1995 Settlement and 1998 Final Release

The counterclaims based upon the 1995 Settlement and 1998 Final Release do not suffer from the same jurisdictional flaw as the implied-agency counterclaims. They are logically related to portions of Plaintiffs' claims that are *not* mere defenses against a possibly meritless arbitration demand, and which therefore arise out of a transaction distinct from the arbitration demand.

The Amended Complaint complains several detailed allegations regarding the 1995 Settlement and 1998 Final Release. Plaintiffs first allege that on December 30, 1994, based on the 1994 Memorandum of Understanding that preceded the 1995 Settlement, "Texaco requested that the District Court in *Aguinda v. Texaco* dismiss the Aguinda Plaintiffs' claims 'in light of the settlement entered into between Texaco and Ecuador.'" (Am. Compl. ¶ 41.) They go on to describe the 1995 Settlement in several respects, alleging that it "specifically stated that the Republic of Ecuador and Petroecuador entered into the agreement 'as one Party'," and that while it "released all of the Government's and Petroecuador's claims against the Releasees [i.e., Texaco and its subsidiaries] for Environmental Impact arising from the Operations of the Consortium....'," it "made no mention of third-party claims against Texaco or its

subsidiaries for environmental damage caused by Texaco during the period in which it operated the Napo Concession."  (Id. ¶ 43 [alterations in original].)  Plaintiffs then imply that the 1995 Settlement was incorporated into the purported request by Texaco to dismiss the *Aguinda* action based on an Ecuador-Texaco settlement, alleging that "Texaco's request to the *Aguinda* Court for dismissal of the Aguinda Plaintiffs' claims based on the 1994 and 1995 remediation agreements was rejected by United States Magistrate Judge Lisa Margaret Smith on June 20, 1995... [and]  Texaco never appealed t[his] ruling...."  (Id. ¶ 44.)  They further refer to the district court's August 12, 1997 decision in *Aguinda* as having "noted that the Republic of Ecuador and Petroecuador had released Texaco from any claims that they might have had against it through the May 4, 1995 settlement agreement."  (Id. ¶ 54.)  Finally, they describe the 1998 Final Release, alleging that in that agreement as in the 1995 Settlement "the Republic of Ecuador and Petroecuador [were] again[] acting together as one party, 'the party of the first part," and that "the 1998 Final [Release] made no mention of third-party claims against Texaco or its subsidiaries for environmental damage caused by Texaco during the period in which it operated the Napo Concession."  (Id. ¶ 55.)

These allegations do not relate to Plaintiffs' claim that Petroecuador never agreed to arbitrate with TexPet.  Rather, they must relate to Plaintiffs' claim that Texaco's conduct in the Aguinda litigation and related post-1993 events effected a waiver of any arbitration or indemnification rights that Texaco and its subsidiaries might previously have possessed.  They serve as a portion of the basis for the requested declaratory judgment that "[t]he Republic of Ecuador and Petroecuador are a single party for the

purposes of their contractual relationship with Texaco" (Am. Compl. Prayer for Relief ¶ (A)(f)), and insofar as they support the indemnification-waiver theory, they are a portion of the basis for the requested injunction "barring Texaco from asserting a right to indemnification against the Republic of Ecuador and Petroecuador in this matter" (id. ¶ C).

To the extent that the waiver claim is based on the allegations discussed above, therefore, the 1995 Settlement and 1998 Final Release are among the transactions or occurrences giving rise to it. This supports the contention that counterclaims based on the 1995 Settlement and 1998 Final Release are "logically related" to the broader claims made by Plaintiffs in their Amended Complaint. As part of that Amended Complaint, Plaintiffs have asserted that the 1995 Settlement and 1998 Final Release do not address third-party claims against Texaco and its subsidiaries; Defendants now seek to prove that they were intended to do so. Plaintiffs' assertions in this regard may be insufficiently central to their claims to serve as a basis for counterclaim jurisdiction if they were the only such basis, but they do provide some support for the exercise of counterclaim jurisdiction, and they are in fact not the only basis.

Further support for jurisdiction over the counterclaims based upon the 1995 Settlement and 1998 Final Release can be found in Plaintiffs' request for a declaratory judgment that "*Aguinda v. Texaco* involved the same claims, brought by many of the same plaintiffs, as the case currently pending in Lago Agrio, Ecuador on which Texaco seeks indemnification in this matter." One of the key issues in the determination whether Plaintiffs have breached the 1995 Settlement and 1998 Final Release in connection with

the Lago Agrio litigation, as Defendants claim, is whether the Lago Agrio litigation indeed involves the same claims as were brought in <u>Aguinda</u>.  Defendants contend that it does not.  In their view, while <u>Aguinda</u> was an action for relief of damages to individuals, the Lago Agrio litigation is an attempt to vindicate public rights to remediation, rights that according to Defendants were formerly possessed by Ecuador itself and were released by Ecuador in 1995 and 1998.  Absent this contention by Defendants, it would be extremely difficult for Defendants to establish that claims nominally brought by third parties in the Lago Agrio litigation were covered by the 1995 and 1998 agreements between Texaco and Ecuador: it is highly unlikely that a settlement entered into while <u>Aguinda</u> was pending would have neglected to mention the third-party claims being contemporaneously made in <u>Aguinda</u> if it had been intended to release those claims or to create an obligation to indemnify against them.  The declaratory judgment requested by Plaintiffs with respect to the identity of the claims in <u>Aguinda</u> and in the Lago Agrio litigation therefore runs directly against a core aspect of Defendants' settlement-related counterclaims.

Plaintiffs have chosen, in their Amended Complaint, to allege that the 1995 Settlement and 1998 Final Release "made no mention of third-party claims against Texaco or its subsidiaries for environmental damage caused by Texaco during the period in which it operated the Napo Concession" (Am. Compl. ¶¶ 43, 55), and to seek a declaration that the <u>Aguinda</u> action "involved the same claims... as the case currently pending in Lago Agrio, Ecuador."  Having thus invoked this Court's jurisdiction with respect to two of the core elements of Defendants' counterclaims based on the 1995

Settlement and 1998 Final Release, Plaintiffs cannot assert sovereign immunity against counterclaims that in large part seek to establish the opposite of what they themselves have already contended. The "essential facts" of the waiver claim insofar as it relies on the 1995 Settlement and 1998 Final Release, and of the request for a declaratory judgment regarding the identity of the claims in Aguinda and in the Lago Agrio litigation, "are so logically connected" to the counterclaims based on the 1995 Settlement and 1998 Final Release "that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." Cabiri, 165 F.3d at 197.

Plaintiffs argue that Defendants have taken inconsistent positions by successfully asserting in the Aguinda litigation that Ecuador and Petroecuador were immune from suit in the United States, and nevertheless contending here that the Court has jurisdiction over counterclaims against Ecuador and Petroecuador in this case. Because the Court's jurisdiction under 28 U.S.C. § 1607(b) derives from the relationship between Defendants' counterclaims and the claims brought by Plaintiffs in their Amended Complaint, this is a non sequitur. That Ecuador and Petroecuador had sovereign immunity before they filed this action, and as a general matter still do, does not imply that they have the same degree of sovereign immunity in this action after voluntarily coming to this Court, making the allegations that they have made, and seeking the relief that they have sought. The circumstances affecting the sovereign-immunity determination have been changed by Plaintiffs themselves.

Plaintiffs' statement at oral argument that all of their claims beyond that for a permanent stay of arbitration are conditional on the failure of their claim for a permanent

stay of arbitration does not suffice to justify a dismissal of the settlement-based counterclaims for lack of jurisdiction. Leaving aside that this conditional nature of the broader claims is not apparent from the Amended Complaint, the fact remains that even under Plaintiffs' theory of the pleadings, they now hold out the possibility of pursuing claims sufficiently broad to confer jurisdiction over Defendants' settlement-based counterclaims. If Plaintiffs suffer defeat on the question of arbitrability, they do not dispute that the Court will then have to address their requests for broader relief. Plaintiffs cannot logically ask the Court to dismiss the counterclaims at this stage in the litigation, while such a possibility remains, based on the assumption that the possibility will not come to fruition. If Plaintiffs are victorious on the arbitrability issue, a renewed motion to dismiss any then-surviving counterclaims for lack of jurisdiction would raise the question whether their declaration of conditionality at oral argument came too late; at this point, that question need not be reached.

### B. Motion to Dismiss Counterclaims for Failure to State a Claim

With respect to the implied-agency counterclaims against Petroecuador, the portion of Plaintiffs' motion to dismiss that asserts failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is mooted by Plaintiffs' victory on the portion of their motion that asserts lack of subject matter jurisdiction. With respect to the counterclaims based on the 1995 Settlement and 1998 Final Release, however, the motion to dismiss for failure to state a claim remains to be adjudicated.

### 1. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted "if, accepting all the allegations in the complaint as true and drawing all reasonable inferences in plaintiff[s'] favor, the complaint fails to allege any set of facts that would entitle plaintiff[s] to relief." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 89-90 (2d Cir. 2004); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 194 (2d Cir. 2003). As to the counterclaims, of course, the "plaintiffs" for Rule 12(b)(6) purposes are Defendants ChevronTexaco and TexPet.

In evaluating the allegations of a complaint on a motion to dismiss, a court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference... matters of which judicial notice may be taken, or... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993). Here, the set of such documents includes the 1965 JOA, the 1994 Memorandum of Understanding, the 1995 Settlement and the 1998 Final Release. Also, as "courts routinely take judicial notice of documents filed in other courts... to establish the fact of such litigation and related filings," Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991), the Court may take notice of the filings made in the Aguinda litigation and the subsequent Lago Agrio litigation in Ecuador.

### 2. Analysis

#### a. Act of State Doctrine as Applied to 1973, 1974, and 1977 Contracts

Plaintiffs assert that the Act of State doctrine as applied to the 1973, 1974 and 1977 Contracts requires Texaco to submit its counterclaims to the courts of Ecuador rather than bringing them in this Court. With respect to the counterclaims based on the 1995 Settlement and 1998 Final Release, this argument fails for two independent reasons. First, as previously discussed, see supra Part III.B.1.b.iii, the forum selection clause in paragraph 50.1 of the 1973 Contract, upon which Plaintiffs rely,[19] is not unambiguously exclusive, as it would have to be to be enforceable under John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc., 22 F.3d 51, 52 (2d Cir. 1994), at the motion to dismiss stage. Second, the 1995 Settlement recites that "the '1973 Contract' expired on June 6, 1992," and contains an integration clause stating in part that "[n]o other agreements, oral or otherwise, regarding this Contract, shall be deemed to exist or to bind the Parties hereto." (Veiga Aff. Ex. B at 3, 14.) The integration clause alone would likely be sufficient to establish that the 1995 Settlement is not governed by a forum selection clause contained in a previous contract, and it is certainly not governed by a forum selection clause contained in a contract that it explicitly declares to be defunct.

---

[19] Defendants do not dispute that the text of the 1973 Contract may be considered on this motion to dismiss. While the 1973 Contract is not incorporated by reference into Defendants' Counterclaims or relied on by the Counterclaims to any significant degree, its contents have been acknowledged by all parties, and excluding it from consideration under Rule 12(b) would be a pointless exercise in formalism inconsistent with the command of Rule 1 that the Federal Rules of Civil Procedure "be construed and administered to secure the just, speedy, and inexpensive determination of every action."

**b. Relevance of 1995 Settlement and 1998 Final Release**

Plaintiffs contend that "[t]he 1995 and 1998 agreements between the Republic and Texaco are immaterial to this case." (Pl. Mot. to Dismiss Countercls. at 20.) Those agreements, they say, address only claims by Ecuador and Petroecuador, not claims by third parties. Defendants counter that at least some of the claims brought in the Lago Agrio action effectively *are* claims by Ecuador, prosecuted on Ecuador's behalf by individual plaintiffs acting as private attorneys general under a 1999 law, and that such claims were intended to be included in the 1995 Settlement and 1998 Final Release.

Plaintiffs argue that they "did not settle any rights for third parties," and in fact "couldn't" have done so. (Oral Ar. Tr. at 23.) This argument implicitly relies on the assumption that a settlement in which a sovereign state releases claims can never affect similar claims brought by citizens of that state, an assumption which is at least overbroad. Within the United States, it is an accepted rule of law that "[w]hen a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment." Satsky v. Paramount Communications, 7 F.3d 1464, 1470 (10th Cir. 1993), quoted with approval in New York by Vacco v. Reebok Int'l, 96 F.3d 44, 48 (2d Cir. 1996). A settlement embodied in a consent decree can constitute a final judgment for Satsky purposes. Satsky, 7 F.3d at 1468. The question is whether something like the Satsky rule applies here, where the settlement is not alleged to have been entered as a consent decree, the relief sought is against the sovereign rather than the individuals alleged to be asserting public rights, and American substantive law may not govern in any event because the 1995 Settlement and 1998 Final Release had

81

little connection with the United States.

The Second Circuit has held that "the FSIA requires courts to apply the choice of law rules of the forum state" in order to "ensure that foreign states are liable 'in the same manner and to the same extent as a private individual under like circumstances,'" at least in a case where "the... court would have applied [forum state] choice of law rules to... [an] action if the parties before it were all private individuals." Barkanic v. General Admin. of Civil Aviation of People's Republic of China, 923 F.2d 957, 960-61 (2d Cir. 1991) (quoting 28 U.S.C. § 1606. Defendants' counterclaims, like the claims at issue in Barkanic, do not raise a federal question in any respect other than having been brought under the FSIA. If the parties before the Court were all private individuals, the counterclaims would be subject to either the Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(2) or its supplemental jurisdiction under 28 U.S.C. § 1367(a). The Court would thus apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989). Therefore, under Barkanic, the choice of law rules of the forum state govern here as well.

"In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing In re Allstate Ins. Co., 613 N.E.2d 936 (N.Y. 1993)). To ascertain whether there is an actual conflict of laws with respect to the counterclaims at issue here, it is necessary to know what the law of Ecuador is: because Ecuador was the place of execution and performance

of the contracts at issue, as well as the place of business of at least some of the parties, it is a logical candidate for the source of governing substantive law, see <u>Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.</u>, 642 N.E.2d 1065, 1068-69 (N.Y. 1994).

It has been said that "[i]f the party urging a choice of law analysis fails to demonstrate a true conflict between New York and another state's laws, no choice of law analysis need be undertaken." <u>Bass v. World Wrestling Fed'n Entm't, Inc.</u>, 129 F. Supp. 2d 491, 504 (E.D.N.Y. 2001) (citing <u>Portanova v. Trump Taj Mahal Assocs.</u>, 270 A.D.2d 757, 759-60, 704 N.Y.S. 2d 380 (App. Div. 2000).) While Plaintiffs have indicated that they believe the law of Ecuador to control, they have not specifically demonstrated a conflict between Ecuadorian law and New York law. The Second Circuit in <u>Curley</u>, however, "urge[d] district courts to invoke the flexible provisions of Rule 44.1 [of the Federal Rules of Civil Procedure] to determine issues relating to the law of foreign nations," rather than "avoid[ing] a full analysis of [that] law simply on the basis of an inadequate submission by one party." 153 F.3d at 13. With respect to this issue relating to the law of a foreign nation, we will not simply rely on Plaintiffs' failure to demonstrate a true conflict, but will instead look to the broader sources of information permitted by Rule 44.1 in order to ascertain Ecuadorian law and thereby determine whether a true conflict exists.

One important source of information under Rule 44.1, although not the only permissible source, is submissions by the parties. While Defendants have submitted an affidavit from Dr. Gustavo Romero-Ponce addressing certain aspects of the Ecuadorian law of contract interpretation, this affidavit does not address whether any special rule

exists for contracts or settlements entered into by the Ecuadorian state. Plaintiffs also have not addressed what Ecuadorian law would be with respect to a contract or settlement entered into by the state and subsequent assertion of related public rights by third parties. Nor has either side addressed whether Ecuadorian law permits the government in power at a given time to make a contractual commitment to a private party that would bind a future government not to pass certain legislation on pain of liability for damages, as Defendants arguably assert that the 1995 Settlement and the 1998 Final Release did with respect to the 1999 environmental law on which Defendants allege many of the claims in the Lago Agrio litigation to be based. Rather than "avoid[ing] a full analysis of [Ecuadorian] law simply on the basis of... inadequate submission[s]," Curley, 153 F.3d at 13, we will follow the example of the Second Circuit in Curley and request further briefing regarding Ecuadorian law.[20] This briefing may be accompanied by affidavits if the parties so desire, but the parties are reminded that Rule 44.1 does not require materials considered in the determination of foreign law to be admissible under the Federal Rules of Evidence.

In their supplemental submissions regarding the Ecuadorian law that would apply to the counterclaims based on the 1995 Settlement and 1998 Final Release, the parties should also address whether they agree that Ecuadorian law governs. Because under New York law "parties to a civil litigation, in the absence of a strong countervailing public policy, may consent, formally or by their conduct, to the law to be

---

[20] The request for further briefing in Curley was made "after oral argument" rather than in the Second Circuit's initial opinion, 153 F.3d at 12, but in Curley subject matter jurisdiction over the relevant claim was not in doubt; here, an immediate call for further briefing could have been wasteful if the Court had found a lack of subject matter jurisdiction as to all of the counterclaims.

applied," <u>Martin v. Cohoes</u>, 332 N.E.2d 867, 869 (N.Y. 1975), agreement on this question could render a choice of law analysis unnecessary.

## V.  Further Proceedings and Other Motions

### A.  Stay of Arbitration

Pending final resolution of the arbitrability issue, it is appropriate to continue the stay of arbitration proceedings that is presently in effect.  In <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171 (2d Cir. 2003), the Second Circuit, remanding an action for an injunction barring arbitration after holding that material issues of fact existed as to arbitrability, instructed that "[u]pon remand, the District Court should stay arbitration pending resolution of this lawsuit."  316 F.3d at 178.  The situation here is analogous to that upon remand in <u>Bensadoun</u>.  <u>See</u> <u>also</u> <u>Ryan, Beck & Co., LLC v. Fakih</u>, 268 F. Supp. 2d 210, 231 (E.D.N.Y. 2003) (citing <u>Bensadoun</u> and staying arbitration pending resolution of suit for a declaration of non-arbitrability).

### B.  Motion for Stay of Discovery

Plaintiffs moved for a stay of discovery pending resolution of the dispositive motions to which this Opinion and Order is addressed, a request that is now largely but not entirely moot given the Court's resolution of all aspects of the dispositive motions other than the motion to dismiss the settlement-based counterclaims under Rule 12(b)(6).  The arguments made by Plaintiffs in support of their request for a stay rely in large part on the "threshold" nature of questions of law regarding "jurisdiction and arbitrability"

(Pl. Mem. in Supp. of Mot. to Stay Disc. at 4), and the specific discovery requests to which they object also appear to be related to aspects of this case other than Defendants' settlement-based counterclaims. The extant motion for a stay of discovery is therefore denied on the ground that the only portion of it not now moot is inadequately supported.

This denial is without prejudice to a renewal of the motion with respect to the counterclaims as to which the Motion to Dismiss has not been fully resolved, if supported by reasons specific to those counterclaims and restricted to discovery requests that can be justified only by reference to those counterclaims. Absent any such renewed motion, Plaintiffs shall have thirty days to respond to Defendants' discovery requests, as the parties appear to agree that this amount of time is appropriate.

### C. Motions Regarding Filings

There remain three outstanding motions regarding the propriety of certain of the parties' filings. The only portion of Plaintiffs' motion to strike certain of Defendants' filings as untimely, or, in the alternative, for a preliminary injunction and additional time to reply, that is not now moot is the portion requesting that Defendants' filings be stricken. No sufficient cause to strike Defendants' filings having been shown, the motion is denied. Also outstanding are Defendants' motion for permission to file sur-replies in opposition to Plaintiffs' motions for summary judgment and to dismiss the counterclaims, and Plaintiffs' motion for permission to file a response to those sur-replies. Defendants' sur-replies having contained relevant information that actually tended to support *Plaintiffs* (in particular the text of the 1991 Agreement), it would not make sense to strike

them from the record at this juncture, but the submission of those sur-replies was sufficiently irregular to justify Plaintiffs' response; the two motions for permission are therefore granted.

### D. Sequence of Further Proceedings

Resolution of Plaintiffs' broader claims beyond that for a permanent stay of arbitration will necessarily await resolution of their demand for such a stay, now that the broader claims have been declared conditional on such a permanent stay being denied.

## VI. Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (dkt. no. 36) is DENIED. Plaintiff's Motion to Dismiss Counterclaims Under Rule 12(b) (dkt. no. 31) is GRANTED IN PART, insofar as it asserts that the Court lacks subject-matter jurisdiction over the counterclaims based on an alleged implied-agency relationship between Petroecuador and TexPet, and is DENIED IN PART, insofar as it asserts that the Court lacks subject-matter jurisdiction over the counterclaims based on the 1995 Settlement and 1998 Final Release; DECISION IS RESERVED IN PART with respect to that portion of the Motion to Dismiss Counterclaims Under Rule 12(b) that asserts that the counterclaims based on the 1995 Settlement and 1998 Final Release fail to state a claim upon which relief can be granted. Plaintiffs' Motion to Stay Discovery Pending Resolution of Dispositive Motions (dkt. no. 45) is DENIED, in part as moot and in part on the merits. Plaintiffs' Motion to Strike Defendants' Responses as Untimely and For

Entry of Judgment or, in the Alternative, For a Preliminary Injunction and Additional Time to Reply (dkt. no. 49) is DENIED, in part as moot and in part on the merits. Defendants' Motion for Leave to File Sur-Replies in Opposition to the Republic of Ecuador's and Petroecuador's Motion for Summary Judgment and Motion to Dismiss (dkt. no. 59) is GRANTED, and Plaintiffs' Motion for Leave to File Response to Defendants' Sur-Replies (dkt. no. 63) is GRANTED.

The parties are directed to submit supplemental memoranda within ninety (90) days of the date of this Opinion and Order, addressing the law of Ecuador as it applies to the counterclaims based on the 1995 Settlement and 1998 Final Release, and addressing whether in their view the law of Ecuador does govern those counterclaims. The parties are further directed to advise the Court in writing when they would be ready for a trial of Plaintiffs' claim for a permanent stay of arbitration. Pending final resolution of the arbitrability question or further order of this Court, the presently effective temporary stay of arbitration proceedings is continued.

SO ORDERED.

Dated:     New York, New York
           June 27, 2005

                                        _____
                                                    U.S.D.J.