UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
THE REPUBLIC OF ECUADOR and PETROECUADOR,

                Plaintiffs, Counterclaim Defendants,

        -against-

CHEVRONTEXACO CORPORATION and TEXACO
PETROLEUM COMPANY,

                Defendants, Counterclaim Plaintiffs.
------------------------------------------------------------------------x

04 Civ. 8378 (LBS)
ECF CASE

## **DECLARATION OF PROFESSOR ALEJANDRO M. GARRO**

I, Alejandro M. Garro, hereby declare under the penalty of perjury:

1. At the request of counsel for the Plaintiffs, the Republic of Ecuador and Petroecuador ("Plaintiffs"), I submit my opinion in the form of this expert declaration on certain aspects of Ecuadorian law deemed relevant to decide whether or not an Ecuadorian court, applying Ecuadorian law today, would find the arbitration provisions of the 1965 Joint Operating Agreement ("1965 JOA") to be valid and enforceable. In considering my opinion, counsel for the Plaintiffs has asked me to assume, *arguendo*, that the 1965 JOA would otherwise be valid and enforceable against Petroecuador.[1]

## **STATEMENT OF QUALIFICATIONS**

2. I have been Adjunct Professor of Law at Columbia University School of Law since 1994, Lecturer in Law since 1981, and Senior Research Scholar of the Parker School of Foreign and Comparative Law of Columbia University since 1985. In those capacities, and during the last twenty-five years or so, I have been engaged in teaching and research on the legal systems of the countries of Latin America, including the legal system of the Republic of Ecuador. Much of my experience, both as an academic and a practitioner, has been in the field

---

[1] I understand that Dr. Eguiguren will testify that, for a host of reasons, an Ecuadorian court would not find the 1965 JOA to be valid or enforceable against Petroecuador as a public law contract. I will assume, *arguendo*, for purposes of rendering my opinion that the 1965 JOA is binding on Petroecuador so that I can focus exclusively on the separate issue of the enforceability of the 1965 JOA's dispute resolution provision.

of international arbitration, especially as practiced in Latin America. I have served as an arbitrator on several arbitration tribunals responsible for settling international commercial disputes, and I currently preside and sit in arbitration tribunals involving disputes between private parties as well as investment disputes involving government instrumentalities. I have appeared as an expert witness to testify as to different aspects of the Latin American legal systems, including the legal system of Ecuador, before courts of the United States and before foreign courts and arbitral tribunals.

     3.    I am admitted to practice in Buenos Aires (1975); New York (1982); and Madrid (1984). I am the author and co-author of books on comparative law and Latin American law, having written articles on different aspects of Latin American legal systems in journals published in the United States and abroad. I am the author of books and articles on various matters pertaining to the law of arbitration in South and Central America, as listed in my curriculum vitae, attached as an exhibit to this declaration in English and Spanish.

## DOCUMENTS REVIEWED

     4.    In examining the legal issues of Ecuadorian law pertaining to this opinion, I have reviewed, among others, the following case-related documents that were furnished to me by Plaintiffs' counsel:

    a. March 1, 2007 Order signed by Judge Leonard B. Sand.

    b. June 27, 2005 Order and Opinion signed by Judge Leonard B. Sand.

    c. Plaintiffs' the Republic of Ecuador and Petroecuador's Amended Complaint dated December 8, 2004.

    d. Defendants' Chevron Texaco Corporation's and Texaco Petroleum Company's Answer to Amended Complaint and Counterclaims, dated January 10, 2005.

e. Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Petition for a Permanent Stay of Arbitration Proceedings, dated January 16, 2007.

f. Plaintiffs' Local Civil Law Rule 56.1 Statement of Undisputed Facts on Motion for Summary Judgment, dated January 16, 2007.

g. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Permanent Injunction of Arbitration, dated January 30, 2007.

h. Reply Memorandum of Chevron Corporation and Texaco Petroleum Company in Support of Motions for Summary Judgment on their Counterclaims and on Claims of Republic of Ecuador and Petroecuador for Permanent Injunction of Arbitration, dated February 6, 2007.

i. Plaintiffs' Reply Memorandum of Law in Support of their Motion for Summary Judgment and Permanent Stay of Arbitration, dated February 6, 2007.

j. Affidavit of Rodrigo Jijon-Letort and Diego Perez-Ordoñez, dated January 30, 2007 (hereinafter "Jijon-Letort Aff.").

k. Foreign Law Declaration of Genaro Eguiguren and Ernesto Alban, dated December 20, 2006 (hereinafter "Eguiguren Decl.").

l. Supplemental Foreign Law Declaration of Genaro Eguiguren, Ernesto Alban and Armando Bermeo Castillo, dated February 6, 2007.

## SUMMARY OF MY CONCLUSIONS

5. It is my conclusion that an Ecuadorian court today, applying Ecuadorian law, would refuse to enforce the arbitration clause of the 1965 JOA providing for arbitration in New York (the "New York arbitration provision") against the State of Ecuador or any of its instrumentalities, including Petroecuador.

**OPINION**

**Impact of the "Calvo Doctrine" on Ecuador's traditional approach
towards arbitration in the settlement of foreign investment disputes**

6.      During the late 1800's and early 1900's, Latin American legal systems embraced what came to be known as the "Calvo Doctrine." This doctrine emerged during the late 1800's out of numerous clashes between heavily indebted Latin American countries and Western European powers. Two of the basic tenets of the Calvo Doctrine were that disputes between foreign investors and the host state or instrumentalities of the host state were required to be settled (a) by the courts of the host country applying (b) the law of the host country.  The Calvo Doctrine is part of a Latin American legal culture according to which national sovereignty is traditionally identified with the exclusive jurisdiction of the courts of the host country to settle disputes arising between the host country or its instrumentalities and foreign investors .

7.      This doctrine has been embodied in the constitutions of some Latin American countries in the form of the so-called "Calvo Clause," which was made mandatory as a matter of law for inclusion in all foreign investment contracts. Some Latin American constitutions provided that contracts entered into between foreign investors and the host state or its instrumentalities within the territorial boundaries of the host country were to be "deemed," as a matter of law, to incorporate a Calvo Clause. Under this constitutional provision, the foreign investor was deemed to waive its right to claim diplomatic immunity, and had to submit to the jurisdiction of the local courts and to the application of local law. Any contractual provision inconsistent with this constitutional mandate was deemed null and void.

8.      The Calvo Doctrine underlies much of the traditional hostility in Latin America towards the enforceability of arbitration and choice-of-forum clauses allowing disputes involving a host country state entity to be decided in a country other than the host country or under a foreign law. This traditional hostility has been reflected in constitutional and statutory provisions restricting the parties' autonomy to choose the forum for the settlement of potential disputes and the substantive law applicable to those disputes. In some

Latin American countries (*e.g.*, Brazil and Uruguay), this limitation on freedom of contract still applies to all disputes, even those entirely among or between private parties. But in most of the Latin American jurisdictions retaining traces of the Calvo Doctrine (*e.g.*, Colombia, Ecuador, and Venezuela), the constitutional prohibition against agreeing to settle disputes in a foreign jurisdiction or under foreign law applies only to disputes in locally executed contracts between foreign nationals and agencies or instrumentalities of the host state, that is, legal entities of public law ("public entities").

9.   The impact of the Calvo Doctrine faded during the late 1970's and early 1980's, as many Latin American countries sought to open up their economies and attract foreign investments. In some Latin American countries, especially those in which the Calvo Doctrine had acquired constitutional stature, the Calvo Clause was not incorporated into new constitutions or was removed from existing ones by constitutional amendment. In other Latin American jurisdictions, the scope of application of the Calvo Clause was limited to the foreign investor's waiver, by operation of law, of any claim for diplomatic protection. Other countries in Latin America have been more reluctant to give up the Calvo Doctrine, yet even in those jurisdictions the prohibition against submitting foreign investment disputes to foreign courts or arbitral tribunals has been limited to contractual disputes involving public entities, and even then only in those cases where the contract had been executed within the host country. This is the case of Ecuador.

### Gradual acceptance in Ecuador of arbitration as a method of resolution of private disputes, but consistent rejection of foreign arbitration to settle disputes involving public entities

10.   Despite this traditional hostility towards arbitration as a method to settle disputes in which the government or public entites are involved, Latin American countries began to encourage arbitration to settle domestic disputes among purely private parties ("private arbitration" or *arbitraje privado*), even though, in comparison with some industrialized countries such as the United States, arbitration in Latin America is yet to be accepted as a common method of settling even private party disputes.

11.     Further efforts to open up the Latin American economies and embrace free trade during the late 1980's and early 1990's have generally been accompanied by the adoption of modern arbitration statutes and the removal of legal obstacles to arbitration proceedings. This welcoming normative approach to arbitration has been coupled with the distinctive trend on the part of Latin American countries to join the two most important multilateral treaties regulating international commercial arbitration, that is, the United Nations (New York) Convention of 1958 and the Inter-American (Panama) Convention of 1975. However, increasing acceptance of private party arbitration has not always been accompanied by a similar liberal approach to accept foreign arbitration to settle disputes involving public entities. This is true with respect to the Republic of Ecuador where, as discussed below, the constitutional prohibition against submitting disputes pertaining to public law to arbitration abroad has been consistently maintained to this day.

12.     Ecuadorian law has provided for arbitration of private domestic disputes in its Code of Civil Procedure. Indeed, as early as 1962, uniquely early among other countries of the region, Ecuador adopted a special framework for international commercial arbitration of private party disputes. Soon thereafter, Ecuador joined the New York Convention (ratified by Ecuador in 1962) and the Panama Convention (ratified by Ecuador in 1978).

13.     However, and central to this Court's March 1, 2007 request for "further input" from the parties on this particular issue, the Ecuadorian legal system, as a matter of constitutional law, has to this very day consistently prohibited public entities from submitting to the jurisdiction of foreign arbitral tribunals whenever the contract under which the dispute arises was executed within the Republic of Ecuador.

**The past and current Ecuadorian constitutional and statutory framework governing the arbitrability of "public disputes"**

14.     Article 153 of the Constitution of Ecuador of 1929 incorporated the Calvo Doctrine for the first time, prescribing, in addition to the implied waiver by the foreign investor of any claim of diplomatic protection, that in every contract involving the government and a foreign national "*the parties cannot stipulate, in any case, to the submission to a foreign jurisdiction*" ("no se podrá estipular, en ningún caso, la sujeción a

una jurisdicción extraña"). Under Ecuadorian law, any stipulation contrary to this provision is null and void. Subsequent constitutions or subsequent codifications of constitutional amendments kept the same text, although narrowing the scope of the prohibition to disputes arising out of contracts concluded in Ecuador. (*See* Article 16 of the 1979 Constitution, as adopted in subsequent enactments adopted in 1984, 1993, 1996, and 1997).

15. A 1996 constitutional amendment to Article 16, which is still in force under the current text of the Ecuadorian constitution adopted in 1998, added language permitting submission to foreign arbitration by the government or a public entity where international treaties so provide ("salvo el caso de convenios internacionales"). This is a narrow exception meant to allow the State of Ecuador or Ecuadorian public entities to submit to arbitration outside of Ecuador only in cases where the Republic of Ecuador has concluded an international treaty specifically providing for foreign arbitration of public disputes, and where the public dispute involves the subject matter of that treaty.

16. The prohibition against an Ecuadorian public entity submitting to a "foreign jurisdiction" encompasses not only foreign judicial tribunals, but also foreign arbitral tribunals. This clearly emerges, not only by the weight of scholarly opinions in Ecuador, but also from the reservation entered by the Republic of Ecuador at the time of joining the Panama Convention. Ecuador's ratification of this treaty was subject to the reservation that "Ecuadorian law entities may not be subjected to a 'foreign jurisdiction'" (Supreme Decree 3019/1978), thus ensuring that the adoption of the Panama Convention was consistent with the constitutional prohibition against settling public entity disputes outside of Ecuador whenever the contract giving rise to the dispute had been concluded in Ecuador. If an arbitration tribunal sitting outside Ecuador were not considered to be a "foreign jurisdiction," there would have been no need for such a reservation when Ecuador adopted the Panama Convention. Accordingly, the Ecuadorian constitutional framework, plus the specific reservation entered by Ecuador to the Panama Convention, leads to the Ecuadorian courts' refusal to recognize and enforce any foreign arbitral award based on an arbitration agreement that is null and void on this ground.

17. This crucial distinction between "private disputes," which under Ecuadorian law can be freely submitted to foreign arbitration, and "public disputes," which cannot be so submitted, is not a peculiarity of Ecuadorian law. This dichotomy is a distinctive feature of the civil law tradition, which draws distinctions between public and private law, public and private contracts, and public and private disputes. This divide between a "public" and "private" sphere of legal relationships has significant jurisdictional, procedural, and substantive consequences. Failure to grasp the distinction between "public" and "private" law, which is not nearly so fundamental a distinction in common-law jurisdictions, invites misunderstandings of the Ecuadorian legal system and its approach to the enforceability of arbitration clauses in public disputes.

18. Plaintiffs' counsel has requested my opinion regarding a case decided in 1995 by the Constitutional Chamber of Ecuador's Supreme Court, in which the Supreme Court upheld the validity of an arbitration clause concluded between two public entities -- the Republic itself and EMELEC, a public utility company. I have read the EMELEC decision, and I submit that it has no bearing on whether or not Ecuadorian law would enforce the New York arbitration provision of the 1965 JOA against Petroecuador. This is so for two reasons. <u>First</u>, what was at stake in EMELEC was whether a special type of arbitration, known as "expert arbitration," involving only the determination of factual issues, was valid and enforceable. This method of settling disputes is to be distinguished from the regular arbitration proceedings, where the arbitrators are also charged with determining and applying the governing law (*de jure* arbitration) or equitable principles (arbitration *ex aequo et bono* or *amigable composición*). <u>Second</u>, the "expert arbitration" was to take place entirely within Ecuador exclusively between Ecuadorian entities. There was no "foreign" element involved, and the rules governing the proceeding to settle the "accounting dispute" (*desacuerdo contable*) at stake in the EMELEC case were entirely Ecuadorian.

**The Law of Hydrocarbons affirmatively requires that
all disputes involving Ecuadorian oil exploration and
<u>production be submitted to Ecuadorian tribunals for resolution</u>**

19.  I have discussed how a portion of the Calvo Doctrine still holds sway in Ecuador under its past and current constitutions, at least insofar as public entities enter into contracts with foreign companies within Ecuador.  The "Calvo Clause" is expressed as a negative --  a prohibition against an Ecuadorian public entity submitting to a "foreign jurisdiction" or its laws. But Ecuadorian law, at least in the mining and energy sector, also contains an affirmative obligation for submission of disputes to domestic jurisdiction -- "the courts of Ecuador." (*See* the successive yet substantially consistent formulations of this rule in the Ecuadorian Law of Hydrocarbons of 1971, Art. 24; Law of Hydrocarbons of 1974, Art. 26; Law of Hydrocarbons of 1978, Art. 10).  This affirmative obligation applies to all parties, public or private entities, where their contractual dispute covers a contract which is subject to the Law of Hydrocarbons.

20. Accordingly, it is my opinion that an Ecuadorian court, even in the absence of Ecuador's constitutional remnants of the Calvo Doctrine, would refuse to enforce the New York arbitration provision against the State of Ecuador or any of its instrumentalities, including Petroecuador, on the separate and alternative ground that such a provision is null and void under the Ecuadorian Law of Hydrocarbons.

I declare under the penalty of perjury and under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing is true and correct.   This Declaration was executed by me at Buenos Aires, on this 7th day of May of 2007.

_____
Prof. Alejandro M. Garro

20. Accordingly, it is my opinion that an Ecuadorian court, even in the absence of Ecuador's constitutional remnants of the Calvo Doctrine, and on the basis of the Law of Hydrocarbons alone, would refuse to enforce the New York arbitration provision against the State of Ecuador or any of its instrumentalities, including Petroecuador, on the separate and alternative ground that such a provision is null and void under the Ecuadorian Law of Hydrocarbons.

I declare under the penalty of perjury and under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing is true and correct. This Declaration was executed by me at Buenos Aires, on this 7th day of May of 2007.

_____
Prof. Alejandro M. Garro