UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
THE REPUBLIC OF ECUADOR and              :
PETROECUADOR,                            :
                                         :
            Plaintiffs, Counterclaim Defendants, :          **OPINION**
                                         :          04 Civ. 8378 (LBS)
                                         :
            - against -                  :
                                         :
CHEVRONTEXACO CORPORATION                :
and TEXACO PETROLEUM COMPANY             :
                                         :
            Defendants, Counterclaim Plaintiffs. :
------------------------------------------------------------------x


Appearances

*Plaintiffs, Counterclaim Defendants*
Charles MacNeil Mitchell
Winston & Strawn LLP (NY)
200 Park Avenue
New York, NY 10166

Eric Weston Bloom
Sarah M. Hall
Tomas Leonard
A. Manuel Garcia
Nicole Y. Silver
Winston & Strawn LLP (DC)
1700 K Street, Nw
Washington, DC 20006


*Defendants, Counterclaim Plaintiffs*
Thomas F. Cullen, Jr.
Gregory A. Castanias
Louis Karl Fisher
Michael L Kolis

Jones Day (DC)
51 Louisiana Avenue, NW
Washington, DC 20001

Thomas E. Lynch
Jones Day 222 East 41st Street
New York, NY 10017

Sand, J.,

Before this Court is a hearing pursuant to Rule 44.1 of the Federal Rules of Civil Procedure to determine issues of Ecuadorian law prior to ruling on plaintiffs' motion for summary judgment entering: (a) judgment on plaintiffs' claims; (b) dismissing defendants' counterclaims; (c) permanently enjoining and staying defendants from continuing any arbitration proceedings in this matter; and (d) awarding plaintiffs such other and further relief as the Court deems just, as well as defendant's motion for summary judgment dismissing plaintiff's claims for a permanent injunction of arbitration. This Rule 44.1 hearing was ordered by the Court to determine whether an Ecuadorian court presented with the 1965 Joint Operating Agreement ("JOA") between Gulf Oil Company ("Gulf") and the defendants' predecessors would find, that plaintiff PetroEcuador's predecessor Compania Estatal Petrolera Ecuatoriana ("CEPE") became bound by the JOA in 1974 after taking over Gulf Oil's ownership interest.


## Fed R. Civ. P. 44.1 Power

Federal Rule of Civil Procedure 44.1 governs how foreign law is determined in federal court.  It provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.  Rule 44.1 was enacted in 1966.  Prior to its enactment foreign law was a question of fact; now it is a question of law, which means that it may be determined at the summary judgment stage of litigation.  <u>See</u> Louise Ellen Teitz, <u>The Use</u>

of Evidence in Admiralty Proceedings, 34. J. Mar. L. & Com. 97, 104 (Jan. 2003)

(discussing the Federal Rules of Civil Procedure and methods of proof of foreign law).

      Rule 44.1 places the burden on the party raising issues of foreign law to give

"notice by pleadings or other reasonable written notice."   "Since in Rule 44.1 there is no

form specified for the notice, federal courts construe the requirement liberally."  Teitz,

34. J. Mar. L. & Com. at 106.  Both parties have over the course of this litigation made

clear the need to determine what was permitted under Ecuadorian law in 1974 before the

Court endeavored to undertake any analysis whether PetroEcuador could be bound to the

JOA under the United States federal laws of estoppel.  See The Republic of Ecuador v.

ChevronTexaco Corp., 376 F. Supp. 2d 334 (S.D.N.Y. 2005) (hereinafter ROE I); The

Republic of Ecuador v. ChevronTexaco Corp., 426 F. Supp. 2d 159 (S.D.N.Y. 2006)

(hereinafter ROE II).

      The advisory committee notes on Rule 44.1 suggest that courts are allowed great

leeway in making a foreign law determination and provide that traditional evidentiary

standards need not apply.  Fed. R. Civ. P. 44.1, advisory notes ("The new rule permits

consideration by the court of any relevant material, including testimony, without regard

to its admissibility under Rule 43.").  To this end, the Court undertook to determine

pertinent Ecuadorian law at a foreign law hearing, which commenced on May 21, 2007

and concluded on May 24, 2007.  The Court permitted each party ample time to brief the

issues and allowed each party to present voluminous expert testimony on the topic and to

cross examine the opposing party's experts.

Both the Court's determination of Ecuadorian law and its partial ruling on the motion for summary judgment are set forth below; a portion of the summary judgment determination is set aside for the parties to reevaluate their posture.

**Factual Background**

This Court and other courts in the Second Circuit have, at multiple times and in various incarnations over the past 14 years, dealt with the underlying facts of this case. They are set forth in greater detail in other opinions rendered by this Court, see ROE I; ROE II, as well as by other courts in the Second Circuit when faced with a suit by a group of indigenous people in the Republic of Ecuador against the defendants in this case.  See Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002); Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998)).  A brief background of the case follows, as well as the facts pertinent to the issue presented here.

In 1965 the government of Ecuador granted an oil concession (the "Napo concession") to Gulf and the Texaco Petroleum Company ("TexPet").  Pursuant to the Napo concession Gulf and TexPet signed a Joint Operating Agreement (JOA) in 1965 for the drilling of the concession.  Both Gulf and TexPet were American companies domiciled in Ecuador, and represented by local Ecuadorian counsel; however, the JOA was signed in Florida.  The JOA provided for arbitration to be conducted pursuant to AAA rules in New York, and is the basis of Chevron's alleged right to engage plaintiffs in arbitration of the 1995 settlement agreement provisions.

In 1972 Ecuador's military assumed control of the government.  In an effort to nationalize the state's oil industry, the government issued Supreme Decree No. 430

"which, *inter alia,* required TexPet and Gulf to agree to new oil concession contracts with the Republic and to relinquish a substantial percentage of Napo concession lands." ROE I, 376 F. Supp. 2d at 339 (internal citations omitted). In 1974, 25% of Gulf's interest in the drilling of Ecuadorian oil was taken over by CEPE pursuant to a government edict following Supreme Decree No. 430, referred to by the parties as the "1974 Acta." "The 1974 Acta did not itself contain a clause providing for arbitration; it did, however, contain a clause stating that 'the totality of the activities that will develop in the Joint Operation will be regulated by an operating agreement entered into by the parties,' the effect of which the parties dispute."[1] ROE I, 376 F. Supp. 2d at 340. The parties agree that neither CEPE nor PetroEcuador ever signed the 1965 JOA at this point, or at any other point going forward.[2] Therefore PetroEcuador can only be held to the terms of the JOA through the operation of law.

For the next three years the parties drilled the fields, but by 1976 Gulf decided to sell its interest in the newest concession to CEPE. CEPE bought out the remainder of Gulf's interest on May 27, 1977. There was no mention of the JOA in CEPE's agreement to take over Gulf's interest. (See Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10.)

From 1977 through 1991, when a new JOA was agreed upon, Texaco and PetroEcuador operated the oil fields in conjunction with each other, with Texaco serving

---

[1] PetroEcuador contends that the 1974 Acta specifically contemplated execution of a JOA at a later date because it provided that all the activities to be performed "shall be ruled by an Operation Agreement to be subscribed to by the parties." (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. at 6.)

[2] PetroEcuador alleges that the JOA was completely abolished as the result of a 1973 contract (which replaced the Napo concession) because it was ancillary to the Napo concession and was thus abolished alongside it. ROE I, 376 F. Supp. 2d at 340; Pl.'s Mot. for Summ. J. at 41. The Court does not rest its decision on this ground and will not address how an Ecuadorian Court would rule on this ancillary contract claim.

as the operator.[3]  The parties attempted, but ultimately were unable until 1991, to agree upon a new JOA at various points during this interim operating period.  At the start of negotiations for a new JOA in 1974, Chevron included provisions requiring arbitration, which were removed at the behest of PetroEcuador.  (Id. at 7.)  Multiple drafts of new JOA's were exchanged by the parties over the 17 year interim period.  (Id.)  The question before the Court is whether an Ecuadorian Court would find that CEPE had assumed Gulf's rights and obligations under the JOA in 1974 so that arbitration before the American Arbitration Association ("AAA") in New York sought in 2004 would be mandated.

The present dispute finds its origin in a 1993 lawsuit instituted in the Southern District of New York by a group of indigenous people in Ecuador who sued defendants ChevronTexaco and Texaco Petroleum Company (referred to herein as "Chevron," except where noted) to compel the cleanup of their community's environmental resources which they allege were damaged by waste remaining after years of oil drilling on the land.  After years of litigation in the American federal courts, the case was dismissed at Chevron's request on the grounds of forum non conveniens by the Second Circuit, with the caveat that Chevron consent to jurisdiction for a renewed suit in Ecuador.  Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002).  The first attempt by indigenous Ecuadorian

_____

[3] Inexplicably, over the entire course of this three year litigation neither party has alleged that the 1991 JOA, which has no arbitration clause in it, supersedes the 1965 JOA or in any way governs this dispute. The Court asked the parties whether they intended to make any arguments along these grounds:

> THE COURT:     And is there an argument being made that whatever existed prior to that time [pre-1991] the 1991 JOA now controls?
> MR. CULLEN [Chevron's attorney]:          No, your Honor.  There is a specific provision in the 1991 JOA that it shall control as of this date forward, as of the date of its execution for the operation.
> MR. MITCHELL [Ecuador's attorney]:          Actually, your Honor, we had not considered that point.  That is one of the – every time you turn around and look in this case another issue pops out, and frankly that is one that I had not thought about.  Maybe I should have, but I haven't.

(Foreign Law Hr'g Tr. at 473, May 24, 2007.)  Therefore the Court will treat any argument along these lines to have been waived.

plaintiffs to sue Chevron is referred to by the parties as the "Aguinda" litigation cases.[4] In 2003 the indigenous Ecuadorian plaintiffs renewed the Aguinda litigation seeking the same relief as that sought earlier, however this time from the courts of Ecuador.  This renewed action is referred to by the parties as the "Lago Agrio" action.

While the Aguinda litigation was ongoing in this district the current plaintiffs and defendants signed a settlement in 1995 ("1995 Settlement") wherein TexPet agreed to perform certain environmental cleanup in exchange for a release of claims by Ecuador and PetroEcuador; in 1998 the 1995 Settlement was declared to be fully performed and concluded and the Government and PetroEcuador released Chevron and any related companies from "from any liability and claims by the Government of the Republic of Ecuador, PetroEcuador and its Affiliates, for items related to the obligations assumed by TEXPET in" the 1995 Settlement. See ROE I, 376 F. Supp. 2d at 341-42 (internal citations omitted).[5]

**Procedural History before this Court**

The essence of the case at hand comes down to who will pay for the costs of any environmental cleanup which may be ordered by an Ecuadorian court at the behest of the Lago Agrio plaintiffs: defendants or Ecuador and its state-owned oil company PetroEcuador.

---

[4] The procedural history of the Aguinda litigation is detailed in Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002), and Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998).  In Aguinda the Second Circuit found that the courts of Ecuador were perfectly capable of handling a tort claim. Id. at 477.  This Court notes that the parties have assumed the other's respective position on forum for this litigation.  In the Lago Agrio line of cases, Chevron preferred to have the courts of Ecuador hear the case instead of the courts of the United States and the Ecuadorian party wanted to keep the case in the United States.  The extent to which the reversal of positions results from changes in the Ecuadorian government is not disclosed.
[5] The parties referred to TexPet alternately as Texaco both in their papers and at the hearing.

On June 11, 2004, to determine who would bear the burden for the cleanup sought in the Lago Agrio litigation, Chevron instituted arbitration proceedings with the AAA seeking indemnification of any adverse judgments and associated costs of litigating the Lago Agrio case, as well as contractual damages for violating the terms of the 1965 JOA.

On October 15, 2004 plaintiffs commenced suit in New York Supreme Court seeking to stay permanently the arbitration proceeding before the AAA; on October 22, 2004 defendants removed the case to the Southern District of New York.  Chevron counterclaimed alleging a breach of contract by Ecuador for failing to indemnify it as it allegedly contracted to do pursuant to the 1995 Settlement.

In <u>ROE I</u>, this Court denied Ecuador's motion for summary judgment.  Chevron claimed at the time, and continues to claim today, that PetroEcuador is estopped from denying that it is bound to the JOA because it acted in a manner consistent with the JOA in the day to day operation of the concession and received benefits from operation during the years following 1974.  The Court found that application of federal common law to the question of whether Ecuador, a nonsignatory to the original arbitration agreement was bound to arbitrate this dispute raised genuine issues of material fact as to whether Ecuador could be bound through principles of estoppel to the 1965 JOA.  The Court wrote:

> Under federal common law, the Second Circuit "has recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." <u>Thomson-CSF, S.A. v. American Arbitration Association</u>, 64 F.3d 773, 776 (2d Cir. 1995). "[A] willing signatory (such as [TexPet]) seeking to arbitrate with a non-signatory that is unwilling (such as [PetroEcuador]) must establish at least one of the five theories described in <u>Thomson-CSF</u>." <u>Merrill Lynch Inv. Managers</u>, 337 F.3d [125,] at 131 [(2d Cir 2003)].

Of the five Thomson-CSF theories, the most likely to apply in this case is estoppel. "A party is estopped from denying its obligation to arbitrate when it receives [\*\*61] a 'direct benefit' from a contract containing an arbitration clause." <u>American Bureau of Shipping v. Tencara Shipyard S.P.A.</u>, 170 F.3d 349, 353 (2d Cir. 1999) (citing <u>Thomson-CSF</u>, 64 F.3d at 778-79). Direct benefits are those "flowing directly from the agreement," while "the benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." <u>MAG Portfolio Consultant, GMBH, v. Merlin Biomed Group LLC</u>, 268 F.3d 58, 61 (2d Cir. 2001). "To prevail, then, [Defendants] must show that [PetroEcuador] 'knowingly exploited' the ... contract and thereby received a direct benefit from the contract." Id. at 62 (quoting <u>Thomson-CSF</u>, 64 F.3d at 778).

<u>ROE I</u>, 376 F. Supp. 2d at 356. The Court then examined the applicable evidence and determined that there was a genuine issue as to the material fact of whether Ecuador was in fact estopped from arguing that it could not be bound to the 1965 JOA.[6]

The Court then held a hearing to determine whether there was a conflict of law between the laws of Ecuador and New York law in relation to the 1995 settlement which was raised in defendant's counterclaim and subject to a motion to dismiss held over from <u>ROE I</u>. Finding no conflict and therefore applying New York law to the breach of contract claim, the Court stated "that any assessment of the intent of the parties in agreeing to the 1995 and 1998 releases must take into consideration the Ecuadorian law at the time of the releases and the Ecuadorian context in which the parties were acting." <u>ROE II</u>, 426 F. Supp. 2d at 164.

---

[6] Both parties have expanded the issues beyond binding arbitration through estoppel and now also make conflicting arguments as to whether or not PetroEcuador can be bound through assignment of the 1965 JOA. This has raised more issues of Ecuadorian law as well.

**The Current Dispute**

Plaintiffs now claim that Ecuadorian law precludes any reasonable belief by Chevron that CEPE agreed to the JOA; this contention, if true, would in effect end the question of arbitrability in this case and make any analysis of the facts of this case under the federal laws of estoppel not needed.  Ecuador and PetroEcuador allege that the terms of the 1965 JOA cannot bind them to arbitration in New York because they were not signatories to the original contract and could not become a party to it, under (1) Ecuadorian government contract law, (2) the Ecuadorian constitution then in effect, or (3) can by their course of conduct be found to have assumed the terms of the JOA.  Chevron disagrees as to the result under Ecuadorian law in all three areas.

While the Court previously stated that federal principles of the American law of estoppel would apply, it is impossible to properly analyze an estoppel claim in American law without reference to the underlying Ecuadorian law because estoppel, particularly when sought against a governmental entity or the government itself, can only lie where there is reasonable reliance.

**Federal Law of Estoppel against the Government**

As we have noted after a study of Second Circuit law, the federal common law of arbitration agreements would apply to this case.  ROE I, 376 F. Supp. 2d at 353-56.

Neither party attempts to argue that PetroEcuador is bound (or not bound) to arbitrate by incorporation by reference, agency, or veil-piercing/alter ego.  Instead, the parties concentrate their arguments on assumption by assignment and assumption by estoppel, meshing categories 2 and 5 of the Thomson-CSF analysis.  Generally, a party

9

may be bound to an arbitration clause only through "ordinary principles of contract and agency" Thomson-CSF, 64 F.3d at 775.  However, the laws differ when the party estopped is a government entity, as is the case with PetroEcuador.

Neither party cites any cases where estoppel is applied against a foreign government by an American court.

In Office of Pers. Mgmt. v. Richmond, 496 U.S. 414 (1990) the Supreme Court maintained its longstanding policy of not allowing estoppel claims to proceed against the American government in instances where the government's agent did not have authority. The Court held "payments of money from the Federal Treasury are limited to those authorized by statute" and therefore erroneous oral and written advice from an agent of the government would not suffice for an estoppel claim.  Id. at 415.  Though the Court has not laid down a blanket rule precluding every estoppel claim, it has reversed every finding by a lower court of estoppel against the government.  Id. at 422.

The Court refuses to tamper where Congress has not authorized expenditures in public contracts: "'not even the temptations of a hard case' will provide a basis for ordering recovery contrary to the terms of the regulation, for to do so would disregard 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'"  Id. at 420 (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385-86 (1947).).

The Court did not find persuasive arguments as to the faith the public would place in officials if their word was not binding:

> To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most

> claims were rejected in the end, the burden of defending such estoppel
> claims would itself be substantial.
> Also questionable is the suggestion that if the Government is not bound by
> its agents' statements, then citizens will not trust them, and will instead
> seek private advice from lawyers, accountants, and others, creating
> wasteful expenses. Although mistakes occur, we may assume with
> confidence that Government agents attempt conscientious performance of
> their duties, and in most cases provide free and valuable information to
> those who seek advice about Government programs.

Id. at 433.

The Court has left open the possibility "in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government." Id. at 421 (citing INS v. Hibi, 414 U.S. 5, 8 (1973) (per curiam).  After reviewing a series of cases (primarily against the IRS) from various circuits (but not the Supreme Court) the Third Circuit articulated a test for determining whether there was the additional affirmative misconduct needed to find estoppel against the government:

> Although the Supreme Court has neither rejected outright nor articulated a
> specific test for estoppel claims against the government, the foregoing
> case law illuminates certain factors beyond the traditional elements of
> estoppel that we should consider before estopping the IRS. Those factors
> are: 1) the impact of the estoppel on the public fisc; 2) whether the
> government agent or agents who made the misrepresentation or error were
> authorized to act as they did; 3) whether the governmental misconduct
> involved a question of law or fact; 4) whether the government benefitted
> from its misrepresentation; and 5) **the existence of irreversible
> detrimental reliance by the party claiming estoppel**.

Fredericks v. Commissioner, 126 F.3d 433, 448-49 (3d Cir. 1997) (emphasis added).  It is basic horn book law that for a claim of detrimental reliance to succeed, any reliance leading to the detriment must be reasonable.  (Restatement 2d of Contracts, § 90)

Before an American court could hold that plaintiffs are estopped from denying that they are bound to the 1965 JOA it would have to find any reliance by defendants on the laws of Ecuador (by whose operation it seeks to bind a nonsignatory to a contract)

was reasonable.  Where the law is unsettled or unclear, an American court must determine how a court in Ecuador would rule on the law upon which the defendant seeks to rely.  Therefore, if the laws of Ecuador either precluded contracting with the state without certain formalities, did not recognize estoppel or arbitration, or in any way made it unreasonable for Chevron to assume the existence of the JOA, then there is no way for Chevron to estop CEPE from denying an obligation to arbitrate.  In the event that the JOA is not binding on PetroEcuador summary judgment would be appropriate, as defendants could prove no genuine issue as to any material fact regarding an agreement to arbitrate in New York.

Today the Court holds that an Ecuadorian court looking at the arbitration provision in the 1965 JOA would find it not binding upon PetroEcuador for the reasons set forth below.

**Ecuadorian Law Relied Upon by the Parties**

The parties agree that CEPE did not sign the 1965 JOA, a contract executed in Florida between two American corporations, either in 1965 or 1974 when the Acta was executed.

Chevron's complex argument for why the JOA's provisions apply to PetroEcuador draws on diverse areas of both Ecuadorian and international law.  The argument can be broken down into three parts: (1) any requirement that government contracting procedure needed to be followed is inapplicable in contracts assumed by the state or its agencies; (2) the Ecuadorian constitution in 1974 allowed for the state or its agencies to agree to engage in arbitration outside the confines of Ecuador; and (3) that

CEPE and PetroEcuador's course of conduct along with the universal requirements of good faith and the "actos proprios" doctrine (defined <u>infra</u> p. 21) binds PetroEcuador to the JOA.[7]

The Court finds the state of Ecuadorian law to have been too unsettled in 1974 for the above propositions to support Chevron's position.  Further, even if the Court held that an Ecuadorian court would find Chevron's interpretation of the laws of Ecuador correct, Chevron has proffered no evidence which shows that it actually believed the JOA bound CEPE at relevant times.  Indeed, evidence to the contrary has been presented.  Chevron's own expert states that this is fatal to any reasonable expectation claim (to the extent it exists) under Ecuadorian law.  This is to say, that even in Chevron's best case scenario, it still cannot show that under Ecuadorian law CEPE or PetroEcuador would have the JOA enforced against it because there would be a lack of any reasonable expectation by Chevron that the JOA had continuing validity.  Below the Court sets forth the arguments by the parties as to each issue in Chevron's analytical framework.

**<u>Government Contracting Procedure in Ecuador</u>**

The parties agree that Ecuadorian law mandates extensive formalities be followed before any government contract will be enforceable.  There is no dispute that PetroEcuador and its predecessor CEPE are or were public entities.  The parties disagree as to whether the formalities needed to be followed here, where CEPE bought out a

---

[7] Naturally, PetroEcuador and Ecuador disagree with all three of these points.  They allege that: (1) any agreement with CEPE, like the JOA, would be a public contract (except in very limited circumstances), which means that a series of formalities mandated by Ecuadorian law must be followed, none of which were followed here; (2) arbitration in New York subjects Ecuador to foreign jurisdiction which was forbidden at the time by the Ecuadorian constitution; and (3) the actos proprios doctrine and the universal maxims proffered by Chevron have no bearing on the current dispute given Ecuador's own local law.

signatory to a contract between two non-governmental entities.  The question for the Court is would an Ecuadorian court require the parties to have complied with government contracting formalities for the JOA to bind PetroEcuador.

The parties agree that none of the formalities required in certain government contracts were followed.  This would prove fatal to any claim as to the binding nature of the JOA only if the formalities were meant to be followed for a contract like the JOA. The extensive formalities for entry into a government contract for the drilling of oil included the following requirements: (1) the contract must be express; (2) in writing; (3) executed by the board and General Manager of CEPE after first securing a favorable report from the Attorney General, the Comptroller General, the National Security Council, the Joint Command of the Armed Forces; (4) consideration and approval from the President of Ecuador along with the Presidential authorization; (5) submission of all parties to the jurisdiction of Ecuadorian courts; (6) express waiver of any diplomatic protection by a foreign private party; (7) execution of a notarized contract; and (8) recordation of the contract with the hydrocarbons registry.  (See Pl.'s  Mem. of Law in Supp. of Mot. for Summ. J. at 31-32.)

PetroEcuador alleges that the formalities had to be followed or else any alleged contract is an absolute nullity because CEPE was a public entity entering into a contract for oil drilling (See Eguigueren/Albán Decl. ¶ 59.).  Chevron disagrees on two grounds: (1) that the contract, if the formalities had to be followed, was later ratified under the civil law by PetroEcuador's course of conduct and (2) that the formalities did not need to be followed because this was not the type of contract contemplated by the code to require the relevant formalities.

Chevron presented the testimony of two Ecuadorian law experts regarding the formalities, Professor Luis Parraguez and Dr. Jorge Zavala. Professor Parraguez presented himself as an expert in Ecuadorian civil law of contracts. However, Professor Parraguez explicitly stated that he is not an expert in government contract law. (Foreign Law Hr'g Tr. at 217-18, May 22, 2007.) While it may be a truism that Professor Parraguez's testimony regarding the ratification of a null contract would only become relevant if the contract to be ratified was indeed null, the only way for the JOA to be null as a contract would be for it to be lacking in formalities,[8] which would place it under the purview of a government contract, an area where Professor Parraguez disclaims expertise.[9] Therefore for Chevron to carry the day here it must be that formalities are required for some contracts entered into by CEPE, a public entity, but that the provisions of this particular contract are ones that would not need to pass the above quoted approval.

To that end Chevron called Dr. Zavala, an expert in Ecuadorian law and a former Ecuadorian judge and professor. Dr. Zavala contends that CEPE is allowed to engage in both private and public contracting; the way to distinguish in which realm CEPE, or any other state agency is acting, is to look at the statute creating the agency, which gives it its purpose. (See Foreign Law Hr'g Tr. 284, May 23, 2007.) "[T]here is only an administrative function or purpose when administrative power is being exercised or authority is being exercised." (Id. at 285-86.) Dr. Zavala was then asked what power CEPE was using in 1974:

---

[8] The contract could also be unconstitutional; the unconstitutional grounds for the contract are discussed, infra p. 18, with regards to whether the constitution in place in 1974 would have permitted CEPE to submit itself to foreign arbitration. As will be seen below, the relevance of the constitution only arises if CEPE is a state entity, which means that government contract formalities would once again be implicated.
[9] Any possible ratification of the JOA through PetroEcuador's course of conduct is addressed in the analysis of the actos proprios doctrine, infra p. 21. Further, if the JOA was a contract purely between two private parties, then the actos proprios doctrine would apply as well.

> A:       … CEPE being an entity of public law when in 1978 – '74 it entered into the agreement, it had a public purpose, which was the exploration, production, transportation, marketing, storage of petroleum and gas, hydrocarbons.
>
> And in regards to those activities, CEPE was and has always been regulated or governed by public law.  And I ratify what Dr. Eguigueren [PetroEcuador's expert] said that CEPE had two positions.
>
> On the one hand, in granting a concession on behalf of the state, and then another position which it adopted as a concessionaire, and CEPE decides to become part of the consortium as a result, when it joins the JOA, the concession agreement, it adopts the purposes of the JOA, which was to coordinate, to organize, and administer the activities of the concessionaires.  That purpose, the purpose of the JOA, is not the specific purpose of CEPE or object of CEPE…
>
> So my position is, my view is, that within the concession, it had public power, a public purpose, and a public object.  But in the JOA, when it operated with Texaco and Gulf and then thereafter just with Texaco, this was an activity without public authority, that is, a private activity, and in private activities such as submitting to the administrative rules and that activity of the JOA has an indirect activity – has an indirect relationship to the purposes of the concession itself; that is to say, it's an instrument.

(Id. at 286-87.)  Dr. Zavala goes on to state that it is not the identity of the contracting party, but the purpose of the contract, which governs what area of the law the contract falls into.  For example "a private person does not become a public authority because he obtains authorization from the state.  What matters is that a private person, [i.e.] Jorge Zavala, is exercising authority for a public purpose, and therefore is under public law." (Id. at 289.)  This point is well taken.  But when applied to this case, the law as interpreted by Dr. Zavala becomes illogical.  The purpose CEPE had was for the "exploration, production, storage, and transportation of petroleum" (Id. at 389.) which was covered by the 1973 concession, therefore Dr. Zavalla believes the JOA was a contract not within CEPE's purpose and was "made to be able to administer or organize that purpose, that object… between those parties [CEPE and Texaco]." (Id. at 390.) According to Dr. Zavala, CEPE was created to exploit oil fields, but any contract it

signed to meet its purpose is purely incidental and hence just a matter of private contract law.

> CEPE's purpose is not to enter into partnerships. CEPE's purpose is to explore, produce, market, store, and sell hydrocarbons. That is the direct and immediate purpose. If it has to carry out other activities or enter into other contracts to achieve those purposes, it is then obvious that that [sic] for is an indirect purpose.

(Id. at 392.) A law of this sort is odd, at best. Any and all outsourcing then falls outside the purview of the extensive checks mandated by the nation's laws. Essentially, a crafty government employee could set up a corporation and, without any oversight, contract to exploit the natural resources of his country which the rest of the government was attempting to nationalize. While Dr. Eguiguren did in fact testify that CEPE was entitled to enter into private contracts without going through the formalities required in a government contract, Dr. Eguiguren limited the instances where this could occur to much more incidental decisions or contracts, such as contracts for uniforms, not contracts which enabled the governmental agency to carry out precisely what it was created to do.

Finally, PetroEcuador argues that the 1991 JOA was duly recorded in the hydrocarbon registry, while the 1965 JOA was not. (See Foreign Law Hr'g Tr. 380, May 23, 2007; ex. 72 (signature page of 1991 JOA showing registration).) The Court finds this fact compelling as evidence that a JOA would need to follow the formalities required by law, and is more than just a contract between two private parties when the state becomes involved. Coupled with the odd result contemplated by Dr. Zavala's interpretation of the government contract scheme in Ecuador, the Court is strongly inclined to side with PetroEcuador here: formalities would be required in a contract like the JOA. Because the formalities were not complied with, an Ecuadorian court looking

back to 1974 would likely rule that the JOA was not binding on PetroEcuador.  Even if

formalities were not to be required in this instance by an Ecuadorian court, there is

substantial disagreement amongst the experts as to whether the JOA, even if completely

valid procedurally, would be constitutional.


**Constitutionality of the Arbitration Clause in the 1965 JOA**

After 1972's *coup d'etat* Ecuador's military government reinstituted the country's

1945 Constitution; this constitution was in effect from February 16, 1972, until August 9,

1979.  (See Eguiguren /Albán Decl. at 22; Aff. of Rodrigo Jijón-Letort and Diego Pérez-

Ordóñez at 2.)  The 1945 Constitution contained a clause which read "[s]ubmission to a

foreign jurisdiction shall be prohibited in all contracts executed in Ecuador by foreign

parties with the Government or with public law entities." (Id.)  Arbitration has long been

recognized as a means for settling disputes in Ecuador, but the question here is, assuming

the JOA was otherwise valid and bound CEPE, would a court in Ecuador find that the

prohibition of submission to a foreign jurisdiction include the public entity CEPE

agreeing to arbitrate in New York pursuant to the rules of the AAA and governed by New

York law?  PetroEcuador alleges that submitting to any arbitration outside the physical

borders of Ecuador would have been unconstitutional at the time that CEPE is alleged to

have entered into the JOA.  Chevron argues that arbitration, rather than litigation, outside

of Ecuador is not submission to foreign jurisdiction.  There are no cases directly on point

from the Ecuadorian courts; thus this issue is again one of expert debate and analysis.[10]

---

[10] The parties argue as to the relevance of several Ecuadorian cases, all of which the Court finds to be no
more than dicta.  (See Foreign Law Hr'g Tr. 112, May 21, 2007.)

Dr. Eguiguren testified that laws, when issued, must conform to the constitution; here, the applicable hydrocarbon law provided that CEPE's contracts could only be adjudicated by the courts of Ecuador.  (Eguiguren/Albán Decl. at ex. 7; <u>See</u> Foreign Law Hr'g Tr. 36, May 21, 2007.)[11]  This was because any adjudication outside of Ecuador would violate the 1945 Constitution.  Dr. Eguiguren states that "international arbitrations are not courts of the country."  (Foreign Law Hr'g Tr. 45, May 21, 2007.)  The hydrocarbons law requires the courts of Ecuador to exercise their jurisdiction.  (<u>Id.</u>)

Ecuador's 1998 constitution allows for submission to foreign jurisdiction for arbitration in the case of international agreements.  (<u>See</u> Foreign Law Hr'g Tr. 35, May 21, 2007 (testimony of Dr. Eguiguren).)  PetroEcuador argues that this means that foreign jurisdiction included arbitration in 1974, hence the need to clarify the availability of arbitration in foreign jurisdictions today.

PetroEcuador also presented the testimony of Professor Alejandro Garro who stated that the "arbitration clause, to the extent that it complies with the requirements that are outlawed by the Constitution, are not valid nor enforceable in Ecuador and no award rendered on the basis of such clause would be recognized or enforced in Ecuador." (Foreign Law Hr'g Tr. 406, May 24, 2007).  Professor Garro's reading of the 1945 Constitution and its bar on public entities entering into arbitration in foreign jurisdictions was informed by reference to the "Calvo Doctrine," a 19th century theory which posited that disputes with foreigners in Latin American countries should be decided not by guns

---

[11] The law reads:

> Foreign companies willing to execute contracts contemplated [under the Hydrocarbons Law] must establish domicilie in the country and comply with all requirements prescribed in applicable laws. These Foreign companies shall be subject to the jurisdiction of the country's courts and shall expressly waive their rights to file a claim by diplomatic channels.  Such jurisdiction and waiver shall be impliedly included in any contract entered into with the State or CEPE

(Hydrocarbons Law of 1971, Art. 24; Eguiguren/Albán Decl. at ex. 7).  By 1974 this provision of the hydrocarbons law had been moved to article 25 but contains the exact same wording.  (<u>Id.</u> at ex. 8.)

or by unsympathetic foreign courts but by submission of the foreign nationals to the courts of the Latin American country.  (See Id. at 404-06.)  Professor Garro testified that "Ecuador is definitely one of the countries more reluctant to give up this 19th century view of Calvo which forces disputes in which the state or instrumentalities intervene to be solved in local courts and/or local law."  (Id. at 405.)

Professor Garro then stated that in theory, arbitration might never come before the courts of a foreign jurisdiction.  In practice, however, arbitration falls under the jurisdiction of the courts when parties challenge arbitral jurisdiction, the freezing of accounts, or the later enforcement of an arbitration award.  (Id. at 410.)

Foreign jurisdiction in Ecuador is strictly defined by the locus of the event, according to Professor Garro.  Two Ecuadorians agreeing to conduct an arbitration in a private conference room with Ecuadorian arbitrators using Ecuadorian law, if the conference room is in Peru, would be a foreign arbitration, because it is taking place beyond the physical borders of Ecuador.  (Id. at 450.)  Arbitration conducted in Quito, Ecuador, with two New York parties using New York law and AAA rules would not be foreign jurisdiction.  (Id.)  Professor Garro disagrees with Dr. Zavala that the nationality of the arbitrators would have any effect on the foreign or domestic nature of the arbitration.  (Id. at 427; See Foreign Law Hr'g Tr. 310, May 23, 2007 (Zavala's direct testimony).)

Chevron's experts vigorously contest these points.  Dr. Zavala argues arbitration does not fall under foreign jurisdiction because it does not require submission to a foreign sovereign power.  (See Foreign Law Hr'g Tr. 298, May 23, 2007.)

> When the Constitution of the Republic of Ecuador, in the many years it has been referring to a foreign jurisdiction, has been referring to a

> principle whereby no one who is part or belongs to the part of the sphere
> of the state can be subject or under the jurisdiction of judges or courts in a
> foreign nation, and that had been the prohibition or the limitation that had
> been imposed insofar as the state is concerned.

(Id.)  Chevron's argument is not unreasonable as to the difference between arbitration and submission to a court of a foreign jurisdiction directly, particularly when viewing arbitration in an ideal setting where the courts need not interfere.  At the same time, Ecuador's later change of the Constitution to expressly allow the type of arbitration sought here, as well as the removal of arbitration clauses from JOA negotiations, cuts against Chevron's argument.  (See Pl.'s  Mem. of Law in Supp. of Mot. for Summ. J. at 7.)  The state of the law of Ecuador in 1974 on arbitral matters would be too unsettled for any reliance to be reasonably maintained.

**Actos Proprios and International Law**

The final battleground amongst the experts is Chevron's contention that although estoppel as understood by American courts does not exist in Ecuador, a close approximation can be found in the actos proprios doctrine, or in maxims of universal law.[12]

Dr. Zavala summarized the actos proprios doctrine for the court and compared it to estoppel.

> This is the same as the, as estoppel in Anglo-Saxon law, and I'm referring
> here only to estoppel by representation, with a notable difference that
> explains this issue.
> In estoppel by representation, as my U.S. colleagues know better, it's
> required that the initial behavior provoke or that in reliance on that initial

---

[12] Professor Andreas Lowenfeld testified on the potential use of maxims of universal law for gap filling by the courts.  As one can see there is disagreement amongst the experts as to how the Court should interpret the laws of Ecuador; universal maxims, though of interest, do not solve the question before the Court.

> behavior the other party engage in a behavior that is detrimental to them,
> and this is not allowed by estoppel
> In the rule of actos proprios, it isn't required that the other party change its
> course of action.  It's only necessary or required that there be an initial
> behavior by one party and not hearing whether the other party contradicts
> that behavior.

(Id. at 321-22.)  One can see how the actos proprios doctrine when paired with Chevron's interpretation of the law and facts of the instant case, would be an appealing doctrine for defendants.  Application of the actos proprios doctrine does require an analysis of reasonable expectations of the parties, however, which reliance the Court finds lacking here.

Dr. Eguiguren does not disagree with Dr. Zavala's recitation of actos proprios, but does not believe it should apply to the JOA.  (See Foreign Law Hr'g Tr. 64, May 21, 2007.)  Dr. Eguiguren states that the first time the actos proprios doctrine appears in Ecuadorian law is 1994, which would be twenty years after the time period this Court's hearing addressed.[13]  (Id.)  The Court need not resolve this conflict because it finds that there could be no reasonable reliance on the JOA even if the actos proprios doctrine was recognized in Ecuador in 1974.

**Reasonable Reliance**

On the third day of expert testimony on Ecuadorian law the parties posed a series of hypotheticals to Dr. Zavala.  Dr. Zavala was of the belief that the JOA governed the parties' course of conduct.  In response to a hypothetical Dr. Zavala stated that "if I am Texaco and Gulf and were negotiating a new proposed JOA, I asked myself, what rules are governing my relationship throughout all of this time.  And I come to the certain

---

[13] Perhaps this explains why no mention of the doctrine was made until the Court requested papers from the parties.

conclusion that it is the JOA."[14]  (Foreign Law Hr'g Tr. at 361, May 23, 2007.)   When

asked what would result if the Ecuadorian state or its representatives had informed Gulf

or TexPet that it was operating without an agreement on an ad hoc basis, Dr. Zavala

responded that it would not change his opinion that there was a legally binding JOA

because "perhaps what is missing is the legal, reliance on a written document, but not the

expectations….they would have a legitimate expectation that there was an agreement."

(Id.)  Therefore the focus of an Ecuadorian court's inquiry should not be on CEPE's

belief, but on TexPet's.

        When the hypothetical was changed to address the situation which occurred here,

where Gulf told TexPet that the parties were operating on an ad hoc basis, Dr. Zavala's

answer changed:

> Q:      If the Gulf and Texaco employees complained that operations were
> impaired because decision making was difficult because there was no
> legally binding joint operating agreement, does that change your
> conclusion?
> A:      If I have evidence that responsible officials or representatives had
> behaved in the way that you describe. . . .  Well, yes, I would lose the
> confidence that I had, the expectation that I had, if I had proof that
> responsible parties felt that way.

(Id. at 362.)  PetroEcuador has submitted evidence that this occurred, where both Texaco

and Gulf complained about the oil drilling partnership which resulted from the 1974

Acta.  (See Pl.'s  Mem. of Law in Supp. of Mot. for Summ. J. at 8.)

        In 1974, when CEPE began to take over Gulf's interest in the Napo concession,

through Gulf's final sale of its interest in 1977, Gulf expressed to the parties the view that

a new JOA should be negotiated, as it was of the belief that 1965 JOA had been cancelled

---

[14] PetroEcuador contends that the 1973 concession, the 1974 Acta, various operations manuals Texaco had
covering payroll and other day to day issues, and certain Ecuadorian hydrocarbon laws were used to govern
the oil drilling during this period.  (See Pl.'s  Mem. of Law in Supp. of Mot. for Summ. J. at 9.)

by the 1973 concession.  (Id. at 42.)  Gulf further advised the parties that it had been

operating on a de facto basis with Chevron since the 1973 concession without a

functioning JOA while it was still a member of the three party oil drilling group with

Chevron and CEPE.  (Id. at n. 29.)  Gulf and Texaco's local representatives in Ecuador

sent their offices in the United States a joint telex complaining about the ad hoc nature of

the oil drilling operation since the 1974 Acta's enactment which made negotiations

interminable.  (Id. at 8.)  TexPet's cash call letters to PetroEcuador made no reference to

the JOA, whereas its cash call letters to Gulf did make reference to the JOA; Gulf would

respond to TexPet's cash call letters by advising it that it viewed the JOA as having been

terminated.  (See Pl.'s  Mem. of Law in Supp. of Mot. for Summ. J. at 8.)  The above

facts, taken as a whole, mean that at the very least Gulf doubted the validity of the JOA

when CEPE began to replace it, and that Gulf had made Chevron aware of this.

PetroEcuador's internal memoranda viewed the JOA as referential in nature, and

expressed doubt as to whether PetroEcuador, short of signing a new JOA, could force a

change in the agreement to make itself operator.  (See Pl.'s  Mem. of Law in Supp. of

Mot. for Summ. J. at 10-11.)  However, though PetroEcuador's own internal analysis of

the JOA serves to bolster the view that the JOA would not be found binding, it is enough

under Dr. Zavala's analysis for Gulf to have had internal doubt.  He believes one should

look at behavior, not at the silence, of the potentially estopped party when making a

reasonable expectation analysis.   (See Foreign Law Hr'g Tr. at 356-57, May 23, 2007.)

Lack of reasonable expectation on the part of Chevron would eliminate the need

for any universal maxims of law or any doctrines cited to by Dr. Zavala.

> Q:     Let's assume, assume hypothetically, that it is proven to your
> satisfaction [that Gulf and/or TexPet did not believe the JOA was

> binding]. In any of the doctrines that you had in your declaration or the universal law of principles cited by Professor Lowenfeld, are there any of these maxims or doctrines that would cause you to believe that there was a binding [JOA] under those factual assumptions?
> A:      Not on the basis of the fact that you described.

(Foreign Law Hr'g Tr. at 362-63, May 23, 2007.)

The Court then summarized a series of hypothetical questions which were posed

to Dr. Zavala, and the following colloquy took place:

> THE COURT:          . . . We are talking about whether under Ecuadorian law the [C]ourt would hold the prior JOA continues as a binding contract, and you talk of, that there would have to be actual or real expectations that there was an existing JOA in force.
>       And then the questions were asked as to what circumstances would support a conclusion that there were reasonable expectations that there was an agreement. Then you were asked if Gulf and Texaco complain that the operations were difficult because there was no JOA what the consequence of that would be, and you said that you would lose confidence. I take it lose confidence that there was a reasonable expectation that there was an agreement in force if the responsible parties felt that there was no agreement in force and that that was creating problems.
>       My question is, does it make any difference whether Gulf and Texaco employees are complaining amongst themselves or whether there is communicated to CEPE the view that the absence of a JOA was creating problems?
> THE WITNESS:      I will answer it. If there is a conviction, an understanding that there is no JOA, there is no confidence that has been caused by the actions.
> THE COURT:          And this is true regardless of whether Gulf and Texaco complain to CEPE or whether this is something that they discuss among themselves?
> THE WITNESS:      It would have been the same if they would have conversed among themselves or stated that there was a lack of expectation or confidence of this JOA. It would have been the same result.

(Id. at 363-65.) Counsel for PetroEcuador expanded on Dr. Zavala's answers to the

Court's questions with the following scenario, which mimics the events that took place

from 1973 through 1977:

> Q:      Would it add or detract or not influence your opinion if I added to this assumption, these assumptions, the assumption that during this period Gulf representatives in Ecuador, in writing, had written to Texaco employees stating that there was no JOA in place, and had put that writing, put that into letters to Texaco?
> A:      Obviously the confidence would diminish.

(Foreign Law Hr'g Tr. at 365, May 23, 2007.)  Once Gulf or Texaco believed the JOA was not in force later discussions with PetroEcuador in order to sign a new JOA, or any course of conduct subsequent to the internal evaluation that the JOA would not apply, would have no effect.

> THE COURT:       Now, the additional fact is that the parties were negotiating a new JOA, which would seem to strengthen the view that there was no existing JOA.  [What result?]
> THE WITNESS:      … if one was confident that there was not a JOA in effect, and they continue negotiating for a new JOA, of course there is no confidence that there is a JOA in existence.

(Id. at 368.)  The course of conduct of the parties in their day to day operations becomes irrelevant if the party seeking to estop the government from denying the existence of a contract does not itself believe, for whatever reason, that the contract is binding on the government.  That is the case here.

Even if Chevron's analytical framework for binding CEPE were to hold (i.e. formalities were not required in this contract because it was a contract not for the express purpose for which CEPE was created, and an agreement to arbitrate in New York was constitutional), Chevron would still need the Court to find that PetroEcuador was bound to the JOA through its course of conduct via the actos proprios doctrine.  The Court cannot do that because it finds that an Ecuadorian court would find no reasonable expectation on Chevron's part that the JOA would bind CEPE in 1974 to arbitration in America sought for the first time in 2004, and therefore there can be no arbitration.

**Summary Judgment Standard**

      A court may grant summary judgment only where the moving papers and affidavits submitted by the parties show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Brown v. City of Oneonta, 106 F.3d 1125, 1130 (2d Cir. 1997).

**Conclusion**

      This Court is of the opinion that an Ecuadorian court would not find the JOA binding on CEPE in 1974.  Because an American court applying federal law would not require arbitration if under Ecuadorian law this was not an available remedy, there is no genuine issue as to the material fact of whether the JOA serves to bind PetroEcuador. The Court need not engage in a determination of whether PetroEcuador can be estopped under the American federal law of estoppel from denying that it is bound to the JOA by its course of conduct because any reliance on a course of conduct in Ecuador would be unreasonable.

      Therefore plaintiff's motion for summary judgment on defendant's counterclaims is GRANTED to the extent that it implicates arbitration in New York; the Court GRANTS plaintiff's request for a permanent injunction of the arbitration in New York; and the Court DENIES defendants' motion for summary judgment on the permanent injunction.

The Court recognizes that there remains the issue of the 1995 Settlement, which the Court did not dismiss in ROE I, after plaintiffs' stated that they would withdraw their claims if they were victorious on their initial arbitrability issue.  See ROE I, 376 F. Supp. 2d at 375.  Recognizing this, the Court will grant the parties 60 days to evaluate their posture and confer with each other, at which point they are to advise the Court in a status letter what further proceedings, if any, they intend to pursue before this Court..

SO ORDERED.

Dated:        New York, New York

              June 19, 2007

                                        U.S.D.J.

28